**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| THE AMERICAN HOSPITAL ASSOCIATION, | ) | |
| 800 Tenth Street, N.W., Suite 400 | ) | |
| Washington, D.C. 20001, | ) | |
| | ) | |
| ASSOCIATION OF AMERICAN MEDICAL | ) | |
| COLLEGES, | ) | |
| 655 K Street, N.W., Suite 100 | ) | |
| Washington, D.C. 20001, | ) | |
| | ) | |
| THE FEDERATION OF AMERICAN | ) | |
| HOSPITALS, | ) | Civil Action No. _____ |
| 750 9th Street, N.W., Suite 600 | ) | |
| Washington, D.C. 20001, | ) | |
| | ) | |
| NATIONAL ASSOCIATION OF CHILDREN'S | ) | |
| HOSPITALS, INC., | ) | |
| 600 13th Street, N.W., Suite 500 | ) | |
| Washington, D.C. 20005, | ) | |
| | ) | |
| MEMORIAL COMMUNITY | ) | |
| HOSPITAL AND HEALTH SYSTEM, | ) | |
| 810 N 22nd Street | ) | |
| Blair, Nebraska 68008, | ) | |
| | ) | |
| PROVIDENCE HEALTH SYSTEM - | ) | |
| SOUTHERN CALIFORNIA d/b/a | ) | |
| PROVIDENCE HOLY CROSS MEDICAL | ) | |
| CENTER, | ) | |
| 15031 Rinaldi St. | ) | |
| Mission Hills, CA 91345, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BOTHWELL REGIONAL HEALTH CENTER, | ) | |
| 601 East 14th Street | ) | |
| Sedalia, MO 65301, | ) | |
| | ) | |
| _Plaintiffs_, | ) | |

|                                      |     |
|--------------------------------------|-----|
|                                      | )   |
| v.                                   | )   |
|                                      | )   |
| ALEX M. AZAR II,                     | )   |
| in his official capacity as SECRETARY OF | ) |
| HEALTH AND HUMAN SERVICES,           | )   |
| 200 Independence Avenue, S.W.        | )   |
| Washington, D.C. 20201,              | )   |
|                                      | )   |
| *Defendant.*                         | )   |
|                                      | )   |

## COMPLAINT

Plaintiffs the American Hospital Association, Association of American Medical Colleges, the Federation of American Hospitals, National Association of Children's Hospitals, Inc., Memorial Community Hospital and Health System, Providence Health System - Southern California d/b/a Providence Holy Cross Medical Center, and Bothwell Regional Health Center (collectively, Plaintiffs) bring this Complaint against Defendant Alex M. Azar II, in his official capacity as Secretary of Health and Human Services (HHS), and allege as follows:

## PRELIMINARY STATEMENT

1.      This is an action to challenge a final rule issued by the Centers for Medicare & Medicaid Services (CMS), an agency within HHS, and published in the Federal Register on November 27, 2019 (the Final Rule).  *See* 84 Fed. Reg. 65,524 (Nov. 27, 2019).

2.      America's hospitals and health systems are committed to providing patients with the financial information they need to make informed decisions about their health care.  That is the out-of-pocket amounts patients will be expected to pay for that care, recognizing that each patient's circumstances will be differently affected by numerous variables in her health insurance coverage.  Even providing out-of-pocket information to patients is challenging, however; it requires a number of different stakeholders, including commercial health insurers, to work with

2

hospitals to develop turnkey technology to provide real-time accurate estimates.  And while there is no actual statutory basis for the federal government to require hospital disclosure of out-of-pocket costs, the hospital field has repeatedly urged CMS to bring together on a voluntary basis the various stakeholders needed in order to develop an effective means to provide all patients with information on out-of-pocket costs.

3.       Instead, CMS promulgated a Final Rule requiring that hospitals post on the internet a file containing five types of pricing information for every item and service they provide.  The types of information are each hospital's "gross charges," "payer-specific negotiated charges," "discounted cash price," and "de-identified" minimum and maximum negotiated charges.  The Final Rule also mandates that hospitals publicly display negotiated charges and certain other information for 300 "shoppable" services (*i.e.*, a health care service that can be scheduled by patients in advance).

4.       In plain English:  The Final Rule requires each hospital in the nation to publicize on its website a huge quantity of confidential pricing information reflecting individually negotiated contract terms with all third-party payers, including all private commercial health insurers, with which the hospital contracts.

5.       The Final Rule is unlawful, several times over.  First, it exceeds the agency's statutory authority.  CMS asserts that its authority to mandate disclosure of "payer-specific negotiated charges" is derived from a statutory provision that requires hospitals to publish their "standard charges for items and services provided by the hospital."  42 U.S.C. § 300gg-18(e).  But to state the obvious, negotiated charges are not "standard charges."  They are the opposite of standard, in fact, because they reflect the non-standard amount negotiated privately between a

hospital and commercial health insurer.  For these and other reasons explained below, CMS lacks statutory authority to implement the Final Rule.

6.      The Final Rule also runs afoul of the First Amendment, because it mandates speech in a manner that fails to directly advance a substantial government interest, let alone in a narrowly tailored way.  Again, Plaintiffs fully endorse the agency's stated goals of increasing information given to patients relating to their costs of hospital services, and putting consumers "at the center of their health care."  But the Final Rule frustrates those goals.  When a patient chooses a hospital, what she wants to know is her out-of-pocket costs, not an insurer's "negotiated charges."  The Court need not take our word for it; that is what CMS itself said during the rulemaking process.  84 Fed. Reg. 39,398, 39,574 (August 9, 2019) ("we know through our stakeholder engagement and research conducted over the past year that consumers of health care services simply want to know where they can get a needed health care service and what that service will cost them out-of-pocket").  The rates negotiated between hospitals and commercial health insurers do not reliably predict the patient's out-of-pocket costs, and there is no easy way to reverse-engineer one from the other to determine what the patient's co-payment and deductible will be or even if the service is covered at all.  The Final Rule will generate confusion about patients' financial obligations, not quell it.

7.      Nor are these disclosure requirements some minor administrative inconvenience. The negotiated charges covered by the Final Rule are confidential and proprietary to both hospitals and commercial health insurers, and their public disclosure would effectively eliminate hospitals' ability to negotiate pricing with insurers at arms' length.  Far from being narrowly tailored, the Final Rule thus imposes a significant burden on hospitals.  Hospitals and commercial health insurers keep the rates they privately negotiate confidential for good reason:

4

it would undermine competition if they were required to be disclosed publicly and blunt incentives for health insurers to participate in innovative arrangements that have the potential to lower costs and increase quality.  That is so because these alternative payment arrangements are not contemplated by the Final Rule.  In addition, the costs of implementation alone will overwhelm many hospitals, especially those already operating on low or negative margins.

8.      Finally, the Final Rule is arbitrary and capricious and lacks any rational basis. The agency's explanation for the Final Rule runs counter to both logic and evidence.  In fact, it is belied by the agency's own research regarding what patients care about most from a pricing standpoint when selecting a hospital:  their own out-of-pocket costs.  The agency's justification for the Final Rule therefore does not stand up to even the barest of scrutiny.  That is the epitome of arbitrary and capricious agency action.

9.      As the Federal Trade Commission (FTC) noted in considering a similar proposal made by Minnesota lawmakers to require health plans to disclose confidential terms and conditions of health plans' contracts with health care providers, "classifying plan provider contracts as public data would offer little benefit but could pose substantial risk of reducing competition in health care markets."   That in turn will increase costs and set back innovation for the health care system as a whole.

10.     America's hospitals and health systems remain committed to providing patients with the information they need to make informed health care decisions.  The rule CMS ultimately issued, however, does not provide the information patients need.  Mandating the public disclosure of negotiated charges would create confusion about patients' out-of-pocket costs, not prevent it.  The rule should be vacated.

11.     The Final Rule becomes effective on January 1, 2021.  But hospitals will need to start devoting substantial planning efforts and resources toward compliance with the Final Rule almost immediately.  Plaintiffs therefore intend to file an early motion for summary judgment and respectfully request a final decision on the merits as soon as practical.  Absent a prompt ruling, the hospital and health system field will need to immediately begin to expend substantial resources to prepare to come into compliance with the Final Rule, which will mean diverting significant personnel and financial resources from other pressing health care needs.  Obtaining the human expertise and sophisticated technical means to capture, display, and amalgamate such a huge quantity of information will overwhelm many smaller rural hospitals and challenge others to respond simultaneously to pressing needs, such as updated cybersecurity protections.

## PARTIES

12.     Plaintiff the American Hospital Association (AHA) is a national, not-for-profit organization incorporated in Washington, D.C.  The AHA represents and serves nearly 5,000 hospitals, healthcare systems, and networks, plus 43,000 individual members.  Its mission is to advance the health of individuals and communities by leading, representing, and serving the hospitals, systems, and other related organizations that are accountable to the community and committed to health improvement.  The AHA provides extensive education for healthcare leaders and is a source of valuable information and data on healthcare issues and trends.  It also ensures that members' perspectives and needs are heard and addressed in national health-policy development, legislative and regulatory debates, and judicial matters.  The AHA has a principal place of business located at 800 Tenth Street, N.W., Suite 400, Washington, D.C. 20001.

13.     Plaintiff Association of American Medical Colleges (AAMC) is a national, not-for-profit association incorporated in Illinois.  AAMC represents and serves all 154 accredited

U.S. medical schools, nearly 400 major teaching hospitals and health systems, and more than 80 academic societies.  Through these institutions and organizations, AAMC represents 128,000 faculty members, 83,000 medical students, and 110,000 resident physicians.  AAMC works to improve the nation's health by strengthening the quality of medical education and training, enhancing the search for biomedical knowledge, advancing health services research, and integrating education and research into the provision of effective health care.  In addition, it is one of the AAMC's core missions to advocate on behalf of its members and patients in connection with national health-policy matters.  AAMC has a principal place of business located at 655 K Street, N.W., Suite 100, Washington, D.C. 20001.

14.     Plaintiff the Federation of American Hospitals (FAH) is a national, not-for-profit trade association.  Founded in 1966, the FAH is the national representative of more than 1,000 investor-owned or managed community hospitals and health systems throughout the United States, including rural and urban teaching and non-teaching hospitals, that provide a range of acute, post-acute, and ambulatory services.  Dedicated to a market-based philosophy, the FAH provides representation and advocacy on behalf of its members to Congress, the Executive Branch, the judiciary, media, academia, accrediting organizations, and the public.  The FAH is incorporated in New York and has a principal place of business located at 750 9th Street, N.W., Suite 600, Washington, D.C. 20001.

15.     Plaintiff National Association of Children's Hospitals (NACH) is a national, not-for-profit association.  Representing more than 220 children's hospitals, NACH is the voice of children's hospitals nationally.  With its members, NACH champions policies that enable children's hospitals to better serve children, leverages its position as the pediatric leader in data analytics to facilitate national collaborative and research efforts to improve performance, and

7

spreads best practices to benefit the nation's children.  NACH is incorporated in Georgia and has a principal place of business located at 600 13th Street, N.W., Suite 500, Washington, D.C. 20005.

16.     Plaintiff Memorial Community Hospital and Health System (Memorial) is a 21-bed Critical Access Hospital in Blair, NE that was founded in 1956 and today provides primary care, specialty physician services, surgery and obstetric services in an inpatient as well as an outpatient setting.  Memorial has three associated Rural Health Clinics in Blair, Fort Calhoun, and Tekamah, Nebraska and serves a population of approximately 20,000 residents throughout its primary service area. Memorial is a 501(c)(3) not-for-profit organization. Memorial is incorporated in Nebraska and has its principal place of business at 1423 Seventh Street Aurora, Nebraska.  Memorial is a member of the American Hospital Association.

17.     Plaintiff Providence Health System - Southern California d/b/a Providence Holy Cross Medical Center (Providence) was founded in 1961 to provide healing and health care to the San Fernando, Santa Clarita and Simi Valleys in Southern California.  Providence is home to the busiest emergency department in the San Fernando Valley and is one of two 24/7 trauma centers.  The 377-bed, not-for-profit Catholic hospital offers both inpatient and outpatient health services, including programs in cancer, neurology, cardiology, orthopedics, women's services, neonatal intensive care, and more.  Providence is steadfast in serving the needs of its communities, with a special focus on those who are poor and vulnerable, providing high-quality care for everyone, regardless of coverage or ability to pay.  Providence contributes to a robust community benefit program with an emphasis on collaborative partnerships that respond to the needs of many underserved populations.  Among those served by Providence are families with low incomes including a large population covered by Medicaid, the elderly, those with mental

illness, schools in high-poverty areas, those experiencing homelessness, and immigrants. Providence is incorporated in California and has its principal place of business at 15031 Rinaldi St., Mission Hills, CA 91345.  Providence is a member of the AHA.

18.      Plaintiff Bothwell Regional Health Center (Bothwell) is a city-chartered health center that has been serving Missouri since 1930.  Bothwell provides a full range of diagnostic, medical and surgical services, including cancer care, emergency services, orthopedics, cardiovascular care, neurodiagnostics, obstetrics and gynecology, pediatrics, outpatient services, diagnostic imaging, medical equipment and community outreach and education.  Bothwell has 108 acute beds and employs more than 900 people in 12 different locations, with nearly 100 physicians providing state-of-the-art care in more than 20 specialty areas.  Bothwell is incorporated in Missouri and has its principal place of business at 601 East 14th Street, Sedalia, MO 65301.  Bothwell is a member of the AHA.

19.      Defendant Alex M. Azar II is the Secretary of HHS and is responsible for the conduct and policies of HHS, including CMS.  The Secretary maintains an office at 200 Independence Avenue, S.W., Washington, D.C. 20201, and is sued in his official capacity only.

## JURISDICTION AND VENUE

20.      Jurisdiction in this Court is grounded upon and proper under 28 U.S.C. § 1331, in that this civil action arises under the laws of the United States; 28 U.S.C. § 1346, in that this case involves claims against the federal government; 28 U.S.C. § 1361, in that this is an action to compel officers of the United States to perform their duty; and 28 U.S.C. §§ 2201–2202, in that there exists an actual justiciable controversy as to which Plaintiffs require a declaration of their rights by this Court and injunctive relief to prohibit the Defendants from violating the Constitution, laws, and regulations.

21.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (e) because this is a civil action in which the Defendant is an officer of the United States acting in his official capacity and maintains his office and conducts business in this judicial district.  Moreover, a substantial part of the events giving rise to the claims occurred within this judicial district.

22.     Plaintiffs have standing to bring this lawsuit because Memorial, Providence, and Bothwell are suffering and face imminent actual injury as a result of the unlawful compelled pricing disclosures mandated in the Final Rule.  The associational plaintiffs (AHA, AAMC, FAH, and NACH) have associational standing to maintain this action because each and every one of their members (including but not limited to the named hospital plaintiffs) are suffering imminent and concrete harm due to the Final Rule, and ameliorating that harm is germane to each association's purpose.

## FACTUAL BACKGROUND

**Statutory Background**

23.     As part of the Affordable Care Act, Congress enacted Section 2718(e) of the Public Health Service Act, which mandated the disclosure by hospitals of their "standard charges for items and services provided by the hospital."  42 U.S.C. § 300gg-18(e).

24.     Specifically, Section 2718(e) states:  "Each hospital operating within the United States shall for each year establish (and update) and make public (in accordance with guidelines developed by the Secretary) a list of the *hospital's standard charges for items and services provided by the hospital,* including for diagnosis-related groups established under section 1395ww(d)(4) of this title."  *Id.* (emphasis added).

10

**How Hospitals Price Their Services**

25.     Among the information that hospitals regularly disclose to the public is the "chargemaster" rate for hospital services.  The chargemaster is a critical administrative tool that hospitals employ for revenue-management and other purposes, which sets the baseline prices for the specific healthcare services offered by a particular hospital.

26.     Commercial health insurers typically negotiate discounts or alternative payment arrangements with hospitals.  These discounts are individually and privately negotiated, at arms' length, between either an individual hospital or a broader hospital system and each specific insurer.  The negotiated rates typically vary by insurance plan, even those offered by a single insurer.  The payment arrangements negotiated with insurers can take many different forms: some are based on a percentage of the chargemaster charge, others are based on a per diem rate, and still others are a flat dollar amount per service, billing code, or other specified metric.  In fact, some payers may negotiate bundled payment arrangements, where a single payment is made for multiple services furnished by multiple providers during an episode of care.  There are also value-based arrangements whereby hospitals agree to take financial risk for meeting certain performance standards; these seek to improve access to care, quality of care, and patient health outcomes while reducing costs.  There is a wide variety of payment models that govern the pricing arrangements between hospitals and insurers.

27.     The commercial health insurer negotiated rate does not tell you how much a patient covered by that insurance plan would pay out of pocket.  Patients' out-of-pocket costs are typically dictated by a variety of factors largely tied to their own contractual relationships with their insurers, including (i) whether the service is covered by the patient's plan; (ii) whether the service is subject to cost-sharing; (iii) the amount of the patient's per-visit co-insurance or co-

payment; (iv) the amount of the patient's annual deductible, and how much of it has been used; (v) the amount of the patient's per-family deductible, and how much of it has been used; (vi) whether the patient has hit the annual maximum out-of-pocket limit on cost-sharing; and (vii) whether the patient has acted in compliance with insurer-mandated requirements, such as obtaining pre-clearance for specified procedures or proof of medical necessity.  As such, knowing the insurer-specific negotiated rate does not tell the patient anything about her own out-of-pocket costs.

28.    Some patients do not have health insurance, or choose not to use their insurance coverage in connection with a hospital visit, for whatever reason.  For those patients, meeting the financial criteria established by the hospital makes them eligible for free or reduced cost care. The criteria are typically linked to the federal poverty level but may consider other facts and circumstances such as the amount a patient has spent on health care over the preceding year regardless of their income level.  For tax-exempt hospitals, these criteria are reported publicly to the Internal Revenue Service each year.  For those who don't meet the criteria, the hospital typically negotiates directly with them for payment and may offer discounts or other abatement based on a number of criteria, including the timing of payments and ability to pay.

**The Proposed Rule**

29.    In August 2019, CMS published its annual proposed rule detailing changes to hospital outpatient payments under Medicare for calendar year (CY) 2020.  84 Fed. Reg. 39,398 (Aug. 9, 2019) (the Proposed Rule).   Among other things, the Proposed Rule included a section entitled:  "Proposed Requirements for Hospitals To Make Public a List of Their Standard Charges."  *Id.* at 39,571.

30.     In the Proposed Rule, CMS proposed new regulations that would compel hospitals to disclose additional new pricing information on their websites, in addition to the "gross charge" already reflected on the hospital's chargemaster.  These new pieces of information included:  (i) the hospital's "payer-specific negotiated charge that applies to each item or service when provided in, as applicable, the hospital inpatient setting and outpatient department setting," with each such list of charges "clearly associated with the  name of the third party payer"; and (ii) the hospital's "payer-specific negotiated charges" and certain other information for 300 "shoppable services," which was defined as "a service package that can be scheduled by a health care consumer in advance."  84 Fed. Reg. at 39,641–642.  CMS cited Section 2718(e) as the statutory basis for its authority to require the disclosure of these additional charges.

31.     In the Preamble to the Proposed Rule, CMS noted:  "We believe that these proposals requiring public release of hospital standard charge information are a necessary and important first step in ensuring transparency in health care prices for consumers, although we recognize that the release of hospital standard charge information is not sufficient by itself to achieve our ultimate goals for price transparency.  For example, we know through our stakeholder engagement and research conducted over the past year that consumers of health care services simply want to know where they can get a needed health care service and what that service will cost them out-of-pocket."  84 Fed. Reg. at 39,574.  The agency admitted:  "We recognize that the impact resulting from the release of negotiated rates is largely unknown."  *Id.* at 39,580.

32.     The Proposed Rule also proposed the imposition of penalties on hospitals that fail

to comply with the mandates of the rule, including civil monetary penalties (CMPs) and posting

of a notice of imposition of a CMP on the agency's website.  84 Fed. Reg. at 39,592–593.

33.     A number of regulated entities submitted comments pointing out major problems

with the Proposed Rule, including AHA, AAMC, FAH, and NACH on behalf of the hospital

field.  Among other issues, these commenters pointed out that CMS's statutory authority under

Section 2718(e) is limited to "standard charges," and that the "payer-specific negotiated charges"

identified in the Proposed Rule are anything but "standard."  Similarly, the commenters noted

that the agency lacks statutory authority to issue CMPs and/or publicly shame hospitals that fail

to comply with the rule.  Commenters also pointed out that the compelled disclosure of insurer-

negotiated charges violates the First Amendment because it mandates speech in a manner that

fails to directly advance a substantial government interest, let alone in a narrowly tailored way.

Indeed, as CMS itself admitted in the preamble, the Proposed Rule fails to directly advance the

proffered governmental interest of providing transparency to patients regarding their out-of-

pocket costs.  A number of comments also pointed out that the Proposed Rule is arbitrary and

capricious, because by the agency's own admission, it fails to achieve its stated goals.

**The Final Rule**

34.     CMS ultimately severed the Proposed Rule from the Medicare hospital outpatient

CY 2020 rule, and published a stand-alone final rule addressing hospital pricing disclosures in

the Federal Register on November 27, 2019.

35.     The Final Rule mandates public disclosure of the two types of charges previously

identified in the Proposed Rule (gross charges and payer-specific negotiated charges), plus three

additional types of information:  "discounted cash price," the "de-identified minimum negotiated

charge," and the "de-identified maximum negotiated charge." 84 Fed. Reg. at 65,560. The Final

Rule also required assembly in a "consumer-friendly manner" and public disclosure of payer-

specific negotiated charges, discounted cash prices, and de-identified minimum and maximum

negotiated charges for the 300 "shoppable" services identified in the Proposed Rule. *Id*. at

65,564.

36.     In response to public comments, CMS acknowledged that it did "agree with

commenters who indicated that disclosure of hospital charge information alone may be

insufficient or does not go far enough for consumers to know their out-of-pocket costs in

advance of receiving a healthcare service." 84 Fed. Reg. at 65,528. The agency also admitted:

"Necessary data to make out-of-pocket price comparisons depends on an individual's

circumstances." *Id.* And it acknowledged that patients with insurance coverage wanting to

know their out-of-pocket costs would also need "additional individual benefit-specific

information such as the amount of cost-sharing, the network status of the healthcare provider,

how much of a deductible has been paid to date, and other information." *Id.*

37.     CMS explained that the "discounted cash price" would be defined as "the price

the hospital would charge individuals who pay cash (or cash equivalent) for an individual item or

service or service package." 84 Fed. Reg.. at 65,552. However, the agency "recognized that

many hospitals have not determined or maintain [sic], a standard cash discount that would apply

uniformly to all self-pay consumers for each of the items and services provided by the hospital or

for service packages, unlike they do for negotiated charges." *Id.* at 65,553. The agency also

clarified that the term "discounted cash price" would reflect "the discounted rate published by

the hospital, unrelated to any charity care or bill forgiveness that a hospital may choose or be

required to apply to a particular individual's bill." *Id.* CMS went on to note: "Hospitals that do

not offer self-pay discounts may display the hospital's undiscounted gross charges as found in the hospital chargemaster." *Id.*

38.     Like the Proposed Rule, the Final Rule also imposed penalties on hospitals that fail to comply with the mandates of the rule, including CMPs and posting of a notice of imposition of a CMP on the agency's website.  84 Fed. Reg. at 65,586.

**The Final Rule Is Unlawful**

39.     The Final Rule is unlawful, for several different reasons.  First, the Final Rule exceeds CMS's statutory authority, which is limited to disclosure of hospitals' "standard charges."  By definition, the insurer-specific rates at issue here are not "standard charges." Second, the Final Rule violates the First Amendment, because it compels disclosure of highly confidential individually negotiated pricing data without any reasonable expectation that it will advance *any* governmental interest in healthcare-pricing transparency, let alone a substantial one. Nor is the Final Rule narrowly tailored to achieve its stated goals.  And finally, the Final Rule is arbitrary and capricious under the Administrative Procedure Act, because it does not further the interests relied upon by the agency to justify its promulgation.

*The Final Rule Exceeds CMS's Statutory Authority*

40.     First and foremost, the Final Rule is unlawful because it exceeds the statutory authority delegated to the agency by Congress under Section 2718(e) of the Public Health Service Act.  42 U.S.C. § 300gg-18(e).

41.     CMS relies on Section 2718(e) as the basis for its statutory authority to promulgate the Final Rule.  84 Fed. Reg. at 65,524.  But Section 2718(e) does not provide CMS with authority to establish these requirements.

42.     Section 2718(e) states: "Each hospital operating within the United States shall for each year establish (and update) and make public (in accordance with guidelines developed by the Secretary) a list of the hospital's standard charges for items and services provided by the hospital, including for diagnosis-related groups established under section 1395ww(d)(4) of this title." *Id.*

43.     As such, Section 2718(e) mandates public disclosure of only "the hospital's *standard charges*." 42 U.S.C. § 300gg-18(e) (emphasis added). "Standard charges" do not include the charges privately negotiated between hospitals and insurers. In fact, the opposite is true. "Standard" means usual, common, or customary. *See, e.g.*, Dictionary.com (2019); Merriam-Webster (2019); Oxford English Dictionary (2019); *see also Black's Law Dictionary* (11th ed. 2019). "Standard," by contrast, does not mean individualized, tailored, or bespoke. Exceptions to the general point of reference (such as the insurer-specific rates privately negotiated with individual insurers) are *non*-standard.

44.     That meaning is also consistent with the longstanding understanding of the term "standard charges" in the hospital services context. "Standard charges" are commonly understood to mean a hospital's usual or customary chargemaster charges. *See, e.g.*, *Webster Cty. Mem'l Hosp., Inc. v. United Mine Workers of Am. Welfare & Ret. Fund of 1950*, 536 F.2d 419, 419–20 (D.C. Cir. 1976) (per curiam); *Lefler v. United Healthcare of Utah, Inc.*, 72 F. App'x 818, 821 (10th Cir. 2003).

45.     The negotiated rates and the discounted cash price (if a hospital even has one) covered by the Final Rule are different from those chargemaster charges. As Congress well knows, hospitals typically negotiate discounts or alternative payment arrangements individually with insurers. By specifically limiting the agency's authority to regulating disclosure of

17

"standard charges," Congress granted CMS narrow authority to mandate disclosure of only that specific type of charges.

46.     To get around this hurdle, CMS purports to interpret "standard charges" to mean charges that are "standard for different identifiable groups of people." 84 Fed. Reg. at 65,539. To be clear: When CMS describes something as "standard for different identifiable groups of people," it is referring to people covered under different insurance plans. That is not "standard." That is "tailored to different identifiable groups of people." An agency cannot purport to reverse the plain meaning of statutory language by engaging in creative definitions of otherwise clear terms, such that black means white and yes means no. "Standard" as used by Congress cannot be defined by the agency to mean "non-standard." That is flatly inconsistent with both the plain language of the statute and the well-understood meaning of the term "standard charges" in the industry.

47.     Had Congress wanted to give CMS the authority to order disclosure of these payer-specific negotiated charges in addition, it would have said so expressly. Indeed, Congress has done just that in other provisions of the Affordable Care Act, which added Section 2718(e) to the Public Health Service Act. *See* Pub. L. No. 111-148, § 1311(e)(3), 124 Stat. 119, 900, codified at 48 U.S.C. § 18031(e)(3)(A)(vii) (requiring that health plans seeking certification on a covered exchange provide, among other things, "[i]nformation on cost-sharing and payments with respect to any out-of-network coverage"); *see also, e.g.*, 42 U.S.C.A. § 1320a-7h (requiring specific disclosures and publication of manufacturer payments to physicians).

48.     More generally, the statute contemplates disclosure of a single list—"*a* list"—of the hospitals' standard charges. It does not contemplate imposing on hospitals the burden of disclosing *multiple* lists of different types of charges—gross charges, insurer-specific negotiated

rates, discounted cash price, and minimum and maximum negotiated charges.  That is far more than the statutory language can bear.

49.     In addition, CMS lacks statutory authority to impose penalties for violations of the Final Rule.  CMS cited both Section 2718(b)(3) of the Affordable Care Act and Section 1102 of the Social Security Act (SSA) as the basis for its statutory authority to impose penalties.  Section 2718(b)(3) states:  "The Secretary shall promulgate regulations for enforcing the provisions of this section and may provide for appropriate penalties."  CMS reads the reference to "this section" to include Section 2718(e), but that reading cannot be squared with the actual history of the enactment of Section 2718.  That history shows that the enforcement provision is intended to apply only as to the medical loss ratio (MLR) provisions; the reference to "section" is a scriveners' error that arose when Congress consolidated various provisions into Section 2718 of the ACA.  Nor does the agency explain how Section 1102 of the SSA could provide the agency with the requisite authority, given that the Final Rule extends well beyond Medicare and Medicaid.

50.     Government-mandated disclosures "invariably raise First Amendment issues" and must be read narrowly as a result.  *See Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 805 (D.C. Cir. 2002).  Rather than observe the statute's clear limits, however, CMS reads Section 2718(e) expansively to sweep in for public disclosure a wide range of plan- and payer-specific negotiated-rates data.

51.     There is no basis in Section 2718(e) or otherwise even hinting that Congress intended that CMS should have the authority to upend the existing equilibrium of hospitals' pricing of healthcare services in this fashion.  Nor can the agency assume this power based on its desire that it be so.

***The Final Rule Violates the First Amendment***

52.     The Final Rule also is unlawful because it unconstitutionally compels speech. Under any potentially applicable level of First Amendment scrutiny, CMS must show that the mandated speech directly and materially advances a substantial government interest and that the means chosen are narrowly tailored to avoid burdening more constitutionally protected activity than is necessary.

53.     The agency cannot make any part of that showing.  CMS has asserted that the rule was designed to take an "important step toward putting consumers at the center of their health care."  84 Fed. Reg. 39,398, 39,574 (Aug. 9, 2019).  But CMS's stated interest in putting consumers "at the center of their health care" will not be served by the mandated disclosure of charges privately negotiated between individual hospitals and hospital systems and health plans. That is clear from the rulemaking record alone.

54.     As CMS itself admitted in the Proposed Rule:  "consumers of health care services simply want to know where they can get a needed health care service and what that service will cost them out of-pocket."  84 Fed. Reg. at 39,574.  *See also, e.g.*, FTC Letter for Members of the Minnesota House of Representatives (June 29, 2015) ("To be most meaningful, price information should reflect an individual consumer's desired health care coverage—including specific out-of-pocket expenditures for specific procedures and services—so that the consumer can make informed decisions when selecting a provider or choosing among treatment options.").

55.     Disclosure of insurer-specific negotiated rates does not provide patients with useful information about their own out-of-pocket costs.  In the Final Rule, CMS attempted to patch over this defect in its logic, asserting that "when a consumer has access to payer-specific negotiated charge information prior to receiving a healthcare service . . . in combination with

20

additional information from payers, it can help him determine potential out of pocket costs." 84

Fed. Reg. at 65,543. That is factually untrue—as CMS itself admits, patients' out-of-pocket

costs are typically driven by their plan design, deductible, co-insurance, and co-payment

requirements, not the rates negotiated between hospitals and insurers, *id.* at 65,528 (conceding

that the Final Rule's disclosure requirements are "merely a necessary first step"). But it is also

too indirect to "directly and materially advance" the proffered government interest.

56.     The agency acknowledged in the Final Rule that in order to determine their out-

of-pocket costs, patients with insurance coverage would need "additional individual benefit-

specific information such as the amount of cost-sharing, the network status of the healthcare

provider, how much of a deductible has been paid to date, and other information." 84 Fed. Reg.

at 65,528. As the agency itself admitted, "we do agree that a payer-specific negotiated charge

does not, in isolation, provide a patient with an individualized out-of-pocket estimate." 84 Fed.

Reg. at 65,543. That admission is telling. Patients need a single critical piece of information:

their out-of-pocket costs. CMS cannot use that need to justify compelled disclosure of other,

more tangential information that does not "directly and materially" enlighten patients about their

out-of-pocket costs.

57.     Moreover, nothing in the Final Rule or the disclosures mandated therein informs

patients *how* to calculate their out-of-pocket costs from the information required to be disclosed.

That is not surprising, because it is often not possible to do so. For that reason alone, the

publication of plan-specific rates information will *create* patient confusion and undermine the

goal of increasing the availability of useful information for patients.

58.     The requirement that hospitals disclose their "discounted cash price" for various

services fares no better. CMS describes this as the "discounted rate published by the hospital,

unrelated to any charity care or bill forgiveness that a hospital may choose or be required to apply to a particular individual's bill." 84 Fed. Reg. at 65,553. While compelling all hospitals to disclose this figure, CMS nonetheless admitted that many hospitals would have no such standard "one size fits all" discount. *Id.* at 65,528–529. And yet the agency nonetheless required that hospitals lacking a "standard" discounted cash price publish the undiscounted gross charges as reflected in the chargemaster under the heading "discounted cash price." *Id.* at 65,553. That disclosure is misleading, because it erroneously suggests to patients that no discounts or forgiveness is available, even if that is not true. And that, in turn, will increase the likelihood that patients may refrain from seeking medical care when needed.

59.     Even if these hurdles could be overcome, which they cannot, the Final Rule is anything but narrowly tailored. Hospitals' negotiated-rates data, the result of nonpublic competitive bargaining, are highly confidential and commercially sensitive, and constitute trade secrets. They have long been afforded a range of legal protections against disclosure for precisely these reasons. *See, e.g.*, *West Penn Allegheny Health Sys., Inc. v. UPMC*, 2013 WL 121441532 (W.D. Pa. Sept. 16, 2013) (trade-secrets protection); *Medical Ctr. at Elizabeth Place, LLC v. Premier Health Partners*, 294 F.R.D. 87 (S.D. Ohio 2013) (discovery protections); 73 Fed. Reg. 30,664-01, 30,675–75 (May 28, 2008) (FOIA Exemption 4). Making public proprietary negotiated-rates data would immediately wipe away all those legal protections, thereby threatening to stifle individual negotiations and dampen—rather than promote—price competition system-wide.

60.     CMS disingenuously suggests that insurer-negotiated rates are not confidential because a patient will see a single piece of data—the specific charge that the hospital charged her insurer—on the Explanation of Benefits (EOB) provided privately to the patient. 84 Fed. Reg. at

65,539–540.  But that is a far cry from mandating that *all* negotiated rates for *all* insurers and *all*
services be collected and posted publicly on the internet for all the world to see.  That
information is considerably more commercially sensitive than a single price disclosed to a
private patient and may not be representative of what a patient covered by the same insurer but
through a different employer would pay.  The Final Rule thus goes much too far in requiring
public disclosure of negotiated rates—well beyond the scope of regulation necessary to achieve
the Final Rule's stated aims.

61.     The Final Rule is not narrowly tailored in another way, too:  The burden of
compliance with the rule is enormous, and way out of line with any projected benefits associated
with the rule.

62.     The file required by the Final Rule would be massive, including not only the
items and services reflected in the chargemaster (often tens of thousands of rows but in some
instances well over 100,000) but also rows reflecting the myriad different ways individual health
plan issuers define payments (e.g., per diems, diagnosis-related groups, and other episode and
value-based payments).  This could introduce thousands or even hundreds of thousands of
additional rows to the required spreadsheet.

63.     The Final Rule would also require hundreds to thousands of columns.  In addition
to descriptions, codes, and gross charges, the spreadsheet would need to include separate
columns for each health plan issuer contract.  Many hospitals and health systems have over 100
contracts with different health plans issuers, often with multiple contracted rates depending on
the type of health plan (e.g., Medicare Advantage, individual market health maintenance
organization (HMO), individual market preferred provider organization (PPO), each self-insured
plan).  Hospitals and health systems report that a file of this size could easily crash most standard

computer systems, and some members worry about the ability of their websites to function at all with such a large file.

64.     To compile the file, hospitals will need to allocate existing finance, legal, and clinical personnel or hire additional staff to review all existing payer contracts to identify the individual insurer-negotiated rates, the de-identified minimum negotiated charges, and the de-identified maximum negotiated charges, if possible.  Hospitals will also need to expend resources to update the files.

65.     For all of these reasons, the First Amendment does not permit the agency to unnecessarily burden speech in this fashion.

***The Final Rule is Arbitrary and Capricious***

66.     The Final Rule also is unlawful because it is arbitrary, capricious, lacks any rational basis, and does not reflect the product of CMS's reasoned decision-making.

67.     The compelled disclosure seeks, by its own terms, to enhance patients' ability to make better-informed healthcare decisions.  84 Fed. Reg. at 65,600.  Importantly, the agency cites no reliable evidence that publicizing negotiated rates would have any impact whatsoever on patient behavior; as the agency candidly concedes, "the impact resulting from the release of negotiated rates is largely unknown."  84 Fed. Reg. at 65,542.

68.     Devoid of evidentiary support, CMS's solution is simply illogical.  The agency's central premise is that additional pricing information about healthcare services—of any sort—is desirable because "[h]aving insight into the charges that have been negotiated on one's behalf" will nonetheless help patients "to determine and compare their potential out-of-pocket obligations prior to receipt of a health care service."  84 Fed. Reg. at 65,542.

69.     But *more* information is not the same thing as *better* information.  When comparing options for healthcare services, patients' prime consideration when it comes to pricing is their own *out-of-pocket* costs—that is, the amounts patients pay directly.

70.     Knowing the insurer-negotiated rate tells patients nothing about their out-of-pocket costs.  The amount, if any, a patient is responsible for paying out of pocket will necessarily vary by insurance plan, depending on a person's particular co-payment obligations and deductible status, among other considerations.  84 Fed. Reg. at 65,528.  It is simplistic—and wrong—to assume that a higher negotiated rate implies a higher (or lower) out-of-pocket cost.  Nor, critically, does knowing insurer-negotiated rates inform patients of the difference, if any, between the out-of-pocket costs for any set of potential providers.

71.     As a result, the Final Rule will not give patients meaningful insight into their own costs but instead will result in greater pricing confusion.  At the same time, the compelled disclosure will upend the longstanding confidentiality and legal protections surrounding hospitals' pricing negotiations with commercial health insurers, thereby threatening future negotiations and competition, particularly for new models for value-based care, system-wide.

72.     To make matters worse, the Final Rule fails to grasp the reality of the pricing arrangements between hospitals and insurers.  Because the pricing arrangements vary considerably among insurance plans, there simply is no uniform way to capture and convey the various pricing terms across insurers, even if CMS's mandate were otherwise lawful.

73.     The Final Rule also is arbitrary because it imposes a huge cost:  despite the agency's benign projections regarding burden, the real world burden of complying with the Final Rule will be severe.  As noted above, the file required by the Final Rule would require production of a chart comprised of hundreds of thousands of rows, and hundreds to thousands of

columns.  That chart would need to be prepared manually by hospital employees, directing already-scarce resources away from tasks more directly supportive of patient care.

74.     In short, CMS's decision to forge ahead with its compelled disclosure of insurer-negotiated rates lacks a rational basis in the record and fails to satisfy the APA's threshold demand for reasoned decision-making.

**Plaintiffs Will Suffer Concrete and Imminent Harm Absent Judicial Intervention**

75.     The Final Rule is set to take effect on January 1, 2021.

76.     However, hospitals must start preparing for implementation of the Final Rule much sooner than that.  Hospitals and health systems will need to begin planning in earnest to comply with this massive obligation immediately.  That will mean diverting existing personnel from other priority tasks or hiring new personnel to determine how to capture and display data from dozens, hundreds, or even potentially thousands of commercial health plans.  A separate but coordinated effort would be required to evaluate the hospital services and combine data from various streams to attempt to determine prices for 300 "shoppable" services.  As noted in the Final Rule, this effort will require input from personnel across multiple hospital departments, including clinical staff.  For larger health systems, assuming it is even possible to harness and display the data as CMS requires, it could take an entire new department of personnel at the cost of thousands of dollars to lead the effort.  In addition, most hospitals would need to hire technology vendors to facilitate the rapid development and implementation, which undoubtedly would come at a premium given the massive requirements and short time frame, at the cost of thousands, perhaps tens of thousands of dollars.  These dollars could and otherwise would be spent on other health care priorities.

77.     The burden of complying with the Final Rule will kick in for hospitals almost immediately.  Hospitals will need to hire new or divert current personnel to begin the laborious process of manually gathering information responsive to the Final Rule—some of which either is not currently available to them, or requires extensive review of claims history to decipher—and then begin the onerous task of preparing the data for formatting, processing, uploading, and hosting.  Many hospitals will be required to hire e-vendors to assist with that process, which will add additional time on the back end.  All of that comes at a severe cost, and would be an unnecessary diversion of resources if the Final Rule is declared invalid.  In order to avoid imposing a crushing burden on hospitals—especially smaller hospitals that are already operating with scarce resources and on thin margins—Plaintiffs respectfully request a decision on the merits well in advance of the Final Rule's effective date.

78.     For that reason, Plaintiffs intend to file their motion for summary judgment shortly and respectfully request a decision on the merits as soon as practical.

## COUNT I
### (APA:  The Final Rule Is Unlawful And In Excess of Statutory Authority)

79.     Plaintiffs re-allege and incorporate by reference the allegations made in the foregoing numbered paragraphs of the Complaint.

80.     The APA prohibits CMS from implementing its statutory mandate in a manner that is unlawful, *ultra vires*, or in excess of statutory authority.  5 U.S.C. § 706(2)(A).

81.     The Final Rule violates that agency's governing statute and exceeds the agency's statutory authority.

82.     The agency cited Section 2718(e) of the Public Health Service Act as the basis for its statutory authority to promulgate the Final Rule.  But in that statutory provision, Congress delegated to the agency authority only over hospitals' "standard charges."  By definition,

privately negotiated rates are not standard.  By purporting to interpret the phrase "standard

charges" to mean its exact opposite—plan-specific, individually negotiated rates—CMS has

failed to observe the "bounds" of its "statutory authority."  *Util. Air Regulatory Grp. v. EPA*, 134

S. Ct. 2427, 2439 (2014).

83.     What is more, the statute contemplates disclosure of "a list"—not multiple lists—

of charges.

84.     In addition, CMS lacks statutory authority to impose the stated penalties on

hospitals that fail to comply with the Final Rule.  CMS relied on Section 2718(b)(3) of the

Affordable Care Act as the basis for its statutory authority to impose penalties.  Section

2718(b)(3) states:  "The Secretary shall promulgate regulations for enforcing the provisions of

this section and may provide for appropriate penalties."  CMS reads the reference to "this

section" to include Section 2718(e), but that reading cannot be squared with the actual history of

the enactment of Section 2718.

85.     For the foregoing reasons, the Final Rule exceeds the agency's statutory authority

and should be set aside.

## COUNT II
### (First Amendment:  The Final Rule Unlawfully Compels Speech)

86.     Plaintiffs re-allege and incorporate by reference the allegations made in the

foregoing numbered paragraphs of the Complaint.

87.     The First Amendment provides, in relevant part, "Congress shall make no law . . .

abridging the freedom of speech."  U.S. Const. amend I.

88.     The First Amendment "prohibits the government from telling people what they

must say."  *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.,* 547 U.S. 47, 61 (2006).

Accordingly, when Government seeks to compel people to speak a certain message, its conduct is subject to heightened scrutiny.

89.     The Final Rule does not regulate voluntary advertising.  It compels speech.  As such, that mandate is a "presumptively unconstitutional" speaker- and content-based compulsion of speech that the Government must prove is "narrowly tailored to serve compelling state interests."  *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015).  At a minimum, however, the intermediate scrutiny used to analyze "commercial speech" applies.  *See, e.g.*, *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 564 (1980).

90.     Under any potentially applicable form of First Amendment "heightened judicial scrutiny," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011), the Final Rule founders.

91.     Even assuming that the Government has a substantial interest in "transparency in health care pricing," the compelled disclosure that CMS has promulgated neither directly nor materially advances that interest.

92.     Worse, because the disclosure of plan-level negotiated-rates data does not reflect the out-of-pocket costs that individual patients ultimately bear, the Final Rule is misleading. Absent judicial intervention, that disclosure mandate will exacerbate patient confusion and *undermine* the Government's stated interest in transparency.

93.     There are numerous alternatives that would better achieve the Government's stated interest while being less restrictive of constitutionally protected speech.  In other words, there are other options with "a more reasonable 'fit' between means and ends."  Among other things, that would include facilitating hospitals' efforts to provide patients with clear information about their out-of-pocket costs estimates.

94.     The Final Rule therefore is unlawful because it violates the First Amendment of the United States Constitution.

## COUNT III
### (APA:  The Final Rule Is Arbitrary and Capricious)

95.     Plaintiffs re-allege and incorporate by reference the allegations made in the foregoing numbered paragraphs of the Complaint.

96.     The APA prohibits CMS from implementing its statutory mandate in a manner that is arbitrary, capricious, an abuse of discretion, or contrary to law.  5 U.S.C. § 706(2)(A).

97.     The Final Rule is arbitrary, capricious, an abuse of discretion, and contrary to law because the agency concedes there is no evidence that its disclosure requirement will improve pricing transparency for hospitals or advance any legitimate government purpose.

98.     By contrast, there is good reason to believe that disclosing plan-level negotiated rates would create and exacerbate patient confusion when patients would reasonably—but incorrectly—assume those published rates reflect their individual out-of-pocket costs.  That could, in turn, discourage patients from seeking care, even when medically necessary.

99.     And that disclosure requirement, if not enjoined, will result in the publication en masse of troves of plan-specific negotiated-rates data that are both highly confidential and commercially sensitive.  The loss of these proprietary confidences will impose significant and unjustified burdens on both hospitals, in their future negotiations with health insurers, and on the healthcare-service system more broadly.

100.     The Final Rule thus lacks any rational basis and cannot be sustained as an exercise of "reasoned decisionmaking."  *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012).

101.     For these and other reasons, the Final Rule is arbitrary and capricious, and should be set aside.

## PRAYER FOR RELIEF

Plaintiffs respectfully pray for the following relief:

A.  A declaration pursuant to 28 U.S.C. § 2201 that the Final Rule (i) exceeds CMS's statutory authority under Section 2718(e) of the Public Health Service Act, 42 U.S.C. § 300gg-18(e); (ii) violates the First Amendment to the United States Constitution; (iii) is arbitrary, capricious, and lacks a sufficient rational basis under the APA, 5 U.S.C. § 706; and (iv) is unenforceable;

B.  Preliminary and permanent injunctive relief barring Defendant from enforcing the Final Rule;

C.  An order awarding Plaintiffs their costs, expenses, and attorneys' fees incurred in these proceedings pursuant to 28 U.S.C. § 2412; and

D.  Such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Catherine E. Stetson
Catherine E. Stetson (D.C. Bar No. 453221)
Susan M. Cook (D.C. Bar No. 462978)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Phone:  (202) 637-5491
Fax: (202) 637-5910
cate.stetson@hoganlovells.com

*Counsel for Plaintiffs*

Dated:  December 3, 2019