# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

THE AMERICAN HOSPITAL
ASSOCIATION, *et al.*,

        *Plaintiffs*,

        v.

ALEX M. AZAR II, in his official capacity as
SECRETARY OF HEALTH AND HUMAN
SERVICES,

        *Defendant*.

Civil Action No. 1:19-cv-3619 (CJN)

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................... 1

BACKGROUND .......................................................................................................................3

I.      THE MARKET FOR HOSPITAL SERVICES ..............................................................3

II.     STATUTORY BACKGROUND ...................................................................................6

III.    REGULATORY BACKGROUND ................................................................................6

IV.     PROCEDURAL HISTORY ..........................................................................................8

LEGAL STANDARD ...............................................................................................................9

ARGUMENT ............................................................................................................................9

I.      HHS'S CONSTRUCTION OF "STANDARD CHARGES" IS FULLY CONSISTENT
        WITH THE PHS ACT. ..................................................................................................9

        A.      "Standard Charges" Cannot Mean Only "Chargemaster Charges." ...........................11

                1.      The Text of the PHS Act Forecloses Plaintiffs' Attempt to Limit "Standard
                        Charges" to the Rates in a Hospital's Chargemaster. .........................................11

                2.      Plaintiffs' Arguments for Reading "Standard Charges" to Mean
                        "Chargemaster Charges" Are Independently Unavailing. ...................................14

        B.      The Text, Structure, and Purpose of the PHS Act Support HHS's Definition of
                "Standard Charges." ...............................................................................................17

        C.      At a Minimum, HHS's Definition of "Standard Charges" Is Reasonable and Is
                Entitled to Deference ..............................................................................................21

II.     CONGRESS DID NOT MAKE A "SCRIVENER'S ERROR" WHEN IT GAVE HHS
        THE POWER TO ENFORCE SECTION 2718 OF THE PHS ACT. .................................24

III.    THE PRICE TRANSPARENCY RULE SATISFIES THE FIRST AMENDMENT. .........27

        A.      The Rule Should Be Upheld Under *Zauderer*. .......................................................28

                1.      The *Zauderer* Test for Compelled Commercial Disclosures Governs the First
                        Amendment Inquiry in this Case. ........................................................................28

                2.      The Rule Imposes A Reasonable Disclosure Requirement. ...............................30

        B.      The Rule Also Passes Intermediate Scrutiny Under *Central Hudson*. ......................31

1.      The Rule Directly Advances the Government's Substantial Interests in Informing Consumers and Lowering Healthcare Costs. ...............................32

2.      The Rule Is Not More Extensive than Necessary...............................................37

IV.     THE RULE WAS THE RESULT OF HHS'S REASONED DECISION-MAKING. .......39

V.      PLAINTIFFS' DESIRED RELIEF IS OVERBROAD IN MULTIPLE RESPECTS.........42

A.      Nationwide Relief Is Improper...........................................................................43

B.      The Injunction or Vacatur of Severable Provisions Is Inappropriate. ........................44

CONCLUSION.................................................................................................................45

# TABLE OF AUTHORITIES

**CASES**

*ACA Int'l v. FCC*,
  885 F.3d 687 (D.C. Cir. 2018) ...............................................................................................45

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001) ...............................................................................................9

*\*Am. Meat Inst. v. USDA*, 760 F.3d 18 (D.C. Cir. 2014) ...............................................*passim*

*Amarei v. City of Chicago*,
  No. 13 C2805, 2015 WL 7251940 (N.D. Ill. Nov. 17, 2015)..................................................28

*Ark Initiative v. Tidwell*,
  816 F.3d 119 (D.C. Cir. 2016) ......................................................................................... 40, 41

*Ass'n for Cmty. Affiliated Plans v. U.S. Dep't of Treasury*,
  392 F. Supp. 3d 22 (D.D.C. 2019) ...........................................................................................23

*Bd. of Trustees v. Fox*,
  492 U.S. 469 (1989).................................................................................................................37

*Bell Atl. Tel. Cos. v. FCC*,
  131 F.3d 1044 (D.C. Cir. 1997) ...............................................................................................23

*Beth Israel Med. Ctr.. v. Horizon Blue Cross & Blue Shield of NJ, Inc.*,
  448 F.3d 573 (2d Cir. 2006) ............................................................................................ 16, 17

*Brown v. Blue Cross & Blue Shield of Michigan, Inc.*,
  No. 94-CV-75033-DT, 1996 WL 608546 (E.D. Mich. Sept. 16, 1996)...................................16

*Califano v. Yamasaki*,
  442 U.S. 682 (1979).................................................................................................................43

*\*Cent. Hudson Gas & Electric Corp. v. Pub. Serv. Comm'n of NY*,
  447 U.S. 557 (1980)................................................................................................. 27, 28, 32, 37

*\*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984)................................................................................................. 9, 10, 22, 23

*Cigar Ass'n of Am. v. FDA*,
  315 F. Supp. 3d 143 (D.D.C. 2018) .................................................................................. 30, 31

*City of Arlington v. FCC*,
  569 U.S. 290 (2013)........................................................................................................... 17, 24

*Demarest v. Manspeaker,*
   498 U.S. 184 (1991) .................................................................................................................... 25

*Edwards v. District of Columbia,*
   755 F.3d 996 (D.C. Cir. 2014) ................................................................................................ 34

*Expressions Hair Design v. Schneiderman,*
   877 F.3d 99 (2d Cir. 2017) ...................................................................................................... 28

*Fla. Power & Light Co. v. Lorion,*
   470 U.S. 729 (1985) ...................................................................................................................... 9

*Giant Food, Inc. v. FTC,*
   322 F.2d 977 (D.C. Cir. 1963) ................................................................................................ 30

*\*Gill v. Whitford,*
   138 S. Ct. 1916 (2018) ............................................................................................................... 43

*Good Fortune Shipping SA v. Comm'r of IRS,*
   897 F.3d 256 (D.C. Cir. 2018) ........................................................................................ 22, 23

*Gray-Bey v. United States,*
   201 F.3d 866 (7th Cir. 2000) .................................................................................................. 45

*Hardt v. Reliance Standard Life Ins. Co.,*
   560 U.S. 242 (2010) .................................................................................................................... 15

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,*
   515 U.S. 557 (1995) .................................................................................................................... 29

*K Mart Corp. v. Cartier, Inc.,*
   486 U.S. 281 (1988) .................................................................................................................... 14

*Lamie v. U.S. Trustee,*
   540 U.S. 526 (2004) .................................................................................................................... 27

*Lexington Ins. Co. v. Precision Drilling Co., L.P.,*
   830 F.3d 1219 (10th Cir. 2016) .............................................................................................. 25

*Lorillard Tobacco Co. v. Reilly,*
   533 U.S. 525 (2001) .................................................................................................................... 34

*\*MD/DC/DE Broadcasters Ass'n v. FCC,*
   236 F.3d 13 (D.C. Cir. 2001) .................................................................................................. 44

*Milavetz, Gallop & Milavetz, P.A. v. United States,*
   559 U.S. 229 (2010) .................................................................................................................... 27

*Moore v. District of Columbia,*
  907 F.2d 165 (D.C. Cir. 1990) ....................................................................................25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) .....................................................................................................40

*Mozilla Corp. v. FCC,*
  940 F.3d 1 (D.C. Cir. 2019) .................................................................................. 9, 10

*Nat'l Ass'n of Mfrs. v. SEC,*
  800 F.3d 518 (D.C. Cir. 2015) ............................................................................ 28, 29

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
  145 F.3d 1399 (D.C. Cir. 1998) ...............................................................................44

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
  551 U.S. 644 (2007) ...................................................................................................40

*\*Nat'l Inst. of Family & Life Advocates ("NIFLA") v. Becerra,*
  138 S. Ct. 2361 (2018) .......................................................................................... 28, 31

*Newspaper Ass'n of Am. v. Postal Reg. Comm'n,*
  734 F.3d 1208 (D.C. Cir. 2013) ...............................................................................37

*Nicopure Labs v. FDA,*
  266 F. Supp. 3d 360 (D.D.C. 2017) .........................................................................32

*NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.,*
  No. 17-CV-05005-LB, 2017 WL 6059299 & n.21 (N.D. Cal. Dec. 7, 2017)............16

*PDK Labs. Inc. v. DEA,*
  362 F.3d 786 (D.C. Cir. 2004) .................................................................................18

*Pharm. Care Mgmt. Ass'n v. Rowe,*
  429 F.3d 294 (1st Cir. 2005)....................................................................................29

*Prudential Ins. Co. of Am.. v. Michael Reese Hospital & Med. Ctr.,*
  No. 81 C 5951, 1985 WL 222 (N.D. Ill. Jan. 9, 1985)..............................................17

*Public Citizen v. Burke,*
  843 F.2d 1473 (D.C. Cir. 1988) .......................................................................... 22, 23

*R.J. Reynolds Tobacco Co. v. FDA,*
  696 F.3d 1205 (D.C. Cir. 2012) ................................................................................ 9

*Rural Cellular Ass'n v. FCC,*
  588 F.3d 1095 (D.C. Cir. 2009) ...............................................................................41

*Serono Labs., Inc. v. Shalala,*
  158 F.3d 1313 (D.C. Cir. 1998) ............................................................22

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ............................................................................43

*Town of Chester v. Laroe Estates, Inc.,*
  137 S. Ct. 1645 (2017).........................................................................43

*United States v. Mead Corp.,*
  533 U.S. 218 (2001) ............................................................................22

*United States v. Schiff,*
  379 F.3d 621 (9th Cir. 2004) ................................................................29

*Vill. of Barrington v. Surface Transp. Bd.,*
  636 F.3d 650 (D.C. Cir. 2011) ..............................................................10

*ViroPharma, Inc. v. Hamburg,*
  898 F. Supp. 2d 1 (D.D.C. 2012) .................................................... 16, 38

*Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC,*
  713 F.3d 175 (4th Cir. 2013) ................................................................43

*Williams-Yulee v. Fla. Bar,*
  575 U.S. 433 (2015) ............................................................................37

*\*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,*
  471 U.S. 626 (1985) ........................................................... 27, 28, 29, 30

## STATUTES

5 U.S.C. § 706 ................................................................................ 9, 40

42 U.S.C. § 300gg-18 ........................................................................*passim*

42 U.S.C. § 1395ww.............................................................................13

42 U.S.C.A. § 300gg-92 .................................................................... 6, 22

Patient Protection and Affordable Care Act ("ACA"),
  Pub. L. No. 111-148, 124 Stat. 119 (2010) ...........................................6

## REGULATIONS

45 C.F.R. § 180.20................................................................................45

45 C.F.R. § 180.90 ............................................................................................................24

Medicare Program,
    84 Fed. Reg. 39,398 (Aug. 9, 2019) ...........................................................................7

Price Transparency Requirements,
    84 Fed. Reg. 65,524 (Nov. 27, 2019) ...................................................................*passim*

Transparency in Coverage,
    84 Fed Reg. 65,464 (Nov. 27, 2019) ...........................................................................8

**OTHER AUTHORITIES**

Antonin Scalia & Bryan A. Garner,
    Reading Law 237-38 (2012) ........................................................................................25

Elena Kagan,
    *Presidential Administration*, 114 Harv. L. Rev. 2245 (2001) ...................................23

Exec. Order No. 13,877, 84 Fed. Reg. 30,849 (June 24, 2019) ..............................6, 7, 22

Providence Holy Cross Medical Center, Chargemaster for CMS Price Transparency – Pharmacy
    (Dec. 3, 2019) ............................................................................................................38

## INTRODUCTION

Patients should be able to know, long before they apprehensively open a medical bill, roughly how much it will cost to receive care at a hospital. But what we take for granted in countless other commercial contexts—that consumers can find out the price of goods or services *before* they make a purchase—is lacking in the market for hospital services. As a result, patients frequently are caught off-guard by hospital charges; they struggle to figure out where they could receive more affordable care; and the market forces that would otherwise keep healthcare costs down are stifled.

The solution to this opacity, Congress determined, is transparency. In 2010, Congress enacted section 2718 of the Public Health Service Act ("PHS Act") to "[b]ring[] down the cost of health care coverage." 42 U.S.C. § 300gg-18. A key provision of that section, and the one at issue here, is subsection 2718(e), which requires each hospital to make public a list of the "standard charges for items and services provided by the hospital[.]" *Id.* § 300gg-18(e). In 2019, the Department of Health and Human Services ("HHS") exercised its authority under the PHS Act to codify, for the first time, the "standard charges" that hospitals must publish. Price Transparency Requirements, 84 Fed. Reg. 65,524 (Nov. 27, 2019) (to be codified at 45 C.F.R. pt. 180) ("the Price Transparency Rule" or "the Rule"). Because the rates that hospitals charge vary significantly based on whether a patient is insured or uninsured, or whether a patient is paying cash, HHS adopted a definition of "standard charges" that accounts for this reality. Accordingly, the agency settled on three main categories of standard charges: (1) "gross" or "chargemaster" charges, (2) standard cash discounts offered to patients who are paying directly for their care, and (3) the regular rates that hospitals have agreed to charge third-party payers, like insurance companies. As HHS found after a thorough evaluation of the record, making these charges public would lead to better-informed consumers and, as a result, lower prices.

If patients *pay* less for healthcare, however, someone else *receives* less. Therein lies the genesis of this suit. Plaintiffs, suing on behalf of the hospital industry, want hospitals to be able to keep the rates they negotiate with insurance companies "secret." But that cat is already out of the bag. When a patient receives a breakdown of a hospital's rates from his insurance company—as part of his

"explanation of benefits" ("EOB")—he sees the rates that the hospital charged the insurer.  The information the Price Transparency Rule principally targets is thus already out there, sitting in the file cabinets and inboxes of millions of patients who are free to share those rates with the world.  And patients increasingly are doing just that—manually uploading the charges reflected in their EOBs and medical bills, line by line, to "crowdsourcing" websites—to give other patients a shred of additional information about what a hospital visit will cost.  Given the choice between making millions of patients do the leg work of compiling this information, or having hospitals do it for the price they may charge for one vial of a cancer treatment, *see infra* at 38, HHS chose to spare the patients.

That result, Plaintiffs contend, is unlawful.  But the arguments they raise misread the statute, misapply the relevant First Amendment case law, and misconstrue the evidence the agency marshalled in support of the Rule.

First, HHS's definition of "standard charges" is not only permissible, it is the best reading of the PHS Act.  The main interpretive dispute between the parties is whether the rates that insurance companies negotiate with hospitals can count as "standard charges" under the statute.  Congress, however, already answered that question.  It required hospitals to include, among their standard charges, the rates they charge for diagnosis-related groups ("DRGs").  And as HHS explained, the rates that hospitals charge for DRGs do not appear on a hospital's chargemaster—instead, they are negotiated with insurance companies (and other third parties).  Plaintiffs ignore both that portion of the PHS Act's text and HHS's reliance on it.  And even on its own terms, Plaintiffs' reading of the PHS Act—that "standard charges" can mean only "chargemaster charges"—is incorrect.  Chargemaster charges are *not* standard (or "usual" or "customary") for roughly 90% of patients.  Instead, the "standard" rates a hospital charges depend on the category in which a patient falls—such as insured or uninsured, or having in-network or out-of-network insurance.  HHS's reading of the PHS Act recognizes that fact; Plaintiffs' does not.  Accordingly, the agency has the far better reading

of the statute.  And even if it did not, HHS's interpretation of "standard charges" plainly is reasonable and should be upheld under a straightforward application of *Chevron* deference.

Second, Plaintiffs' First Amendment claim falls wide of the mark.  Because the Rule requires the disclosure of only factual, commercial information—*i.e.*, a hospital's charges—it is subject to the lowest level of First Amendment scrutiny for commercial speech, a bar it readily clears.  Moreover, HHS clearly explained how the Rule will give consumers access to needed information about their healthcare and push down costs nationwide.  Plaintiffs' principal argument on this point—that the Rule does not provide patients with their out-of-pocket costs—is both wrong and irrelevant.  It is wrong because the Rule *does* provide some patients (such as those without insurance or with high deductibles) the out-of-pocket rates they likely will be charged, and the Rule provides an even larger group of patients (those with more comprehensive insurance) information they need to determine those costs.  And it is irrelevant because even incomplete information is better than the status quo, which leaves intact the barriers that prevent patients from learning basic facts about the cost of their care.  Because the Rule directly advances important government goals, without in any way restricting speech, it is constitutional under whatever level of scrutiny applies.

For similar reasons, Plaintiffs' claim that the Rule is arbitrary and capricious also fails.  In the Rule's preamble, HHS acknowledged, engaged with, and reasonably dispensed with the arguments Plaintiffs raise in their brief.  At bottom, everyone agrees that consumers are fumbling in the dark for information about how much their hospital care will cost.  HHS chose to shine light on the problem; Plaintiffs are quibbling over the agency's choice of wattage.  The Court should grant Defendant's motion for summary judgment, deny Plaintiffs', and uphold the Rule.

## BACKGROUND

### I.      THE MARKET FOR HOSPITAL SERVICES

As many patients know too well, the market for hospital services in the United States can be an opaque morass.  The same procedure, for the same patient, in the same geographic area, can cost

vastly different amounts depending on a confluence of factors—ranging from the hospital where the procedure is performed, to the patient's insurance status, to whether the anesthesiologist who happens to be on duty at an in-network hospital is actually employed by that hospital.  Often, it is difficult, if not impossible, for a patient to learn before receiving care what the potential costs of that care will be.

Section 2718 of the PHS Act and the Price Transparency Rule operate against this backdrop. Before turning to that statutory and regulatory scheme, we begin with some terminology.  There are three key categories of participants in the market for hospital services: providers (*e.g.*, hospitals), patients, and payers.  The payer has primary responsibility for paying a bill, and two kinds are relevant here.  The more common is a "third-party payer," like an insurance company or a group health plan. If, however, a patient is paying for care himself—whether because he is uninsured, is receiving care from an out-of-network provider, or has decided it is more affordable than going through a third-party payer—the patient is described as "self-pay."

There are three broad types of hospitals rates: (1) Medicaid and Medicare fee-for-service rates, which are determined by the states and the Centers for Medicare and Medicaid Services ("CMS"), respectively, rather than by hospitals; (2) uninsured or self-pay rates; and (3) rates negotiated with private insurers or health plans.  84 Fed. Reg. at 65,538.  The first category, however, is not relevant here, as hospitals are reimbursed at set rates for Medicare and Medicaid, and those rates already are public.  *See id.* at 65,552.

The second category—uninsured or self-pay rates—typically comes in two forms.  The first is "chargemaster" (or "gross") rates.  Every hospital maintains a chargemaster, which contains all of the individual items and services provided by the hospital, along with corresponding codes and "list prices," or "gross charge[s]," for those items and services.  84 Fed. Reg. at 65,533.  But chargemaster rates "bear little relationship to market rates, are usually highly inflated, and tend to be an artifact of the way in which Medicare used to reimburse hospitals."  *Id.* at 65,538.  In other words, chargemaster rates usually are the worst-case-scenario rates for a patient receiving a hospital bill.  Many hospitals,

however, offer discounts to patients who are "self-pay" (either by choice or through lack of coverage). Some of these are standardized cash discounts, meaning they are offered to any patient who agrees to pay directly for his care (as opposed to having the hospital bill a third-party payer). *See id.* at 65,553. Others are negotiated on a case-by-case basis, often because of a patient's financial need. *See id.*

Third, there are rates that hospitals have negotiated with third-party payers (the "payer-specific negotiated rates"). If a hospital has negotiated rates with a third-party payer—*e.g.*, an insurance company where the hospital is "in-network"—then patients who have coverage from that third-party payer generally are charged the negotiated rate, not the chargemaster rate. Hospitals can reach different kinds of agreements with third-party payers about the rates they charge. In a "fee-for-service" arrangement, for instance, a hospital and an insurer might agree to a flat discount off of the hospital's chargemaster rates for the insurer's customers. 84 Fed. Reg. at 65,533. But hospitals and insurers can also agree to bundle items and services into "service packages." *Id.* Instead of charging patients for every "imaging study, laboratory test, or alcohol swab found on the chargemaster[,]" hospitals may establish charges based on common procedures, per diem rates, or other factors that are used to group patients. *Id.* Of particular relevance here, some hospitals and insurers have adopted a diagnosis-related group ("DRG") methodology, which uses the characteristics of patients who tend to receive similar sets of hospitals services (based on their diagnosis) as a means of setting the hospital's rates. *Id.* at 65,534; *see also infra* at 12-13. Many hospitals and insurers use the same list of DRGs that Medicare has established to classify patients, *see* AR 4769,[1] but some have developed different classifications for DRGs and for other kinds of service packages, *see* 84 Fed. Reg. at 65,534.

For patients with insurance, the price of a hospital stay often (though not always) becomes clear only after receiving an explanation of benefits ("EOB") from the insurance company. EOBs generally include the services a patient received, the gross charges for those services, the insurer-specific charges for those services, and the amount the patient owes out-of-pocket—an amount that

---

[1] Citations in this brief to pages in the administrative record are to "AR XXXX."

depends on factors like co-pays and the patient's deductible.  *See* 84 Fed. Reg. at 65,539.  But to be clear, even though an EOB would list both the gross charges and the insurer-specific charges, only the insurer-specific charge would affect the patient's costs.  After all, the point of insurer-specific charges is that they replace the often-inflated chargemaster rates.

## II.    STATUTORY BACKGROUND

Congress enacted the "standard charges" provision in 2010.  *See* Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148 § 10101(f), 124 Stat. 119, 887 (2010).  It provides:

> Each hospital operating within the United States shall for each year establish (and update) and make public (in accordance with guidelines developed by the Secretary) a list of the hospital's standard charges for items and services provided by the hospital, including for diagnosis-related groups established under section 1395ww(d)(4) of this title.

42 U.S.C. § 300gg-18(e).  Congress added the "standard charges" provision to section 2718 of the Public Health Service Act ("PHS Act")—a section titled "Bringing down the cost of health care coverage."  *Id.* § 300gg-18.  Congress placed section 2718 in Subchapter XXV of the PHS Act, which authorizes HHS to issue regulations "to carry out the provisions of this subchapter."  *Id.* § 300gg-92.

## III.   REGULATORY BACKGROUND

In June 2019, President Trump issued an Executive Order on Improving Price and Quality Transparency in American Healthcare to Put Patients First (the "Price Transparency Executive Order").  Exec. Order No. 13,877, 84 Fed. Reg. 30,849 (June 24, 2019).  The Executive Order highlighted the challenges patients face in accessing "useful price and quality information," which impedes their ability "[t]o make fully informed decisions about their healthcare[.]"  *Id.* § 1.  To address these challenges, the President directed the heads of various agencies to take steps that would "eliminate unnecessary barriers to price and quality transparency."  *Id.* § 2.  As relevant here, the President instructed the Secretary of Health and Human Services ("the Secretary") to "propose a regulation, consistent with applicable law, to require hospitals to publicly post standard charge information, including charges and information based on negotiated rates and for common or

shoppable items and services, in an easy-to-understand, consumer-friendly, and machine-readable format[.]" *Id.* § 3. Additionally, the President instructed the Secretaries of Health and Human Services, the Treasury, and Labor to outline a proposal for requiring various third-party payers to "provide or facilitate access to information about expected out-of-pocket costs for items or services to patients before they receive care." *Id.*

In August 2019, the Secretary and the CMS Administrator issued CMS's annual notice of proposed rulemaking outlining proposed modifications to certain Medicare payment systems. Medicare Program, 84 Fed. Reg. 39,398 (Aug. 9, 2019) (the "Proposed Rule"). The Proposed Rule included a section on "establish[ing] requirements for all hospitals in the United States" to make their "standard charges available to the public." *Id.* at 39,398. Although HHS previously had issued guidance about the scope of "standard charges"—guidance that permitted hospitals to publish their chargemaster rates, *see id.* at 39,571-72—the Proposed Rule was the agency's first effort to define that term through notice-and-comment rulemaking. Consistent with the Executive Order, the Proposed Rule suggested defining "two types of 'standard charges' (specifically, gross charges and payer-specific negotiated charges)[.]" *Id.* at 39,574. But it expressly sought "public comments on whether we should instead, or additionally, require the disclosure of other types of charges[.]" *Id.* at 39,580.

The Proposed Rule also included details for how hospitals would be required to publish their standard charges. In particular, it proposed requiring hospitals (1) to make public their standard charges for all items and services in a single, machine-readable file, and (2) to display and package in a consumer-friendly manner the payer-specific negotiated charges for 300 items and services that are "shoppable"—*i.e.*, can be scheduled in advance (like a colonoscopy). 84 Fed. Reg. at 39,574. Finally, the Proposed Rule outlined a series of enforcement steps CMS could take, culminating in the imposition of civil monetary penalties on noncompliant hospitals. *Id.*

In November 2019, HHS issued the Price Transparency Rule as a standalone rule—*i.e.*, the agency separated the price-transparency portion from the final rule on Medicare payment systems. 84

7

Fed. Reg. 65,524.[2]   After considering the relevant comments, the agency determined that five categories of hospital charges should be treated as "standard charges" under section 2718 of the PHS Act.  The first two—gross charges and payer-specific negotiated rates—were the ones suggested in the Proposed Rule.  *Id.* at 65,540.  But the agency also determined that hospitals should be required to publish three other "standard charges" for all items and services provided by hospitals: (1) discounted cash prices, (2) the de-identified minimum negotiated charge, and (3) the de-identified maximum negotiated charge.  *Id.*  These final two categories are a subset of the payer-specific negotiated rates—*i.e.*, they are the minimum and maximum rates that a hospital has negotiated with third-party payers for each item or service, with the name of the payer removed (hence, "de-identified").  *Id.* at 65,555.  Including those charges thus affects how hospitals must *display* their standard charges, *see id.* (explaining how consumers would use the de-identified minimum and maximum charges), but it does not expand the set of charges hospitals must disclose.

HHS also adopted the proposal for publishing the data, requiring all of the standard charges to be made available in a machine-readable file, and requiring the standard charges for at least 300 shoppable services to be made available in a consumer-friendly manner.  84 Fed. Reg. at 65,525. The agency likewise adopted the proposal for CMS to enforce the Rule and penalize noncompliance.  *Id.* Finally, after carefully considering the public comments, HHS revised its assessment of the proposed cost of compliance with the Rule, estimating average per-hospital costs of $11,898.60 in the first year and $3,610.88 in subsequent years.  *Id.* at 65,592, 65,596.  To minimize the burden on hospitals, HHS delayed the Rule's effective date by a full year—from January 1, 2020, to January 1, 2021.  *Id.* at 65,585.

## IV.   PROCEDURAL HISTORY

One week after HHS promulgated the Price Transparency Rule, Plaintiffs—four organizations and three hospitals—filed suit.  They allege that HHS violated the Administrative Procedure Act

---

[2] On that same day, HHS, the Department of the Treasury, and the Department of Labor proposed a rule that would require third-party payers to disclose estimates of a patient's out-of-pocket expenses upon request.  *See* Transparency in Coverage, 84 Fed Reg. 65,464 (Nov. 27, 2019).

("APA") and the First Amendment in promulgating the Rule.  Compl., ECF No. 1.  Five days later, without having asked for or received the administrative record, Plaintiffs moved for summary judgment.  *See* Pls.' Mot. Summ. J., ECF No. 13.  The parties then agreed to a proposed briefing schedule, which the Court adopted.  *See* Order, ECF No. 18.

## LEGAL STANDARD

Where, as here, "a party seeks review of agency action under the APA, the district court sits as an appellate tribunal," and "[t]he 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  The Court's role—in assessing both Plaintiffs' statutory and constitutional claims—is "to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (citation omitted); *see also R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1217-18 (D.C. Cir. 2012) (holding, in a First Amendment case, that "[b]ecause th[e] case involves a challenge to final agency action, the Administrative Procedure Act governs our review of the record"), *overruled on other grounds by Am. Meat Inst. v. USDA*, 760 F.3d 18 (D.C. Cir. 2014) (en banc). Specifically, HHS's "action[s], findings, and conclusions" must be upheld unless they are "arbitrary, capricious, an abuse of discretion, . . . contrary to constitutional right, . . . [or] in excess of statutory jurisdiction, authority, or limitations[.]"  5 U.S.C. § 706(2).

## ARGUMENT

### I.  HHS'S CONSTRUCTION OF "STANDARD CHARGES" IS FULLY CONSISTENT WITH THE PHS ACT.

The question at the core of this case—whether HHS permissibly defined "standard charges" in the Price Transparency Rule—is one of straightforward statutory analysis.  That analysis proceeds under the familiar framework from *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), which lays out the steps for reviewing an agency's interpretation of a regulatory statute that the agency administers.  Under the *Chevron* framework, the Court first asks "whether Congress has directly spoken to the precise question at issue." *Mozilla Corp. v. FCC*, 940 F.3d 1, 19 (D.C. Cir.

2019) (per curiam) (quoting *Chevron*, 467 U.S. at 842).  If so, both the Court and the agency "must give effect to the unambiguously expressed intent of Congress." *Id.* (quoting *Chevron*, 467 U.S. at 843).  But if there is "statutory ambiguity," the Court "defer[s] to the agency's permissible interpretation" so long as "the agency has offered a reasoned explanation for why it chose that interpretation." *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011).

Courts, to be sure, "do not apply *Chevron* reflexively"; rather, they "find ambiguity only after exhausting ordinary tools of the judicial craft." *Mozilla*, 940 F.3d at 20.  But here, those tools foreclose the only interpretation of "standard charges" that Plaintiffs advance.  "Standard charges" cannot mean only "chargemaster charges," as Plaintiffs maintain, because Congress expressly included charges for diagnosis-related groups ("DRGs") as an example of charges that must be made public.  Because charges for DRGs are not listed on a hospital's chargemaster, but are instead negotiated with third-party payers, Congress must have intended the term "standard charges" to cover more than just chargemaster rates—including, at a minimum, certain negotiated rates with insurers.  In any event, because chargemaster rates are not usual or customary for the vast majority of patients, it would not make sense to define those rates as the only kind of "standard" charge.

HHS heeded Congress's clear textual command.  It defined "standard charges" to mean the regular rates that a hospital establishes for items and services provided to defined groups of paying patients, which distinguishes "standard charges" from the individualized rates patients end up paying at the conclusion of their treatment.  And HHS reasonably determined that those "standard charges" should include rates negotiated with third-party payers—like the rates for DRGs or other service packages.  That determination is not only consistent with the PHS Act's text and structure, but also furthers the statute's express purpose of bringing down the cost of healthcare coverage by enabling patients to more easily compare prices across hospitals.  HHS's definition of "standard charges" should therefore be upheld even without *Chevron* deference.  But even if the Court is not convinced that the agency arrived at the best interpretation of the PHS Act, or decides that it need not resolve

that question, then at a minimum, HHS's reading of "standard charges" is reasonable.  The Rule therefore fall squarely within HHS's statutory authority and must be upheld.

### A.      "Standard Charges" Cannot Mean Only "Chargemaster Charges."

Congress did not define the term "standard charges" anywhere in the PHS Act, nor is the term defined elsewhere in the U.S. Code.  Plaintiffs contend that "standard charges" unambiguously means a hospital's "chargemaster charges."  Mem. in Supp. of Pls.' Mot. Summ. J. 12 ("Pls.' Br."), ECF No. 13-1.  But the text of the PHS Act confirms that Plaintiffs cannot be right.  Congress unambiguously instructed hospitals to publish more than just their chargemaster rates.  It required hospitals to publish their rates for DRGs, which are not listed on chargemasters.  Moreover, even if Congress had not spoken so clearly on the issue, Plaintiffs' reading of "standard charges" would still be wrong, as Congress did not use "standard charges" as a term of art.  Accordingly, the Court should reject Plaintiffs' unduly narrow definition.

### 1.      The Text of the PHS Act Forecloses Plaintiffs' Attempt to Limit "Standard Charges" to the Rates in a Hospital's Chargemaster.

To determine the meaning of "standard charges," we start, as do Plaintiffs, "with the plain language of the statute."  Pls.' Br. 11.  But unlike Plaintiffs, we start with the *full* text of the "standard charges" provision.  It reads:

> Each hospital operating within the United States shall for each year establish (and update) and make public (in accordance with guidelines developed by the Secretary) a list of the hospital's standard charges for items and services provided by the hospital, *including for diagnosis-related groups ["DRGs"] established under section 1395ww(d)(4) of this title.*

42 U.S.C. § 300gg-18(e) (emphasis added).

Plaintiffs address only a portion of this text in their statutory analysis—namely, the phrase, "a list of the hospital's standard charges for items and services provided by the hospital."  Pls.' Br. 11 (emphasis omitted); *see also id.* at 10-16.  But truncating the provision before the word "including" is a mistake, as the phrase "including for diagnosis-related groups" provides the statute's most specific example of the kind of information Congress wanted hospitals to publish.  From that phrase we know

that, whatever else Congress intended, it unambiguously wanted hospitals to publish their standard charges for DRGs.

That fact, in turn, makes another interpretive point clear: that when Congress used the term "standard charges," it must have meant something *other* than just "chargemaster rates." To understand why, a brief detour into the mechanics of hospital payment schemes is necessary. We start with the chargemaster. As noted previously, "the hospital chargemaster contains only list prices for individual items and services." 84 Fed. Reg. at 65,539. Thus, for a patient without insurance who is billed according to the hospital's chargemaster rates, the bill would be the sum total of every item and service the patient received as part of his treatment. For instance, a patient with non-extensive burns might be billed for the price for one hour of surgery, plus the price for IV fluids, plus the price for the hospital room where he recovered, plus the price for his dosage of pain medication, and so on.

Under a commercial DRG-based payment system, by contrast, there generally is a *single* charge for a patient's treatment—one that reflects the items and services hospitals typically furnish to similarly situated patients. Specifically, "[u]nder a DRG methodology, a base rate of payment is prospectively negotiated between each insurer and hospital, and this base rate drives the total payment level for each admission." Massachusetts Office of the Attorney General, Examination of Health Care Cost Trends and Cost Drivers (2018) ("Mass. OAG Report"), AR 5285. Although the exact payment mechanics of this system are complex, the core concept is not: A third-party payer (usually an insurance company) agrees to pay a "base rate" for a patient's treatment that is determined by the "group" the patient is assigned to. That "group" is based on the patient's diagnosis (hence the term "diagnosis-related group") and other factors, such as age. *See id.* From there, the base rate can be adjusted depending on circumstances specific to the patient's treatment. The bottom line, however, is that the "charges" under a DRG-based system stem principally from the nature of the patient's case, rather than from the list prices of any specific items and services the patient has "consumed" while at the hospital. Thus, if two patients at a hospital are assigned to the same DRG (for instance, the DRG for

12

non-extensive burns), they generally would *not* face different bills just because one patient received more pain medication or an additional bag of IV fluid (assuming the other relevant factors—such as insurance coverage and usage, patient characteristics, and lack of complications—are constant). Because a hospital's charges under a DRG methodology are not charges for individual items and services, DRG-based charges are not listed on hospital chargemasters.  *See* 84 Fed. Reg. at 65,539 ("Hospital chargemasters do not include list prices for service packages represented by common billing codes such as DRGs.").  Instead, as HHS explained, "standard charges" for DRGs and other service packages "are determined as a result of negotiations with third party payers."  *Id.*

That is true regardless of how hospitals choose to "code" their DRGs.  The PHS Act specifically mentions DRGs "established under section 1395ww(d)(4) of [Title 42]," 42 U.S.C. § 300gg-18(e), which is the provision of the U.S. Code that requires the establishment of DRG-based classifications for Medicare, *see id.* § 1395ww(d)(4)(A).  Many private insurers have chosen, in their agreements with hospitals, to use the same DRG classifications that Medicare uses, whereas others have adopted their own classification systems for DRGs.  *See* Mass. OAG Report, AR 5286.  But although different DRG-based systems may use different parameters when assigning patients to "groups," the systems function in the same basic way.  Accordingly, there is no reason to require hospitals to publish standard charges for only one set of DRGs, particularly given that Congress used non-exclusive language—*i.e.,* the word "including"—in the statute.  *See* 42 U.S.C. § 300gg-18(e).

Ultimately, Congress's decision to "includ[e]" DRGs in the "standard charges" provision, 42 U.S.C. § 300gg-18(e), makes two things clear:  First, Congress wanted hospitals to publish something other than just their chargemaster rates, given that DRG-based charges are not listed on a chargemaster.  HHS was thus correct when it observed that the PHS Act "contemplates disclosure of charges other than the list prices as found in the hospital chargemaster[.]"  84 Fed. Reg. at 65,539. Second, Congress understood that at least some negotiated rates would become public, given that the charges under a DRG-based system stem from negotiations with third-party payers.

13

These conclusions foreclose Plaintiffs' reading of the PHS Act.  Plaintiffs' suggestion that "standard charges" must mean "chargemaster charges" is not viable if the *only* charges that Congress specifically identified as "standard" do not appear on a hospital's chargemaster.  Similarly, Plaintiffs' assertion that it is "obvious" that "negotiated charges are not 'standard charges,'" Pls.' Br. 2, gets things exactly backwards.  In fact, section 2718(e) makes it "obvious" that Congress *included* negotiated charges for DRGs as "standard charges" under the PHS Act.

2. **Plaintiffs' Arguments for Reading "Standard Charges" to Mean "Chargemaster Charges" Are Independently Unavailing.**

Even though the preceding textual argument about DRGs was central to HHS's interpretation of "standard charges," *see* 84 Fed. Reg. at 65,539-40, Plaintiffs ignore the argument entirely. Accordingly, even if the arguments Plaintiffs do raise about the supposedly "clear meaning" of "standard charges" were persuasive in a vacuum, *see* Pls.' Br. 12, they would not carry the day because they fail to account fully for "the particular statutory language at issue, as well as the language and design of the statute as a whole."  *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988).  But Plaintiffs' position fares no better when considered on its own terms.

Plaintiffs begin their statutory analysis with the word "standard," which they define to mean "usual, common, or customary, especially for purposes of comparison."  Pls.' Br. 11.  Whatever appeal that definition might have in the abstract, standing alone it sheds little light on the question of which charges can count as "usual, common, or customary" in the hospital-services context.  To answer that question, Plaintiffs claim that "'[s]tandard charges' are commonly understood to mean a hospital's usual or customary chargemaster charges[.]"  *Id.* at 12.  But the phrase "usual or customary chargemaster charges" does not make sense.  As noted above, a hospital has just *one* chargemaster, which lists all of its charges for individual items and services.  Yet the phrase "usual or customary chargemaster charges" suggests that hospitals have *un*usual or *non*-customary chargemasters, when in fact they do not.  And to the extent Plaintiffs would claim that "usual or customary chargemaster charges" means "the most commonly levied chargemaster charges," that argument is nowhere in their

brief and is inconsistent with the statute, which requires hospitals to publish a list of their "standard charges for items and services," not for a *subset* of their items and services.  42 U.S.C. § 300gg-18(e).

Plaintiffs' "definition" of "standard charges" is thus nothing of the sort.  Instead of *defining* "standard charges," Plaintiffs have simply slipped the word "chargemaster" in between the definition of "standard" and the word "charges."  The unstated assumption is that "chargemaster charges" *are* a hospital's "usual or customary" charges.  But perhaps the reason that assumption is unstated is because it is untrue.  As HHS found (and as Plaintiffs do not dispute), "the gross charge," *i.e.*, chargemaster rate, "does not apply to most consumers of hospital services, for example, consumers with third party payer coverage."  84 Fed. Reg. at 65,575.  In fact, "the gross charge is not a standard charge for approximately 90 percent of [a] hospital's customers who have third party payer coverage."  *Id.*; *see also* *id.* at 65,538 ("Chargemaster (gross) rates charged to self-pay individuals bear little relationship to market rates, are usually highly inflated, and tend to be an artifact of the way in which Medicare used to reimburse hospitals.").  Accordingly, when Plaintiffs claim that Congress used "standard charges" to mean "usual or customary chargemaster charges," Pls.' Br. 12, what they are really suggesting is that Congress meant "usual or customary [very-rarely-charged] charges."  That internally contradictory reading is implausible, particularly given that if Congress had just wanted hospitals to publish their chargemasters, it would have said so.  *See Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252 (2010) (adding a "term of art" that is "conspicuously absent" from the text "more closely resembles inventing a statute rather than interpreting one" (alterations and citation omitted)).  Indeed, Plaintiffs' subsequent suggestion that "Congress knows how to specify the disclosure of payer-specific information" reinforces this point.  Pls.' Br. 14.  If Congress had wanted to require hospitals to publish only one kind of charge—whether chargemaster rates or payer-specific rates—it presumably would have said so.  That Congress instead used "standard charges"—a broader term that can encompass multiple kinds of rates—confirms that its focus was not as narrow as Plaintiffs suggest.

The smattering of cases Plaintiffs cite that include the words "standard charge[s]" does not render their reading of the PHS Act any more viable. For starters, not one of the cases interprets "standard charge[s]" in the context of a statute or regulation. *Cf. ViroPharma, Inc. v. Hamburg*, 898 F. Supp. 2d 1, 19 (D.D.C. 2012) (rejecting the argument that a statutory term's "common usage in industry transforms it into a clear term").

Second, only one of the cases even *mentions* a chargemaster, and the court there was not independently discerning the meaning of "standard charges," but merely reciting allegations from the complaint (brought by two hospitals) in considering a motion to dismiss. *NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, No. 17-CV-05005-LB, 2017 WL 6059299, at *2 & n.21 (N.D. Cal. Dec. 7, 2017) (citing the complaint in n.21). And even that case suggests there was a difference between the hospitals' "reasonable-and-customary rate" and the "full charge-master rate." *Compare id.* at *6 n.54, *with* Pls.' Br. 11 ("standard" means "customary"). That only one of Plaintiffs' cases refers to "standard charges" as "chargemaster charges"—and only in passing—cuts against the notion that "standard charges" is a "term[] of art" that really just means "chargemaster charges." *See* Pls.' Br. 12.

Third, another of Plaintiffs' cases reinforces the significance of Congress's decision to include DRGs as "standard charges" in the PHS Act. In *Brown v. Blue Cross & Blue Shield of Michigan, Inc.*, No. 94-CV-75033-DT, 1996 WL 608546, at *1 (E.D. Mich. Sept. 16, 1996), *vacated*, No. 94-CV-75033-DT, 1997 WL 858746 (E.D. Mich. Jan. 23, 1997), the court explained that payment "using a Diagnosis-Related Group ('DRG') methodology . . . was *not* based on each hospital's standard charge[.]" *Id.* (emphasis added). In other words, that discussion of "standard charge[s]" hinged on an assumption— that standard charges are different from DRG-based charges—that Congress expressly rejected.

Finally, other cases where courts have discussed "standard charges" or "standard rates" confirm that the term does not unambiguously mean "chargemaster rates." For instance, *Beth Israel Medical Center v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 577 (2d Cir. 2006), addressed a New York law that defined the "Standard Rate" for payments to hospitals as the rate paid

by state governmental agencies and certain non-profit health plans.  Unlike chargemaster prices, the "Standard Rate" generally was *lower* than the "Commercial Rate" and the "Self-Pay Rate" under the same law.  *Id.*  And *Prudential Insurance Co. of America. v. Michael Reese Hospital & Medical Center*, No. 81 C 5951, 1985 WL 222, at *2 (N.D. Ill. Jan. 9, 1985), used "standard charge" to mean something akin to a national-average price.  *See id.* (explaining that "a nationwide area must be used" to determine "the standard charge for [a drug called] Autoplex," with no mention of the drug's chargemaster price).

In sum, "applying the ordinary tools of statutory construction," *City of Arlington v. FCC*, 569 U.S. 290, 296-97 (2013), it is clear that "standard charges" in the PHS Act does not mean only "chargemaster charges."

### B.     The Text, Structure, and Purpose of the PHS Act Support HHS's Definition of "Standard Charges."

Having determined what "standard charges" does *not* mean, we turn to what it does.  HHS defined a "standard charge" to mean "a regular rate established by [a] hospital for the items and services provided to a specific group of paying patients."  84 Fed Reg. at 65,541-42.  The key features of this definition are that the rate must be *regular*—*i.e.*, the rate must be formalized through something like a hospital's rate sheets, *see id.* at 65,546—and that there must be an identifiable group of patients for whom that rate would apply.  From there, HHS determined that, broadly speaking, there are two distinct groups that face hospital charges:  "individuals that are self-pay and individuals that have third party payer coverage."  *Id.* at 65,546.  For self-pay individuals, HHS found that there are two kinds of regular rates that hospitals charge: chargemaster rates and discounted cash prices.  *See id.* at 65,540. And for individuals with third-party payer coverage, the regular rates generally are the ones negotiated between the payer (usually an insurance company) and the hospital.  *See id.* at 65,542.  Accordingly, HHS required hospitals to publish as "standard charges" their chargemaster rates, their discounted cash prices, and the rates they have negotiated with third-party payers (including the de-identified minimum and maximum of those negotiated rates).

Plaintiffs directly challenge only the last of these requirements—*i.e.*, HHS's determination that hospitals must publish the regular charges they have negotiated with third-party payers, including the de-identified minimum and maximum rates.[3]  In assessing HHS's interpretation of the PHS Act, "[t]he words of the statute should be read in context, the statute's place in 'the overall statutory scheme' should be considered, and the problem Congress sought to solve should be taken into account."  *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 796 (D.C. Cir. 2004).  All of those factors support HHS's decision to include negotiated third-party rates in its definition of "standard charges."

Starting with the relevant context, the term "standard charges" does not appear in isolation in section 2718(e).  Rather, Congress required hospitals to publish their "standard charges *for items and services provided by the hospital.*"  42 U.S.C. § 300gg-18(e) (emphasis added).  That linkage makes sense; before one can know what charges count as "standard," one must know what the charges are for.  Accordingly, before turning to "standard charges," the Rule first defines "items and services."  *See* 84 Fed. Reg. at 65,533-37.  Of particular relevance, HHS defined "items and services" to include "individual items and services," on the one hand, and "service packages," on the other.  *Id.* at 65,536.  HHS's reason for including service packages is straightforward, and it again relies on Congress's decision to single out DRGs in section 2718(e):  DRG-based charges are billed as a service package, and thus "the inclusion of DRGs as an item or service in section 2718(e) recognizes that hospital services can be provided, and charges billed, based on [either] the service's individual component parts or as a more inclusive service package."  *Id.* at 65,534.

Plaintiffs do not mention—much less dispute—that the PHS Act requires hospitals to publish standard charges for at least some service packages.  And accepting that service packages are within

---

[3] Plaintiffs do not dispute that it is a permissible reading of the PHS Act to include the discounted cash price as a "standard charge."  *See* Pls.' Br. 11 (claiming only that the statute "does not allow the agency to mandate disclosure of insurer-specific negotiated charges, a 'de-identified minimum' negotiated charge, or a 'de-identified maximum' negotiated charge").  Moreover, nothing in Plaintiffs' brief casts doubt on HHS's decision to consider a "cash discounted price [that] would apply to all self-pay individuals, regardless of insurance status," a "standard charge."  84 Fed. Reg. at 65,553.

the scope of section 2718(e) has clear implications for the definition of "standard charges."  As HHS explained, "[h]ospital chargemasters do not include list prices for service packages represented by common billing codes such as DRGs.  Instead, 'standard charges' for service packages are determined as a result of negotiations with third party payers."  84 Fed. Reg. at 65,539.  Again, the key point is that Congress wanted charges that are negotiated with third-party payers to be part of the list of standard charges that hospitals publish.  *See supra* at 13.

Further support for HHS's decision to include negotiated rates within its definition of "standard charges" comes from the agency's assessment of the market for hospital services.  After reviewing the comments on the Proposed Rule, the agency determined that "a singular 'standard' that applies to all identifiable groups of patients is not possible because groups of patients with third party payer insurance have different standard charges that apply to them than do patients without third party payer coverage."  84 Fed Reg. 65,541.  In other words, the "usual or customary" charges for patients who have insurance are different than the "usual or customary" charges for patients who do not.  Accordingly, to capture the "standard charges" for the roughly 90% of hospital patients with third-party coverage, *see id.* at 65,575, it was necessary to include rates negotiated with insurance companies.  *See also id.* at 65,546 (explaining that a hospital's negotiated rate "with a specific plan through a specific insurer . . . is the usual or common rate for the members of that plan").

Plaintiffs' arguments to the contrary are unpersuasive.  First, Plaintiffs claim that the regular charges for different identifiable groups, such as patients covered under a particular insurance plan, cannot count as "standard" because the rates are "tailored" to that particular group.  Pls.' Br. 13.  But as explained above, the charges for hospital service packages, including for DRGs, result from negotiations with third-party payers.  Those charges are by definition "tailored" to particular groups (*i.e.*, whatever group is covered by a specific third-party payer), and Congress plainly included them in section 2718(e).  Moreover, HHS's definition appropriately distinguishes between "standard" charges (*e.g.*, the ones formalized in a regular contract or policy) and charges that are "tailored" through

adjustments to a hospital's base rates or to a patient's ultimate payments.  *See* 84 Fed. Reg. at 65,546-47.  Put differently, HHS's definition of "standard charges" broadly reflects the difference between a charge that can be looked up in advance on a hospital's rate sheets and a charge that can only be determined on a case-by-case basis.

Second, Plaintiffs are wrong to suggest that the statute's use of "*a list*" (instead of the plural "lists") means that hospitals should have to publish only one kind of standard charge.  Pls.' Br. 13-14.  Again, Congress's decision to include DRGs in section 2718(e) is dispositive.  It demonstrates that the required "list" of hospital charges must include charges other than just chargemaster rates.  Given that the statute requires at least two categories of charges in "a list," Plaintiffs provide no reason why that list could not include the five categories of charges that HHS identified.  Moreover, as a technical matter, hospitals *can* publish their standard charges in one "list" under the Rule.  In fact, HHS required that hospitals make their standard charges available in "a *single* data file."  84 Fed. Reg. at 65,555 (emphasis added).  Thus, even if Congress authorized HHS to collect only a "single set of data," Pls.' Br. 13, the agency has complied with any such limitation.

Third, Plaintiffs' concern about the commercial sensitivity of the regular rates that hospitals charge third-party payers does not change the meaning of "standard charges" in the PHS Act.  As an initial matter, any suggestion that these charges are especially sensitive is overblown, given that "this information is already generally disclosed to the public in a variety of ways[.]"  84 Fed. Reg. at 65,544.  As HHS described at length in the Rule (and as Plaintiffs do not contest), many negotiated rates between hospitals and insurers are available through state databases, patient EOBs, and a variety of private entities, like price-transparency vendors, that have an interest in making the information public.  *See id.*  Of particular note, patients have used crowdsourcing websites—*i.e.*, sites through which they manually submit the details of their own medical bills and EOBs, including payer-specific negotiated charges, to private entities that collect and display the information—as a means of bringing some measure of transparency to the market for hospital services.  *See id.*; *see also* AR 5431-35 (example of a

crowdsourcing website's form for patients to submit the details of their hospital charges).  In any event, the best indication that Congress wanted hospitals to disclose negotiated charges is that it required hospitals to disclose negotiated charges—at a minimum, the rates negotiated with third-party payers for DRGs.  *See* 84 Fed. Reg. at 65,539 (explaining that the "standard charges" for DRGs that must be made public under section 2718(e) "are determined as a result of negotiations with third party payers").  Although Plaintiffs may prefer a world in which patients have to resort to crowdsourcing to figure out the cost of going to the hospital, Congress did not.

Finally, Plaintiffs ignore the purpose of section 2718 of the PHS Act, which is titled "Bringing down the cost of health care coverage."  42 U.S.C. § 300gg-18.  To that end, HHS found that requiring hospitals to publish the rates they charge third-party payers would lower prices through several mechanisms.  *See* 84 Fed. Reg. at 65,543-51.  For instance, patients with insurance need to know the rates their insurance company has negotiated with hospitals in order "to determine their potential out-of-pocket cost estimates," which means the information is necessary for patients to meaningfully shop for more affordable care.  *Id.* at 65,543.  And when patients use pricing information to shop for care, the evidence suggests that "cost savings result[] for both inpatient and outpatient care without sacrificing quality."  *Id.* at 65,545-46.  The degree to which the Rule actually achieves these costs reductions is discussed in greater depth below, as part of the explanation for why the Rule directly advances the government's substantial interest in making healthcare more affordable.  *See infra* at 32-37.  But in sum, HHS's interpretation of the PHS Act is grounded in a careful reading of the text and a serious engagement with the statute's purpose.  HHS's statutory analysis demonstrates that it reached the best definition of "standard charges," and this Court should uphold that definition.

### C.    At a Minimum, HHS's Definition of "Standard Charges" Is Reasonable and Is Entitled to Deference.

The above analysis confirms that HHS's definition of "standard charges" best harmonizes the PHS Act's text, structure, and purpose.  But the Court need not assign superlatives to uphold the agency's interpretation.  Rather, "under *Chevron*, courts are bound to uphold an agency interpretation

as long as it is reasonable—regardless whether there may be other reasonable, or even more reasonable, views." *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1321 (D.C. Cir. 1998).

In Plaintiffs' view, however, HHS is owed no deference in this case because of the President's role in pushing for price transparency. Specifically, Plaintiffs claim that the Price Transparency Executive Order contained a "critical assumption" about the meaning of "standard charges," and that this "assumption" eliminates the possibility that the Price Transparency Rule flowed "from the agency's reasoned judgment[.]" Pls.' Br. 14. That is mistaken. To begin, the Executive Order did not purport to supplant HHS's judgment; it simply instructed the agency to "*propose* a regulation, consistent with applicable law, to require hospitals to publicly post standard charge information, including charges and information based on negotiated rates and for common or shoppable items and services[.]" Exec. Order No. 13,877, 84 Fed. Reg. 30,849, § 3 (emphasis added). Once the agency did so, nothing in the Executive Order prejudged the contours of the Final Rule, and indeed, HHS did not rely on the Executive Order in justifying its interpretation of "standard charges." *See Good Fortune Shipping SA v. Comm'r of IRS*, 897 F.3d 256, 263 (D.C. Cir. 2018) (emphasizing that courts "look only to what the agency said at the time of the rulemaking" in "assessing the reasonableness of the [agency's] interpretation" (citation omitted)). The agency arrived at its interpretation of "standard charges" after going through the notice-and-comment rulemaking the PHS Act expressly authorizes. *See* 42 U.S.C.A. § 300gg-92. That fact places this case in the same category as "the overwhelming number of cases applying *Chevron* deference," where courts "review[] the fruits of notice-and-comment rulemaking or formal adjudication." *United States v. Mead Corp.*, 533 U.S. 218, 230 (2001).

In any event, Plaintiffs cite no authority for the remarkable proposition that presidential involvement should diminish the deference an agency is owed. *Chevron* itself suggests the opposite result by emphasizing that although "agencies are not directly accountable to the people, *the Chief Executive is*, and it is entirely appropriate for this political branch of the Government" to "resolv[e] the competing interests which Congress" did not. *Chevron*, 467 U.S. at 865 (emphasis added); *see also Public*

*Citizen v. Burke*, 843 F.2d 1473, 1477-78 (D.C. Cir. 1988).  In fact, the very regulation at issue in *Chevron* "arose, as the Court recognized, from a 'Government-wide reexamination of regulatory burdens and complexities' that President Reagan ordered in his first months in office."  Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2376 (2001) (quoting *Chevron*, 467 U.S. at 857).

Applying *Chevron* deference here confirms that HHS adopted a permissible construction of the PHS Act.  In determining "[w]hether an agency's construction is reasonable" under the *Chevron* framework, the analysis proceeds along familiar lines—courts begin with "the text of the statute" and assess "the construction's 'fit' with the statutory language, as well as its conformity to statutory purposes."  *Good Fortune Shipping*, 897 F.3d at 262 (citations omitted).  In other words, all of the foregoing analysis about how HHS's definition of "standard charges" aligns with the PHS Act's text, structure, and purpose applies with equal force at *Chevron* step two.  Whether those factors "permit the interpretation chosen by the agency . . . 'depends on the nature and extent of the ambiguity' identified[.]"  *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1049 (D.C. Cir. 1997) (citation omitted).

"Standard charges" is a term that can encompass multiple kinds of charges.  As noted above, Congress did not specify only "chargemaster charges" or "negotiated charges"; it chose "indefinite, flexible phraseology," and this Court should not "ignore the legislature's choice[.]"  *Ass'n for Cmty. Affiliated Plans v. U.S. Dep't of Treasury*, 392 F. Supp. 3d 22, 39 (D.D.C. 2019), *appeal filed*, No. 19-5212 (D.C. Cir. Jul. 30, 2019).  Moreover, Congress's decision to place the "standard charges" provision in section 2718 of the PHS Act—a section that is dedicated to lowering healthcare costs—reinforces that HHS is entitled to deference.  *See Good Fortune Shipping*, 897 F.3d at 262 (reasonableness depends on "conformity to statutory purposes").  Determining which "standard charges" would provide the public with the kind of information that will lower healthcare costs is the sort of judgment that an agency is best positioned to make in the first instance.

At bottom, even if the Court concludes that the Rule does not reflect the *best* reading of the statute, the task that HHS undertook—*i.e.*, deciding "how best to construe an ambiguous term [in the

PHS Act] in light of competing policy interests"—would clearly present an "archetypal *Chevron* question[.]" *City of Arlington*, 569 U.S. at 304.  And it is precisely the kind of question that the Supreme Court has cautioned against transferring "from the agencies that administer the statutes to federal courts." *Id.*  HHS exercised its reasoned, considered judgment in construing the PHS Act, and it did so in a manner consistent with the statute's text and that furthered the statute's purpose.  HHS's definition of "standard charges" should be upheld.

## II.    CONGRESS DID NOT MAKE A "SCRIVENER'S ERROR" WHEN IT GAVE HHS THE POWER TO ENFORCE SECTION 2718 OF THE PHS ACT.

To promote the efficacy of the Price Transparency Rule, HHS authorized the imposition of penalties on noncompliant hospitals.  *See* 84 Fed. Reg. 65,589-90; *see also* 45 C.F.R. § 180.90.  The authority to do so comes straight from section 2718 of the PHS Act, which provides:  "The Secretary shall promulgate regulations for enforcing the provisions of this section and may provide for appropriate penalties."  42 U.S.C. 300gg-18(b)(3).  There is, of course, no dispute that subsection 2718(e), which contains the "standard charges" requirement, is within section 2718.  The requirement for hospitals to publish their standard charges thus is plainly one of the "provisions of this section [*i.e.*, 2718] for which the Secretary may provide for penalties."  *Id.*

Faced with this clear language, Plaintiffs nonetheless insist that the penalties provision was the result of a "scrivener's error," and that Congress *actually* intended 2718(b)(3)'s penalty clause to refer only to subsections 2718(a) and (b), which address medical loss ratio ("MLR").  *See* Pls.' Br. 16-17.  The theory goes like this:  Section 2718 was originally two separate provisions, one related to MLR (which included the penalties provision) and one related to standard charges (which did not).  Then, during the ACA's drafting process, the two provisions were fused together in a way that, in Plaintiffs' telling, inadvertently made the penalty provision applicable to *all* of section 2718, rather than just to subsections (a) and (b).  *See id.*  The result, Plaintiffs contend, is a scrivener's error that requires this Court to ignore the plain text of section 2718(b)(3).

Plaintiffs, however, do not come close to surmounting the high bar required to rewrite the PHS Act on a theory of scrivener's error—indeed, Plaintiffs fail to even mention the applicable standard in their brief. *See* Pls.' Br. 16-19. The scrivener's error doctrine comes into play only when a statute has an error that "is so 'unthinkable' that any reasonable reader would know immediately both (1) that it contains a 'technical or ministerial' mistake, and (2) the correct meaning of the text." *Lexington Ins. Co. v. Precision Drilling Co., L.P.*, 830 F.3d 1219, 1223 (10th Cir. 2016) (Gorsuch, J.) (quoting Antonin Scalia & Bryan A. Garner, Reading Law 237-38 (2012)); *see also Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991) (considering whether "the application of the statute as written will produce a result 'demonstrably at odds with the intentions of its drafters'").[4]

Set against this demanding standard, Plaintiffs' argument fails. The statute is hardly "unthinkable" on its face; it imposes reporting and rebate obligations on private entities in at least three subsections: 2718(a) (imposing reporting obligations on health insurers), 2718(b) (imposing rebate requirements on insurers), and 2718(e) (imposing reporting requirements on hospitals). All three are affirmative, regular obligations imposed on third parties, and it is far from "unthinkable" that all three obligations would require enforcement and penalty provisions. If anything, the vehemence with which Plaintiffs oppose the Price Transparency Rule illustrates why it made sense for Congress to give HHS the power to impose penalties on non-compliance.

Moreover, under Plaintiffs' theory, a reader would not "immediately" know the correct reading of the text. In fact, Plaintiffs appear to get the "correct" reading wrong in their own brief. They say that, after "the standalone MLR and 'standard charges' bills were consolidated," Congress should have "updat[ed]" the word "section" in 2718(b)(3) to "subsection." Pls.' Br. 18. If Congress had done that, the resulting provision would have read: "The Secretary shall promulgate regulations for

---

[4] Although Plaintiffs cite to *Moore v. District of Columbia*, 907 F.2d 165, 172 (D.C. Cir. 1990), for the proposition that courts can look to legislative history whenever Congress's intention is not "*crystal* clear," Pls.' Br. 18, *Moore* is largely a case about ordinary principles of statutory interpretation. It does not mention scrivener's errors.

enforcing the provisions of this *sub*section and may provide for appropriate penalties." *See* 42 U.S.C. § 300gg-18(b)(3). But that wording would have limited the penalties provision to only 2718(b)—*i.e.*, "this subsection"—not 2718(a) *and* (b), which comprise *two* subsections. Accordingly, although Plaintiffs claim that "it is clear that Congress intended to limit Section 2718(b)(3)" to *both* of the "MLR provisions," Pls.' Br. 17, Plaintiffs' suggested fix would not accomplish that goal, as it would limit the penalties provision to *one* MLR provision, the one in subsection 2718(b). In other words, in attempting to correct an alleged scrivener's error, Plaintiffs appear to have introduced one of their own.

And even taking Plaintiffs' claims about legislative history at face value, their argument is unpersuasive. To recap: Plaintiffs think that, in section 2718, when Congress combined subsections (a) and (b), which had come from one bill, with subsections (c), (d), and (e), which had come from different bills, Congress overlooked the interaction between subsection (b) and the three subsections that had been added. But that theory—that Congress did not pay attention to how the newly combined subsections in 2718 would interact—is belied by the text of subsections (c) and (d). Those subsections each reference either subsection (a) or (b), confirming that Congress *did* pay attention to how all of 2718's subsections would work together before it finalized the ACA. *See* 42 U.S.C. § 300gg-18(c), (d). The drafting history of the statute thus confirms that there is no scrivener's error here.

Finally, Plaintiffs suggest that applying the plain language of subsection 2718(b)(3) would be absurd because it would grant CMS the authority to "penalize . . . the National Association of Insurance Commissioners [("NAIC")]." Pls.' Br. 18. Subsection (c) provides that the NAIC "shall establish uniform" definitions and standardized methodologies of certain MLR-related activities by the end of 2010. 42 U.S.C. § 300gg-18(c). Plaintiffs say that it would be absurd to permit the Secretary to establish penalties to enforce that provision, and thus subsection (b)(3) could not possibly apply. *See* Pls.' Br. 18-19. But this argument is a red herring. First, subsection (b)(3) provides that the Secretary "*may*" provide for penalties; he is not *required* to do so. Moreover, subsection (c) requires an organization to issue definitions, which is not the type of regular, repeated obligation that would

tend to lead to enforcement actions.   And, of course, a permissive statutory provision—like the penalties provision here—can be over-inclusive without being absurd or a scrivener's error.

Ultimately, "[i]f Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent.  'It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think . . . is the preferred result.'"  *Lamie v. U.S. Trustee*, 540 U.S. 526, 542 (2004) (citation omitted).   Because it is not "unthinkable"—and indeed, is quite sensible—for Congress to have enacted section 2718 as written, this Court cannot rewrite it.

## III.   THE PRICE TRANSPARENCY RULE SATISFIES THE FIRST AMENDMENT.

The Price Transparency Rule imposes a straightforward requirement on hospitals to disclose purely commercial information—their standard charges—to potential customers.   Plaintiffs' contention that this requirement violates the First Amendment does not withstand scrutiny.  Typically, courts evaluate a regulation of commercial speech under the intermediate scrutiny standard set forth in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980).  But a more lenient standard applies where, as here, a commercial speech regulation "impose[s] a disclosure requirement," *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249 (2010), and the disclosure involves "purely factual and uncontroversial information about the good or service," *Am. Meat Inst.* ("*AMI*") *v. U.S. Dep't of Agric.*, 760 F.3d 18, 27 (D.C. Cir. 2014) (en banc) (citation omitted). As such, the Rule complies with the First Amendment if it is "reasonably related to the [government's] interest" and is not so "unjustified or unduly burdensome" that it "chill[s] protected commercial speech." *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985).

The Price Transparency Rule plainly is permissible under *Zauderer*.  It directly advances the government's substantial interest in providing consumers with better information about the price of healthcare and in lowering healthcare costs, and it does not chill any protected speech.  Moreover, because the Rule's scope is reasonable in light of its purpose, it also readily passes muster under intermediate scrutiny.  Thus, regardless of which standard is applied, the Rule is constitutional.

A.      **The Rule Should Be Upheld Under *Zauderer*.**

1.      **The *Zauderer* Test for Compelled Commercial Disclosures Governs the First Amendment Inquiry in this Case.**

Plaintiffs devote significant attention in their brief to the appropriate level of scrutiny.  *See* Pls.' Br. 19-20, 26.  But as the Supreme Court recently confirmed, "[t]he *Zauderer* standard" applies to disclosures of "purely factual and uncontroversial information about the terms under which . . . services will be available," *Nat'l Inst. of Family & Life Advocates ("NIFLA") v. Becerra*, 138 S. Ct. 2361, 2372 (2018) (quoting *Zauderer*, 471 U.S. at 651), and that description sums up this case.  The "standard charges" hospitals must publish are "factual and uncontroversial information" about what is arguably the most important "term[] under which [hospital] . . . services will be available"—the price.  *See, e.g.*, *Amarei v. City of Chicago*, No. 13 C2805, 2015 WL 7251940, at *3 (N.D. Ill. Nov. 17, 2015) (describing "a list of services rendered by the tax preparer" and "a list of corresponding prices" as "the sort of uncontroversial factual information that *Zauderer* contemplated").

Plaintiffs try to muddy these waters in several ways.  First, they note that *Zauderer* applies only in commercial-speech contexts (which is true), and contend that the Rule does not regulate commercial speech (which is not).  *See* Pls.' Br. 19-20.  Plaintiffs suggest that the Rule does not regulate commercial speech because the "Rule . . . does not regulate advertising," *id.*, but advertising is not the only kind of commercial speech.  The Supreme Court has defined "commercial speech" to mean "expression related solely to the economic interests of the speaker and its audience," *Cent. Hudson*, 447 U.S. at 561, a definition that plainly includes price, *see, e.g.*, *Expressions Hair Design v. Schneiderman*, 877 F.3d 99, 103 (2d Cir. 2017) (treating the "disclos[ure] [of] an item's credit card price" as commercial speech).  Plaintiffs later tweak this argument to suggest that it is *Zauderer*, rather than the commercial speech doctrine more broadly, that "applies only in the context of commercial advertising."  Pls.' Br. 26.  But even the D.C. Circuit case Plaintiffs cite for that proposition, *National Association of Manufacturers v. SEC*, 800 F.3d 518 (D.C. Cir. 2015) ("*NAM*"), recognizes that a prior en banc decision of the D.C. Circuit held otherwise.  *See AMI*, 760 F.3d at 22-23 (holding that *Zauderer* applies to a

country-of-origin disclosure requirement on *labels*).  Although *NAM* suggested that *AMI* was wrong to apply *Zauderer* outside the realm of advertising, *see* 800 F.3d at 520, this Court remains bound by *AMI*.  And while *NAM* went on to hold (in the alternative) that *Zauderer* did *not* apply to SEC disclosure requirements about conflict minerals—requirements that were "quite different from the economic or investor protection benefits that [SEC] rules ordinarily strive to achieve," *id.* at 522 (citation omitted)—the "standard charges" provision at issue here is squarely aimed at "economic or [consumer] protection benefits."

Second, Plaintiffs cite *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995), for the proposition that regulations that compel speech can be subject to strict scrutiny. *See* Pls.' Br. 20.  But *Hurley* just reinforces the gap between the kind of speech at issue here (prices) and the kind of speech that requires closer First Amendment scrutiny.  In *Hurley*, the issue was whether a state could "require private citizens who organize a parade to include among the marchers a group imparting a message the organizers do not wish to convey."  515 U.S. at 559.  Here, by contrast, it is a hospital's *own prices* that would be disclosed, not the speech of some other entity or a compelled message with which the hospital might disagree.  *See id.* at 573 (distinguishing between the required "dissemination of 'purely factual and uncontroversial opinion'" and the "compel[led] affirmation of a belief with which the speaker disagrees" (quoting *Zauderer*, 471 U.S. at 651)); *see also Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005) (op. of Boudin, C.J. & Dyk, J.) (the compelled "disclosure of economically significant information designed to forward ordinary regulatory purposes" does not "require an extensive First Amendment analysis"); *United States v. Schiff*, 379 F.3d 621, 630-31 (9th Cir. 2004) (holding that *Zauderer*, rather than *Hurley*, applies in evaluating a court's order to post a preliminary injunction on a commercial website).

Finally, Plaintiffs are wrong to suggest that a list of a hospital's standard charges does not count as "purely factual and uncontroversial information." Pls.' Br. 26.  The disclosures HHS requires are not "one-sided or incomplete," *id.*, as there is not another "side" to a price, and there are no

additional hospital charges that Plaintiffs have suggested publishing. To the contrary, Plaintiffs' concern appears to be that the required set of standard hospital charges is *too* complete. And to the extent Plaintiffs contend that the disclosures are incomplete because they lack relevant contextual information, the Rule emphasizes that a hospital is free to "convey other information of its choosing[.]" 84 Fed. Reg. at 65,545. Moreover, Plaintiffs offer no support for their suggestion that it is "by any definition 'misleading'" for hospitals to publish the rates they have agreed to with insurance companies. Pls.' Br. 26. In fact, the only case Plaintiffs cite here, *Giant Food, Inc. v. FTC*, 322 F.2d 977 (D.C. Cir. 1963), illustrates why including those rates will *decrease* the chances that consumers will be misled. There, the court upheld an agency determination that the phrase "manufacturer's list price" was misleading because it did not reflect the "price at which the product was *usually and customarily sold*[.]" *Id.* at 982 (emphasis added). In the hospital context, the clear analogue for a "list price" that is not the price at which hospital services are "usually and customarily sold" is the chargemaster rate. But because the Rule requires hospitals to disclose more than just their chargemaster rates, patients can get a more complete picture of the charges that will be billed for their care. To be sure, patients may have to make further calculations to arrive at an estimate of their out-of-pocket costs. *See infra* at 35-37. But a system in which patients have to do *some* of the work to estimate their costs is less disorienting than the present one, where, if estimates are even possible, *all* of the work falls on patients.

### 2.     The Rule Imposes A Reasonable Disclosure Requirement.

The Price Transparency Rule easily satisfies the "reasonableness" standard that *Zauderer* sets. "To withstand scrutiny under *Zauderer*, the disclosure requirements need only be 'reasonably related to the [government's] interest,' and not so 'unjustified or unduly burdensome' as to chill protected commercial speech." *Cigar Ass'n of Am. v. FDA*, 315 F. Supp. 3d 143, 165 (D.D.C. 2018) (quoting *Zauderer*, 471 U.S. at 651), *appeal pending*, No. 18-5195 (D.C. Cir., argued Oct. 29, 2019).

Plaintiffs do not—and cannot—dispute that the Rule is reasonably related to a governmental interest. *Zauderer* and its progeny require "disclosures to remedy a harm that is 'potentially real not

purely hypothetical,' and to extend 'no broader than reasonably necessary.'" *NIFLA*, 138 S. Ct. at 2377 (citation omitted).  That is what the Rule does.  It remedies the fact that patients lack information about hospital charges, and it "reasonably" does so by requiring hospitals to provide information that patients need to determine how much they may pay.  *See* 84 Fed. Reg. at 65,544-45; *infra at* 32-39.

Instead, Plaintiffs contend that the Rule is both "unjustified" and "unduly burdensome."  Pls.' Br. 26-27.  But those labels are red herrings because they are unconnected to the particular harm that matters under *Zauderer*—chilling commercial speech.  *See AMI*, 760 F.3d at 27 ("*Zauderer* cannot justify a disclosure so burdensome that it essentially operates as a restriction on constitutionally protected speech.").  Plaintiffs make no claim that the Rule will chill commercial speech, and it is difficult to see how such a claim could be plausible.  Requiring hospitals to disclose their standard charges does not "effectively rule out speech or 'nullify' the message" hospitals might otherwise wish to communicate.  *Cigar Ass'n of Am.*, 315 F. Supp. 3d at 173.

Moreover, any suggestion that the Rule is ineffective and unduly burdensome is undercut by the agency's detailed analysis of both points.  HHS carefully reviewed the evidence in the record and determined that price transparency will improve patients' choice, lower prices, and impose manageable administrative costs on hospitals.  *See* 84 Fed. Reg. at 65,529; *see also infra* at 32-39.  Plaintiffs offer nothing to undercut the reasonableness of those conclusions.  And the Rule's requirement that *all* hospitals publish a list of their own standard charges is far from the kind of "government-scripted, speaker-based disclosure requirement[s]" that the Supreme Court has found incompatible with *Zauderer*.  *NIFLA*, 138 S. Ct. at 2377; *see also id.* at 2378 (explaining that the notice at issue "drown[ed] out the facility's own message").  Ultimately, because hospitals "can still effectively communicate their desired message," *id.*, the Rule complies with *Zauderer* and does not violate the First Amendment.

### B.    The Rule Also Passes Intermediate Scrutiny Under *Central Hudson*.

Even if this Court were to hold that *Zauderer* does not apply here (or to decide not to reach the issue), the Price Transparency Rule should still be upheld as a permissible regulation of commercial

speech.   Under the *Central Hudson* test for commercial speech, courts "ask whether the asserted governmental interest [in regulation] is substantial" and "whether the regulation [at issue] directly advances the governmental interest asserted[.]"   *Cent. Hudson*, 447 U.S. at 566.   If so, then the regulation satisfies the First Amendment so long as it is "not more extensive than . . . necessary" to further the government's interest.   *Id.*   The Rule clears each of these bars.[5]

### 1.   The Rule Directly Advances the Government's Substantial Interests in Informing Consumers and Lowering Healthcare Costs.

HHS was clear about the interests it seeks to advance through the Price Transparency Rule—namely, "the government's substantial interest in providing consumers with factual price information to facilitate more informed health care decisions, as well as the government's substantial interest in lowering healthcare costs."   84 Fed. Reg. at 65,544-45.   Plaintiffs do not contest that both of these interests are substantial, or even compelling.   *See, e.g.*, Pls.' Br. 21 (professing Plaintiffs' "full[]" support for "transparency in healthcare pricing").   Instead, Plaintiffs contend "[t]here is no evidence" that the disclosure of standard charges—in particular, the disclosure of insurer-specific charges—"will directly and materially further" those interests.   *Id.*

In making that claim, Plaintiffs ignore at least three categories of evidence that HHS discussed at length in the Rule.   First, HHS established that there is extensive support for the economic theory underlying the Rule.   That is true at a high level of abstraction—*e.g.*, the theory that price transparency generally lowers costs in commercial markets.   *See* 84 Fed. Reg. at 65,526; *see also* Congressional Research Service, Does Price Transparency Improve Market Efficiency? (2008), AR 4761 ("[T]he majority of the empirical studies tend to find that greater price transparency . . . leads to lower and more uniform prices[.]").   But the evidence in the record also supports the more specific conclusion that price transparency is effective at lowering costs in the market for healthcare.   *See* 84 Fed. Reg. at

---

[5] Indeed, although Plaintiffs do not meaningfully address the application of strict scrutiny, *see* Pls.' Br. 19-27, the Rule satisfies even that test given the weight of the interests the Rule promotes and the fact that, by requiring the disclosure only of hospital charges, the Rule imposes a minimal burden on speech and is thus narrowly tailored to the compelling interests it furthers.

65,545-46; *see also, e.g.*, Zach Y. Brown, *Equilibrium Effects of Health Care Price Information*, The Review of Economics and Statistics (2019), AR 5008 (finding "evidence that price transparency can be effective in the long run, especially when it is available to the entire market" in study of medical imaging services); Ethan M.J. Lieber, *Does It Pay to Know Prices in Health Care?*, American Economic Journal (2017), AR 5652-53 (finding that giving employees in a study "access to price information [about healthcare] reduce[d] the average price paid by 1.6 percent"); Christopher Whaley, *et al.*, *Association Between Availability of Health Service Prices and Payments for These Services*, JAMA (2014), AR 5685 ("Use of price transparency information was associated with lower total claims payments for common medical services.").

Second, research from states that have taken steps to increase price transparency supports the interests HHS seeks to advance. In New Hampshire, price-transparency efforts resulted in lower out-of-pocket costs for medical-imaging procedures through two, interrelated mechanisms: First, patients who used New Hampshire's price transparency website chose lower-cost options, which demonstrates that patients will indeed take advantage of price-transparency tools to make more informed healthcare choices. *See* 84 Fed. Reg. at 65,527. Second, the downward pressure those choices put on prices led to lower costs for patients throughout the state—including the ones who did not use the website. *See id.* The analysis of New Hampshire's price-transparency efforts is particularly relevant because New Hampshire releases some "payer and provider specific negotiated rates [through] its state operated HealthCost database." *Id.* at 65,544. Maine similarly gets high marks for price transparency, which has been linked to a more competitive market for hospital services in the state. *See id.* at 65,529. And like New Hampshire, Maine's price transparency efforts have included the release of negotiated rate information. *Id.* at 65,544.

The above evidence is not, of course, the same as a nationwide dataset, which is one reason HHS has acknowledged that the Price Transparency Rule comes with some degree of uncertainty. *See* 84 Fed. Reg. at 65,542; *see also* Pls.' Br. 21. But the lack of nationwide data stems principally from the

fact that HHS is the only entity that can require hospital price transparency in all 50 states. To require such data *before* HHS has issued the Rule would create a Catch-22, whereby the agency must promulgate the Rule, to study the Rule's effects, in order to have the authority to promulgate the Rule. *See Edwards v. District of Columbia*, 755 F.3d 996, 1003 (D.C. Cir. 2014) (rejecting the argument that the government is "required to produce empirical data 'accompanied by a surfeit of background information'" and emphasizing that "the Supreme Court has 'permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether'" (quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001)).

Third, there is a clear need for this information among patients. As a 2011 report from the Government Accountability Office found, price opacity is one of the principal reasons patients struggle to navigate the market for healthcare services and to shop for value. 84 Fed. Reg. at 65,526. It is unsurprising, then, that the record is replete with indications that patients want access to hospital pricing information. *See id.* at 65,545 (describing the "resounding[]" support in the comments for access to pricing information and citing studies and surveys to the same effect); *see also, e.g.*, Jon Bees, *Survey Snapshot: Is Transparency the Answer to Rising Health Care Costs?* New England Journal of Medicine Catalyst, March 20, 2019, AR 4595 ("[S]urvey respondents say that transparency about the true cost and quality of services (71%) is the top change needed to support patients/consumers in lowering total health care costs."). HHS also identified an important reason why requiring hospitals to publish *both* insurer-specific charges and discounted cash rates will lower costs—namely, that some hospitals' cash discounts are sufficiently steep that a patient might choose to opt for that price, instead of paying whatever portion of the insurer-negotiated rate would be required. *See* 84 Fed. Reg. at 65,542. Such comparisons are possible only if, as the Rule requires, hospitals publish both sets of rates. And it is not just patients who would use this kind of information—physicians also want to advise their patients about the cost of care. *See id.* at 65,530. As HHS highlighted, there is evidence that physicians order

different radiology and laboratory services when they are given prospective access to prices, *id.* at 65,550, and the Rule will significantly improve their ability to do so.

HHS's conclusions are also supported by a fourth category of evidence (though one concededly not a part of the administrative record): Plaintiffs' own declarations.  For example, Kathleen Tenoever, the declarant for the National Association of Children's Hospitals, Inc., explained one reason why the Rule will create downward pressure on hospitals' prices:  "Insurers will demand lower rates when they learn that a member hospital has given one of its competitors a better rate for a specific service."  Tenoever Decl. ¶ 12, ECF No. 13-5; *see also* Kaufman Decl. ¶ 12, ECF No. 13-4 ("The end result [of the Price Transparency Rule] is likely to be much lower payment rates[.]").  To be sure, these declarants also expressed concern about what lower payment rates would mean for hospitals.  *See* Kaufman Decl. ¶ 12.  But it is telling that Plaintiffs simultaneously are claiming that the Rule will have no effect on "the Government's stated goals," Pls.' Br. 21, which include lowering prices, and that the Rule will be *too* successful at lowering prices.  Plaintiffs cannot have it both ways.

Rather than engage with this evidence, Plaintiffs' contention that the Rule fails to advance the government's interests reduces to one point: that the Rule does not go far enough in providing patients with useful information because it is only a "first step" toward complete price transparency.  Pls.' Br. 22.  Plaintiffs' view appears to be that the Rule would be constitutional only if it resulted in complete information about patients' out-of-pocket costs.  *See id.* at 21-22.  Or, in other words, Plaintiffs think the First Amendment *requires* the perfect to be the enemy of the good.  But that is not the law.

As an initial matter, the Rule *does* provide out-of-pocket cost information for many patients, including some with insurance.  Under the Rule, patients who are self-pay can see both the chargemaster rate and any discounted cash rate a hospital makes available, which may well end up as their out-of-pocket cost.  *See* 84 Fed. Reg. at 65,553.  And insured patients with high deductibles (who have not hit those deductibles) may be able to determine the full cost of a service just by looking at the charge a hospital has negotiated with the patient's insurance company.  *See id.*  Even if the Rule

helped *only* those subgroups, it would still "directly and materially advance" the government's goal of better informing consumers about healthcare costs.

The Rule's benefits, however, are much broader.  For insured patients, the Rule provides access to rates that were previously unavailable and that often are necessary for estimating out-of-pocket expenses.  HHS provides a good example of why that matters: "[I]f a healthcare consumer knows that he or she will be responsible for a co-pay of 20 percent of the charges for a hospital service, he or she can compare the charges that the third party negotiated with hospital A and hospital B and, from that, the consumer can determine his or her expected out-of-pocket costs at hospital A versus hospital B."  84 Fed. Reg. at 65,542.  Without the Rule, by contrast, the key input for that simple calculation—*i.e.*, the charge each insurer has negotiated for the hospital service—is unknowable.

Plaintiffs never grapple with what this new information will mean for the patients they serve.  Take, for example, a family with a high-deductible health plan that is living paycheck-to-paycheck.  If the father is due for a colonoscopy, it *matters* if he can determine that the procedure will cost $1,000 less at one of his two local hospitals.  *See* AR 727 (patient delayed colonoscopy for more than twelve months because of cost); *id.* at 807, 1133 (recounting price differences for colonoscopies).  Of course, he may have to do some basic math to figure that out.  But the suggestion that he will not—that the potentially crippling costs of healthcare will not motivate patients to take available steps to ensure they end up on the right side of the line that separates "bankrupt" from "not bankrupt"—is unfounded. Yes, not *every* patient will look up a hospital's standard charges and estimate an out-of-pocket payment, and yes, some insurance arrangements are more complicated than others.  But given that HHS found overwhelming patient interest in acquiring this information, it is inescapable that many will use it. After all, if patients are willing to manually fill in the details of their own hospital care on crowdsourcing websites, *see* 84 Fed. Reg. at 65,544—about as cumbersome a solution to the problem of opaque markets as one could imagine—then surely they will take advantage of the information that hospitals must provide under the Rule.  Moreover, given the interest in the private sector in developing

tools that would allow patients to more easily compare prices, *see id.* at 65,543-44, 65,549, the effort required for patients to make those comparisons should only diminish over time.

In sum, studies show that price transparency reduces prices; states that have required similar disclosures have seen patients take advantage of the new information and prices go down; and patients have a longstanding, demonstrated interest in the charges that hospitals must disclose under the Rule. And "[w]hen, as here, an agency is making 'predictive judgments about the likely economic effects of a rule,' [courts] are particularly loath to second-guess its analysis." *Newspaper Ass'n of Am. v. Postal Reg. Comm'n*, 734 F.3d 1208, 1216 (D.C. Cir. 2013) (citation omitted)).  HHS has thus amply shown that the Rule directly advances the government's substantial interests.

### 2.    The Rule Is Not More Extensive than Necessary.

The final *Central Hudson* factor asks whether a regulation is "not more extensive than . . . necessary" to further the government's interest.  *Cent. Hudson*, 447 U.S. at 566.  Plaintiffs characterize this as a "narrow-tailoring requirement," Pls.' Br. 23, but the Supreme Court "has made clear that the government's burden on the final *Central Hudson* factor is to show a 'reasonable fit[]' . . . between means and ends." *AMI*, 760 F.3d at 26 (citations omitted); *see also Bd. of Trustees v. Fox*, 492 U.S. 469, 478 (1989) ("*Central Hudson* . . . does *not* require [the] least restrictive means[.]").  And even in the context of strict scrutiny, the First Amendment requires only that a regulation "be narrowly tailored, not that it be 'perfectly tailored.'" *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015) (citation omitted).

A good indication that the Rule is, in fact, "a reasonable fit" is that neither HHS nor Plaintiffs have identified a narrower alternative.  *See* 84 Fed. Reg. at 65546 ("[W]e are not aware of any alternatives to the policies in this final rule that would be as effective in achieving these results.").  To be sure, Plaintiffs have *asserted* that such an alternative exists.  *See* Pls.' Br. 23 ("[T]he 'standard charge' disclosure . . . requires the disclosure of a broad swath of data that is much more extensive than necessary to serve the proffered interest."); *id.* at 24 ("The Final Rule thus goes . . . well beyond the scope of regulation necessary to achieve the Final Rule's stated aims.").  But the only alternative

Plaintiffs identify is for CMS to "facilitate a solution" that will somehow "ensure that hospitals could provide patients with their out-of-pocket costs[.]"  *Id.* at 21.  Of course, Plaintiffs do not describe what this solution is, or even what its broad contours might look like.  In fact, they concede that "there is no statutory basis for the federal government to require hospital disclosure of out-of-pocket costs[.]" *Id.* at 1.  To state the obvious:  HHS was not required to identify an as-yet-unknowable, and statutorily unenforceable, solution to the problem of price transparency before adopting the Rule.

Plaintiffs nonetheless put forward two reasons why the Rule fails to satisfy the "reasonable fit" test.  First, they reiterate their unavailing argument that rates negotiated with insurance are commercially sensitive.  *See* Pls.' Br. 23-24; *see also supra* at 20-21.  But again, even if Plaintiffs were correct in their assessment of how sensitive this information *used* to be, Congress clearly reached a different judgment when it included DRGs in section 2718.  *See* 84 Fed. Reg. at 65,539 (explaining that "standard charges" for DRGs "are determined as a result of negotiations with third party payers").

The second reason Plaintiffs claim the Rule is not sufficiently tailored is the burden it will allegedly place on hospitals.  *See* Pls.' Br. 25.  But the pitch of Plaintiffs' rhetoric, *see id.* ("staggering," "colossal," "enormous"), does not align with reality.  HHS found that the average hospital will face a cost of $11,898.60 for complying with the Rule in its first year, and a cost of $3,610.88 in subsequent years.  84 Fed. Reg. at 65,596.  Plaintiffs do not offer a single argument contesting that assessment, perhaps because HHS has already taken account of hospitals' concerns by increasing its cost estimate from what was in the Proposed Rule.  *See id.* at 65,593.  And to put that figure in perspective, the average cost of complying with the Rule—in its first and most "burdensome" year—is roughly the same as the list price of *one vial* of the anti-cancer medication Bortezomib on plaintiff Providence Holy Cross Medical Center's 2019 chargemaster.  *See* Providence Holy Cross Medical Center, Chargemaster for CMS Price Transparency – Pharmacy (Dec. 3, 2019) (listing Bortezomib in second of three tabs).[6]

---

[6] The Providence chargemaster is publicly accessible at https://www.providence.org/ obp/ca/ca-la/pricing-transparency by clicking on the plus sign next to "Providence Holy Cross

Even if the price of compliance were to turn out costlier than HHS reasonably projected, that would not show what Plaintiffs seem to think.  At bottom, the Rule requires hospitals to gather, in one location, the regular rates that they charge for discrete, identifiable groups of patients.  If gathering that information is difficult, that is an indictment of hospitals' accounting systems, not a reason the Rule violates the First Amendment.

Again, one of Plaintiffs' own declarations illustrates the point.  Plaintiff Memorial Community Hospital and Health System ("Memorial") speculates that, because its insurance agreements "do[] not always specify a dollar amount per service[,] . . . compliance with the Final Rule would require [it] to assign someone manually to review historical claims histories in order to determine what individual insurers are actually paying for each service under each insurance plan."  Wolf Decl. ¶ 11, ECF No. 13-7.  That statement is astounding.  Memorial concedes that its pricing system is so non-transparent that the hospital may not even be able to provide its own prices on request—that in order to figure out what the hospital *will* charge, it has to hire a full-time employee to figure out what it *has* charged.  If Memorial does not know all of the rates it could charge tomorrow when a patient shows up at its doors, then how could a patient deciding whether to seek care at Memorial even begin to estimate his out-of-pocket expenses?  If the Rule did nothing other than cause hospitals like Memorial to decipher, and then publish, *their own rates*, the Rule would be reasonably tailored to the purposes it serves.  But the Rule accomplishes more, and the means that HHS chose to achieve those ends were reasonable.  Accordingly, the Rule complies with the First Amendment.

## IV.   THE RULE WAS THE RESULT OF HHS'S REASONED DECISION-MAKING.

In deciding to require hospitals to make five categories of standard charges public, HHS carefully considered the evidence in the record, acknowledged and engaged with critical comments, and ultimately provided a thorough, evenhanded explanation for its decision.  Accordingly, HHS's

---

Medical Center" and downloading the "standard hospital charges for Providence Holy Cross Medical Center relevant to the CMS guidance."

decision to issue the Rule was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).

Agency action is not arbitrary and capricious unless the agency has "relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (citation omitted). The Court's review is "narrow," limited to determining whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The Court "is not to substitute its judgment for that of the agency," the question before the Court simply is whether the agency's decision "was the product of reasoned decisionmaking."  *State Farm*, 463 U.S. at 43, 52.

Plaintiffs' arguments on this issue are nothing more than repackaged versions of their First Amendment arguments about government interests and narrow tailoring.  *Compare* Pls.' Br. 27-28 (Rule does not provide out-of-pocket costs), 28 (burden on hospitals), 28-29 (discounted cash price is supposedly misleading), *with id.* at 21-22, 25, 22-23.  In fact, the final paragraph of Plaintiffs' "substantial government interest" section virtually duplicates, almost word for word, the final paragraph of the "arbitrary and capricious" section.  *Compare id.* at 22-23, *with id.* at 28-29.  Those arguments are even less defensible under the deferential standard for arbitrary-and-capricious review.

Briefly though, Plaintiffs are incorrect when they assert that HHS "does not know whether publicizing negotiated rates would have any impact whatsoever on patient behavior."  Pls.' Br. 27 (emphasis).  Plaintiffs draw that conclusion from the agency's acknowledgment in the *Proposed* Rule "that the impact resulting from the release of negotiated rates is largely unknown."  84 Fed. Reg. at

65,542 (recounting that "[i]n the CY 2020 OPPS/ASC proposed rule . . . we also stated . . .").  But that uncertainty pertained principally to the effect of releasing negotiated rates on "highly concentrated markets," *id.*, and the agency received evidence addressing those concerns during the notice-and-comment period, *see id.* at 65,544 (noting that a Maine state official found "no evidence" that releasing "claims data has resulted in an anticompetitive market").  Moreover, even at the time of the Proposed Rule, it was already "clear that such data is necessary for consumers to be able to determine their potential out-of-pocket costs in advance," and there was already support for the agency's predictive judgment that "the release of such data will help drive down health care costs[.]"  *Id.* at 39,580.  By the time of the Final Rule, the support for those conclusions was even stronger.  *See supra* at 32-37; *see also Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009) ("The 'arbitrary and capricious' standard is particularly deferential in matters implicating predictive judgments.").

Next, with respect to the alleged burden on hospitals, it is telling that the only authority Plaintiffs cite to establish the size of the burden is the Rule itself.  *See* Pls.' Br. 28 (citing the Rule for the size of the chart hospitals will have to create and the input that will be required to generate the chart).  The fact that HHS has already considered these issues—and taken them into account when modifying the agency's estimate of the Rule's costs, *see* 84 Fed. Reg. at 65,592-96—is further evidence that HHS "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action[.]" *Ark Initiative*, 816 F.3d at 127 (citation omitted).  While the charts that hospitals disclose may be lengthy, Plaintiffs offer no basis to dispute HHS's estimate that this effort will cost each hospital, on average, just $11,898.60 in the first year and $3,610.88 in later years.  It is difficult to fathom how that modest sum could be "disproportionate[]," Pls.' Br. 28, to the benefits the Rule is expected to generate for patients.

Finally, Plaintiffs suggest that if hospitals release their standard charges, it will "exacerbate consumer confusion" because consumers will assume that a high negotiated price always will correlate with a high out-of-pocket cost and will not understand that discounts other than standard discounts

may be available.  Pls.' Br. 28-29 (emphasis omitted).  Plaintiffs cite no evidence for this conjecture, which HHS in any event considered—and reasonably rejected—in the Rule.  *See* 84 Fed. Reg. at 65,547.  Moreover, as HHS emphasized, "nothing in this final rule would prevent a hospital from engaging in patient education or otherwise assisting patients in understanding potential hospital charges in advance of receiving a hospital service, including articulating factors that may influence ultimate patient out-of-pocket costs[.]"  *Id.*  In other words, to the extent Plaintiffs are genuinely concerned about patients being misled, the fault would lie with them, not the Rule.  If, for instance, a hospital without a "standard one-size-fits-all discount" is worried that its patients will overlook all the other "discounts or forgiveness [that] [are] available," Pls.' Br. 29, the solution is just to display those other discounts alongside the information the Rule requires.

Stepping back, Plaintiffs have taken a "heads-I-win, tails-you-lose" approach to the issue of consumer confusion.  They do not dispute that consumers are casting about for accurate information about prices in a complex healthcare system, yet they rely on that same complexity as an affirmative reason to deprive patients of pricing information they need to figure out their out-of-pocket expenses. *Compare* Pls.' Br. 28, *with* 84 Fed. Reg. at 65,540 (standard charges are "necessary starting points for patients . . . to understand their out-of-pocket cost obligations").  Plaintiffs' theory—that consumers are better off in a position of compelled ignorance—is not only disproved by the evidence the agency marshalled for how and why patients will use the "standard charges" information, *see supra* at 32-37, but also common sense.  The agency did not accept hospitals' false narrative on consumer deception, *see* 84 Fed. Reg. at 65,547, and neither should this Court.

## V.   PLAINTIFFS' DESIRED RELIEF IS OVERBROAD IN MULTIPLE RESPECTS.

Even if the Court disagrees with HHS on the merits, Plaintiffs' requested relief is overbroad. *See* Pls.' Br. 29.  At a minimum, the Court should not vacate and permanently enjoin the enforcement of the entire Price Transparency Rule with respect to every hospital.

### A.       Nationwide Relief Is Improper.

According nationwide relief—through either vacatur or a permanent injunction—would exceed this Court's authority under Article III and longstanding equitable doctrine.  A court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," and "[a] plaintiff's remedy" accordingly "must be tailored to redress the plaintiff's particular injury."  *Gill v. Whitford*, 138 S. Ct. 1916, 1933, 1934 (2018); *see also Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) ("[S]tanding is not dispensed in gross," and "a plaintiff must demonstrate standing . . . for each form of relief that is sought." (citations omitted)).  Basic principles of equity likewise prohibit remedies that are "more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Here, the only plaintiffs who have alleged any potential injury from the Rule are the three hospitals, who appear to be members only of the American Hospital Association ("AHA").  *See* Wolf Decl. ¶ 4, ECF No. 13-7; Klein Decl. ¶ 6, ECF No. 13-8; Wightman Decl. ¶ 4, ECF No. 13-6.  For its part, the AHA does not identify any specific members who will be injured by the Rule, *see generally* Smith Decl., ECF No. 13-2, and the other three organizational Plaintiffs—the Association of American Medical Colleges, the Federation of American Hospitals, and the National Association of Children's Hospitals, Inc.—do not identify any members *at all*, much less one who has been injured. *See* Orlowski Decl. ¶ 3, ECF No. 13-3 (claiming knowledge of effects on organization's members, without identifying any); Tenoever Decl. ¶ 3 (same); Kaufman Decl. ¶ 3 (same).  At most, then, the AHA is the only organizational plaintiff with standing.   *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (organizational plaintiffs must "establish[] that at least one *identified* member ha[s] suffered or [will] suffer harm" (emphasis added)); *see also Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013).  The application of the Rule to the subset of Plaintiffs with standing is thus the only proper subject of judicial review, and vacating or enjoining the Rule with respect to those plaintiffs marks the outer limit of any relief.  *See Whitford*, 138 S. Ct. at 1930, 1934.  Because prohibiting application of the Rule to those plaintiffs (whether through vacatur or

injunction) would fully redress the only injuries Plaintiffs have established, Article III and equitable principles preclude this Court from imposing a broader remedy.

The D.C. Circuit's precedent does not require deviating from those principles here.  Unlike in *National Mining Association v. U.S. Army Corps of Engineers*, 145 F.3d 1399 (D.C. Cir. 1998), this is not a case where granting an appropriately limited vacatur will lead to "a flood of duplicative litigation" in this Court.  *See id.* at 1409.  Although some hospitals evidently are willing to sue over the Rule, Plaintiffs have not established that most hospitals in America will run into court if the Rule is not vacated nationwide.  To the contrary, HHS highlighted a number of hospitals that are already taking steps to make their charges transparent, and the agency exempted hospitals that offer an internet-based price estimator from some of the Rule's requirements.  *See* 84 Fed. Reg. at 65,577-79.  In any event, *National Mining* itself recognized that a court's decision to grant the equitable relief of vacatur is discretionary rather than mandatory under the APA, *id.* at 1408, meaning there is no basis to conclude that if vacatur is granted, it must *always* be nationwide.  To the extent *National Mining* suggests otherwise, we respectfully disagree and preserve the issue for further review.

### B.   The Injunction or Vacatur of Severable Provisions Is Inappropriate.

This Court should also decline Plaintiffs' invitation to vacate or enjoin the Rule in its entirety.  For example, if the Court concludes that HHS may not require hospitals to publish any of five of the "standard charges" addressed in the Price Transparency Rule, it should sever the offending charges and not disturb the other "standard charges" in the Rule.  "Whether the offending portion of a regulation is severable depends upon the intent of the agency and upon whether the remainder of the regulation could function sensibly without the stricken provision."  *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001).  The five standard charges easily meet those requirements.

First, HHS's intent is clear because the Rule describes itself as severable.  *See MD/DC/DE Broadcasters*, 236 F.3d at 22 ("[T]he Commission clearly intends that the regulation be treated as severable, to the extent possible, for it said so in adopting the regulation.").  Specifically, the agency

explained that it "intend[s] for all five definitions to be severable, such that if a court were to invalidate the inclusion of an individual definition, the remaining definitions would remain defined as types of standard charges." 84 Fed. Reg. at 65,555.   Because there is no "substantial doubt that the agency would have adopted [any] severed portion" of the standard charges definition "on its own," the five charges are severable. *ACA Int'l v. FCC*, 885 F.3d 687, 708 (D.C. Cir. 2018) (citation omitted).

Second, if the Court were to sever any of the standard charges, the remaining charges would function sensibly.  As a textual matter, it is difficult to imagine an easier provision to sever:  45 C.F.R. § 180.20 identifies the five standard charges in a numbered list, so all that would be needed is to excise any problematic ones.  And as a structural matter, HHS clarified that although the five "standard charges" work best when published in tandem, "each type of standard charge alone, if made public nationwide, could also further hospital price transparency in the United States."  84 Fed. Reg. at 65,555.

Accordingly, although the "standard charges" portion of the Rule should be upheld in its entirety, it is severable if necessary.   Similarly, even if the Court concludes that HHS cannot impose penalties on noncompliant hospitals under section 2718, there is no basis for invalidating any or all of the Rule's requirements concerning "standard charges."   Even shorn of a particular enforcement mechanism, the "standard charges" portion of the Rule would still function sensibly. *Cf., e.g., Gray-Bey v. United States*, 201 F.3d 866, 872 (7th Cir. 2000) (Easterbrook, J., dissenting) ("[M]uch of our law is based on [the] premise . . . that rules are effective, and must be implemented in good faith, even if there is no stated penalty.").

## CONCLUSION

For the foregoing reasons, the Court should grant Defendant's motion for summary judgment and deny Plaintiffs' motion for summary judgment.

Dated: February 4, 2020

Of Counsel:

ROBERT P. CHARROW
General Counsel

BRIAN R. STIMSON
Principal Deputy General Counsel

KELLY M. CLEARY
Deputy General Counsel & Chief Legal Officer-CMS

JANICE L. HOFFMAN
Associate General Counsel

ALEXANDER R. WHITE
Attorney
U.S. Dept. of Health & Human Services
Office of the General Counsel
Centers for Medicare & Medicaid Services Div.
5300 Cohen Building
330 Independence Ave., SW
Washington, D.C. 20201
Tel: (202) 619-0182
Email: alexander.white@hhs.gov

U.S. Dept. of Health & Human Services

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

TIMOTHY J. SHEA
United States Attorney

DAVID M. MORRELL
Deputy Assistant Attorney General

ERIC B. BECKENHAUER
Assistant Branch Director

*/s/  Michael H. Baer*
MICHAEL H. BAER (New York 5384300)
JOSEPH E. BORSON (Va. Bar 85519)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-8574
Email: Michael.H.Baer@usdoj.gov

*Counsel for Defendant*

46