**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN HOSPITAL ASSOCIATION, *et al.*,   ) | |
|                               ) | |
|           Plaintiffs,       ) | |
|                               ) | |
| v.                               ) | Case No. 1:19-cv-03619-CJN |
|                               ) | |
| ALEX M. AZAR II, in his official capacity as  ) | |
| Secretary of Health and Human Services,    ) | |
|                               ) | |
|           Defendant.       ) | |
| _____) | |

**BRIEF OF CHAMBER OF COMMERCE OF THE UNITED
STATES OF AMERICA AS *AMICUS CURIAE* IN SUPPORT
OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Daryl Joseffer
Tara S. Morrissey
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
Telephone: (202) 463-5337
Email: tmorrissey@uschamber.com

Jeffrey S. Bucholtz (D.C. Bar No. 452385)
Joel McElvain (D.C. Bar No. 448431)
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
Telephone: (202) 737-0500
Email: jbucholtz@kslaw.com

*Counsel for Amicus Curiae*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

CORPORATE DISCLOSURE STATEMENT .................................................. vi

INTEREST OF AMICUS CURIAE ..................................................................... 1

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................. 2

I.      The Rule Dramatically Expands the Statutory Mandate by Requiring Hospitals to
        Disclose Individually-Negotiated Payment Rates ............................................ 2

II.     Hospitals Will Face a Severe Burden in Attempting to Comply with the Rule ................ 5

III.    The Rule Does Not Require Disclosure of a Patient's Out-of-Pocket Costs ...................... 8

SUMMARY OF ARGUMENT ......................................................................... 10

ARGUMENT ................................................................................................... 11

I.      CMS Lacks the Statutory Authority to Impose the Price Disclosure Rule ...................... 11

        A.      The Rule Requires the Disclosure of Far More than "A List" of the
                Hospital's "Standard Charges" ................................................................. 12

        B.      The Statute's Reference to "Diagnosis-Related Groups" Does Not Expand
                Hospitals' Disclosure Obligations ........................................................... 14

        C.      Congress Speaks Clearly When It Intends to Impose a Disclosure
                Obligation on Private Parties .................................................................. 17

II.     The Final Rule Compels the Disclosure of Misleading Information, in Violation
        of the First Amendment ......................................................................... 19

        A.      The Rule Fails Under *Zauderer* ............................................................ 20

        B.      The Rule Is Invalid Under *Central Hudson* ............................................. 23

CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Am. Clinical Lab. Ass'n v. Azar*,
931 F.3d 1195 (D.C. Cir. 2019) ............................................................ 18

*Am. Meat Inst. v. U.S. Dep't of Agric.*,
760 F.3d 18 (D.C. Cir. 2014) ................................................................ 21

*Cape Cod Hosp. v. Sebelius*,
630 F.3d 203 (D.C. Cir. 2011) ......................................................... 15, 16

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
447 U.S. 557 (1980) ........................................................................ 19, 24

*City of Cincinnati v. Discovery Network, Inc.*,
507 U.S. 410 (1993) ............................................................................. 25

*Clark v. Martinez*,
543 U.S. 371 (2005) ............................................................................. 18

*Edenfield v. Fane*,
507 U.S. 761 (1993) ............................................................................. 24

*Fla. Bar v. Went For It, Inc.*,
515 U.S. 618 (1995) ............................................................................. 25

*Flynn v. S. Seamless Floors, Inc.*,
460 F. Supp. 2d 46 (D.D.C. 2006) ....................................................... 13

*Gross v. FBL Fin. Servs. Inc.*,
557 U.S. 167 (2009) ....................................................................... 11, 13

*Hertz Corp. v. Friend*,
559 U.S. 77 (2010) ............................................................................... 12

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994) ............................................................................. 15

*Lorillard Tobacco Co. v. Reilly*,
533 U.S. 525 (2001) ............................................................................. 24

*Loving v. IRS*,
742 F.3d 1013 (D.C. Cir. 2014) ........................................................... 17

*Nat'l Ass'n of Mfrs. v. Dep't of Defense*,
138 S. Ct. 617 (2018) .......................................................................... 14

*Nat'l Ass'n of Mfrs. v. SEC*,
800 F.3d 518 (D.C. Cir. 2015) ............................................................. 24

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
138 S. Ct. 2361 (2018) ............................................................. 20, 22, 23

*Nicopure Labs, LLC v. FDA*,
944 F.3d 267 (D.C. Cir. 2019) ............................................................. 24

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988) ............................................................................................ 19

*R.J. Reynolds Tobacco Co. v. FDA*,
    696 F.3d 1205 (D.C. Cir. 2012) ........................................................................ 21

*SAS Inst., Inc. v. Iancu*,
    138 S. Ct. 1348 (2018) ...................................................................................... 11

*Util. Air Regulatory Grp. v. EPA*,
    573 U.S. 302 (2014) .......................................................................................... 11

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
    471 U.S. 626 (1985) .................................................................................... 19, 20

**Statutes**

42 U.S.C. § 300gg-18(e) ............................................................................... *passim*

42 U.S.C. § 1320b-23(c) ........................................................................................ 18

42 U.S.C. § 1395m-1(a) ........................................................................................ 18

42 U.S.C. § 1395ww(d) ............................................................................. 14, 16, 17

**Regulations**

42 C.F.R. § 412.52 ................................................................................................. 16

42 C.F.R. § 412.84 ................................................................................................. 16

42 C.F.R. § 413.20 ................................................................................................. 16

42 C.F.R. § 424.32(b) ............................................................................................ 16

45 C.F.R. § 180.20 ............................................................................................. 4, 5

45 C.F.R. § 180.40 ............................................................................................. 4, 5

45 C.F.R. § 180.50 ................................................................................................... 5

45 C.F.R. § 180.60 ................................................................................................... 5

79 Fed. Reg. 49,854 (Aug. 22, 2014) ..................................................................... 3

83 Fed. Reg. 41,114 (Aug. 17, 2018) ..................................................................... 3

84 Fed. Reg. 39,398 (Aug. 9, 2019) ................................................................. 8, 20

84 Fed. Reg. 42,044 (Aug. 16, 2019) ................................................................... 15

Medicare and Medicaid Programs: Price Transparency Requirements for Hospitals to
    Make Standard Charges Public, 84 Fed. Reg. 65,524 (Nov. 27, 2019) ........... *passim*

**Other Authorities**

Svend Albaek et al., *Government-Assisted Oligopoly Coordination? A Concrete Case*,
45 J. INDUS. ECON. 429 (Dec. 1997) ............................................................. 23

American Heritage Dictionary of the English Language (5th ed. 2011) ...................................... 13

Atrium Health, Comment Letter on CMS-1717-P, Medicare Program:
Proposed Changes to Hospital Outpatient Perspective Payment (Sept. 23, 2019),
regulations.gov/document?D=CMS-2019-0109-2495 ............................................ 5

Baylor Scott & White Health, Comment Letter on CMS-1717-P, Medicare Program:
Proposed Changes to Hospital Outpatient Perspective Payment (Sept. 27, 2019),
regulations.gov/document?D=CMS-2019-0109-2805 ............................................ 6

CMS Provider Reimbursement Manual .......................................................... 17

Ctrs. for Medicare & Medicaid Servs, CMS-1450 (July 19, 2019),
https://www.cms.gov/Regulations-and-
Guidance/Legislation/PaperworkReductionActof1995/PRA-Listing-Items/CMS-1450 ....... 16

CommonSpirit Health, Comment Letter on CMS-1717-P, Medicare Program:
Proposed Changes to Hospital Outpatient Perspective Payment (Sept. 27, 2019),
regulations.gov/document?D=CMS-2019-0109-3113 ............................................ 6

David Cutler and Leemore Dafny,
*Designing Transparency Systems for Medical Care Prices*,
364 N. ENG. J. MED. 894 (Mar. 10, 2011) ...................................................... 22

Georgia Hospital Association, Comment Letter on CMS-1717-P, Medicare Program:
Proposed Changes to Hospital Outpatient Perspective Payment (Sept. 27, 2019),
regulations.gov/document?D=CMS-2019-0109-2570 ............................................ 6

Health Care Payment Learning & Action Network,
*APM Measurement: Progress of Alternative Payment Models* (2018),
hcp-lan.org/workproducts/apm-discussion-2018.pdf ............................................ 7

Hospital + Healthsystem Association of Pennsylvania, Comment Letter on CMS-1717-P,
Medicare Program: Proposed Changes to Hospital Outpatient Perspective Payment
(Sept. 27, 2019), regulations.gov/document?D=CMS-2019-0109-3079 ............................ 8

Jefferson Health, Comment Letter on CMS-1717-P, Medicare Program:
Proposed Changes to Hospital Outpatient Perspective Payment (Sept. 27, 2019),
regulations.gov/document?D=CMS-2019-0109-3111 ............................................ 6

Sheetal M. Kircher et al., *Opaque Results of Federal Price Transparency Rules and
State-Based Alternatives*, 15 J. ONCOLOGY PRAC. 463, 463 (July 3, 2019) ...................... 21

Letter from Marina Lao, Dir., Office of Policy Planning, FTC, to the
Minn. House of Representatives (June 29, 2015),
ftc.gov/system/files/documents/advocacy_documents/ftc-staff-comment-regarding-
amendments-minnesota-government-data-practices-act-regarding-health-
care/150702minnhealthcare.pdf ................................................................ 23

Merriam-Webster.com (2020), merriam-webster.com/dictionary/standard ........................... 13

Texas Hospital Association, Comment Letter on CMS-1717-P, Medicare Program:
  Proposed Changes to Hospital Outpatient Perspective Payment (Sept. 26, 2019),
  regulations.gov/document?D=CMS-2019-0109-2398 ......................................................... 6

Christopher P. Tompkins et al., *The Precarious Pricing System for Hospital Services*,
  HEALTH AFFAIRS (Jan.-Feb. 2006) ........................................................................................ 3

U.S. Dep't of Justice and FTC, Statements of Antitrust Enforcement Policy in
  Health Care, at 49-51 (Aug. 1996),
  ftc.gov/sites/default/files/attachments/competition-policy-guidance/
  statements_of_antitrust_enforcement_policy_in_health_care_august_1996.pdf.................. 23

Virtua Health, Inc., Comment Letter on CMS-1717-P, Medicare Program:
  Proposed Changes to Hospital Outpatient Perspective Payment (Sept. 27, 2019),
  regulations.gov/document?D=CMS-2019-0109-3165 ............................................................ 5

**CORPORATE DISCLOSURE STATEMENT**

The Chamber of Commerce of the United States of America is a not-for-profit, tax-exempt organization incorporated in the District of Columbia.  The Chamber has no parent company, and no publicly held company has 10% or greater ownership in the Chamber.

## INTEREST OF AMICUS CURIAE

The Chamber of Commerce of the United States of America is the world's largest business federation.  It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country.  An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts.  To that end, the Chamber regularly files amicus curiae briefs in cases that raise issues of concern to the nation's business community.  This is such a case because, in the Chamber's view, the Centers for Medicare & Medicaid Services (CMS) has misinterpreted a federal statute to impose a disclosure obligation on private parties that is far more wide-ranging and onerous than what Congress intended, and that provides consumers with misleading information.  The Chamber and its members have an interest in ensuring that agencies adhere to the limits of their statutory authority, and that agencies do not violate First Amendment principles by compelling speech that would only serve to confuse the public.[1]

## INTRODUCTION

Transparency in the cost and quality of health care is a laudable goal.  The Chamber strongly supports appropriate efforts to ensure that patients and employers have access to useful information on the cost and quality of health care items and services.  For over a decade, the Chamber has advocated for measures that would advance informed consumerism in health care, such as value-based insurance design models.  In order for these measures to work, employers and

---

[1] The Chamber certifies that (1) this brief was authored entirely by its counsel and not by counsel for any party, in whole or in part; (2) no party or counsel for any party contributed money to fund preparing or submitting the brief; and (3) apart from amicus curiae, its members, and its counsel, no other person contributed money to fund preparing or submitting this brief.

consumers need better information on the price and quality of their health care choices.

But a consumer's access to cost and quality information is only as useful as the information provided.  CMS's price transparency rule[2] does not require hospitals to disclose the out-of-pocket amounts that individual health care consumers would pay, but rather mandates that hospitals publish the payer-specific rates for items and services that hospitals have negotiated with third-party insurers.  Providing these payer-specific rates broadly to the public does nothing to inform individual consumers of their specific financial exposure for a service or treatment, in the form of a co-pay or a deductible.  Therefore, the disclosure of the rates negotiated between hospitals and third-party payers would not be meaningful or helpful to consumers.  To the contrary, publishing this information will only lead to greater consumer confusion.

Congress did not authorize CMS to impose such a burdensome and pointless obligation on hospitals; the statute that the agency relies upon instead established a much narrower disclosure requirement.  In any event, CMS cannot, consistent with the First Amendment, impose an obligation on hospitals to publish information that will only serve to mislead their patients.   To achieve meaningful transparency in health care, the agency should focus instead on promoting the consumer-specific private sector tools that are already available to assist consumers in navigating the health care marketplace.

## BACKGROUND

### I.     The Rule Dramatically Expands the Statutory Mandate by Requiring Hospitals to Disclose Individually-Negotiated Payment Rates

In 2010, as part of the Affordable Care Act, Congress enacted Section 2718(e) of the Public Health Service Act, which requires that:

---

[2] Medicare and Medicaid Programs: Price Transparency Requirements for Hospitals to Make Standard Charges Public, 84 Fed. Reg. 65,524 (Nov. 27, 2019).

> Each hospital operating within the United States shall for each year establish (and update) and make public (in accordance with guidelines developed by the Secretary) *a list* of the hospital's *standard charges* for items and services provided by the hospital, including for diagnosis-related groups established under section 1886(d)(4) of the Social Security Act.

42 U.S.C. § 300gg-18(e) (emphases added).  The Secretary has delegated to CMS the task of developing guidelines governing the manner in which a hospital makes its standard charges public.

CMS has advised hospitals that they may fulfill their obligation to "make public . . . a list of the hospital's standard charges" by disclosing the hospital's "chargemaster."  A chargemaster is a file system that "contains all billable procedure codes performed at the hospital, along with descriptions of those codes and the hospitals' own list prices."  Christopher P. Tompkins et al., *The Precarious Pricing System for Hospital Services*, HEALTH AFFAIRS 45, 48-49 (Jan.-Feb. 2006); *see also* 84 Fed. Reg. 65,524, 65,533 (Nov. 27, 2019).  In the fiscal year (FY) 2015 Medicare inpatient prospective payment system (IPPS) final rule, CMS explained that hospitals could comply with the statute by making public either "a list of their standard charges (whether that be the chargemaster itself or in another form of their choice)" or "their policies for allowing the public to view a list of those charges in response to an inquiry."  79 Fed. Reg. 49,854, 50,146 (Aug. 22, 2014).  Likewise, in the FY 2019 IPPS final rule, CMS stated that hospitals may publish the list "in the form of the chargemaster itself or another form of the hospital's choice, as long as the information is in machine readable format."  83 Fed. Reg. 41,114, 41,686 (Aug. 17, 2018).  In light of this guidance, hospitals have for the most part disclosed their chargemasters to comply with their statutory obligation to "make public . . . a list of the hospital's standard charges."  42 U.S.C. § 300gg-18(e).

CMS has transformed this disclosure obligation in its new rule.  When the rule goes into effect in 2021, all state-licensed hospitals (with minimal exceptions) will be required to publish privately-negotiated payer-specific reimbursement rates for every item and service that could be

provided by the hospital to an insured patient in connection with an inpatient admission or an outpatient department visit.  45 C.F.R. §§ 180.20, 180.40; *see* 84 Fed. Reg. at 65,536.  The disclosure obligation will apply to every individual item or service that a hospital furnishes, as well as every "service package," that is, every combination of items and services that are bundled together for the purposes of payment from any one of the hospital's third-party payers.  45 C.F.R. § 180.40; 84 Fed. Reg. at 65,560.  That information must be separately broken down again for each of a hospital system's locations, to the extent that the hospital's negotiated rates vary by location.  84 Fed. Reg. at 65,563-65,564.

For each of these items and services, hospitals will no longer be required to publish "a list," in the singular, of the "standard charges" for those items.  Instead, CMS will require hospitals to publish five forms of information for each item or service.  *First*, hospitals will be required to publish the "gross charge," that is, the charge reflected on the hospital's chargemaster, for each item or service.  45 C.F.R. §§ 180.20, 180.40; 84 Fed. Reg. at 65,540-65,541.  *Second*, for each item and service, and for each of the separate contracts that hospitals have entered into with third-party payers, hospitals will be required to publish the "payer-specific negotiated charge," that is, the rate that the hospital has negotiated with the payer for that item or service.  45 C.F.R. §§ 180.20, 180.40; 84 Fed. Reg. at 65,541-65,552.  *Third*, the hospital must publish the "de-identified minimum negotiated charge," that is, the lowest rate that the hospital has negotiated with any one third-party payer for an item or service.  45 C.F.R. §§ 180.20, 180.40; 84 Fed. Reg. at 65,553-65,555.  *Fourth*, the hospital must publish the "de-identified maximum negotiated charge," that is, the highest rate that the hospital has negotiated with any one third-party payer for an item or service.  45 C.F.R. §§ 180.20, 180.40; 84 Fed. Reg. at 65,553-65,555.  *Fifth*, the hospital must

publish its "discounted cash price" for an item or service, that is, the price it would accept from a cash-paying patient. 45 C.F.R. §§ 180.20, 180.40; 84 Fed. Reg. at 65,552-65,553.

This information will have to be published in two separate ways. First, hospitals will have to publish a comprehensive machine-readable file that discloses this data, for each of the items and services for which the hospital has arrived at a contracted price with any particular third-party payer. 45 C.F.R. § 180.50; 84 Fed. Reg. at 65,555-65,564. Second, hospitals will also have to publish a consumer-friendly display of charges for certain common "shoppable" services, grouping together primary services and ancillary items and services customarily furnished in conjunction with the primary service. 45 C.F.R. § 180.60; 84 Fed. Reg. at 65,564-65,581. This display must include a plain-language description for a total of 300 services. 45 C.F.R. § 180.60(a); 84 Fed. Reg. at 65,569.

## II.   Hospitals Will Face a Severe Burden in Attempting to Comply with the Rule

Once this rule goes into effect, hospitals will be required to disclose voluminous data to the public. Hospitals perform a wide variety of medical services for their patients, and given the ever-changing nature of medical practices, those services may be delivered in countless different ways. It is accordingly not unusual for a hospital's chargemaster to include "tens of thousands of line items," as CMS itself acknowledges. 84 Fed. Reg. at 65,553. The figure varies by hospitals and the nature of the services that the hospital performs; some hospitals that commented on the proposed rule reported that their chargemaster includes as many as 50,000 individual items.[3]

---

[3] *See, e.g.*, Virtua Health, Inc., Comment Letter on CMS-1717-P, Medicare Program: Proposed Changes to Hospital Outpatient Perspective Payment, at 3 (Sept. 27, 2019), regulations.gov/document?D=CMS-2019-0109-3165 (50,000 chargemaster items); Atrium Health, Comment Letter on CMS-1717-P, Medicare Program: Proposed Changes to Hospital Outpatient Perspective Payment, at 2 (Sept. 23, 2019), regulations.gov/document?D=CMS-2019-0109-2495 (over 30,000 chargemaster items).

Hospitals already faced a significant burden, then, under the agency's reading of the statute before 2019, when CMS had understood that the disclosure of a hospital's chargemaster file alone would satisfy § 300gg-18(e).  Under the new rule, however, hospitals must prepare and publish, not only data on what CMS now calls the "gross charges" from the hospital's chargemaster, but also—for each of the tens of thousands of individual lines from the chargemaster file—data as to the rate for each individual item or service that the hospital has arrived at in negotiations with each of its third-party payers, as well as its minimum, maximum, and cash discount prices.  This dramatically expands the burden on hospitals.  As a matter of course, hospitals negotiate contracts with dozens of third-party payers to cover beneficiaries under Medicare Advantage, Medicaid managed care plans, or the commercial marketplace.  Each of those payers may offer multiple plans, with differing benefit designs.  It is not uncommon for larger hospitals or hospital systems to have negotiated varying payment rates with over a hundred separate payers, covering hundreds or, sometimes, even thousands of separate plan designs.[4]  By requiring the reporting of pricing data for tens of thousands of items and services, in five different forms and under two different

---

[4] *See, e.g.*, Jefferson Health, Comment Letter on CMS-1717-P, Medicare Program: Proposed Changes to Hospital Outpatient Perspective Payment, at 4 (Sept. 27, 2019), regulations.gov/document?D=CMS-2019-0109-3111 (contracts with "over 100 plans"); Georgia Hospital Association, Comment Letter on CMS-1717-P, Medicare Program: Proposed Changes to Hospital Outpatient Perspective Payment, at 4 (Sept. 27, 2019), regulations.gov/document?D=CMS-2019-0109-2570 ("hundreds of separate payers"); Baylor Scott & White Health, Comment Letter on CMS-1717-P, Medicare Program: Proposed Changes to Hospital Outpatient Perspective Payment, at 13 (Sept. 27, 2019), regulations.gov/document?D=CMS-2019-0109-2805 ("thousands of contracts across payers and contracted providers"); Texas Hospital Association, Comment Letter on CMS-1717-P, Medicare Program: Proposed Changes to Hospital Outpatient Perspective Payment, at 4 (Sept. 26, 2019), regulations.gov/document?D=CMS-2019-0109-2398 ("more than 3,000 contracts with health plans"); CommonSpirit Health, Comment Letter on CMS-1717-P, Medicare Program: Proposed Changes to Hospital Outpatient Perspective Payment, at 6 (Sept. 27, 2019), regulations.gov/document?D=CMS-2019-0109-3113 ("at least 3,000 agreements with payers, each with 10-15 unique benefit designs").

formats, for each of the hospital's dozens, hundreds, or thousands of contracted plans and for each of the hospital's locations, CMS's rule effectively forces hospitals to publish and to maintain a database consisting of millions of data points.

This monumental effort is further complicated by the fact that hospitals and insurers are moving away from the fee-for-service model for health care payments and toward alternative payment models, such as shared-savings models, shared-risk contracts, bundled payments, or capitated payments. Under one type of an alternative payment model, a hospital's payment for treating a given beneficiary may be based at the outset on an agreed-upon price for particular items or services, subject to upward or downward adjustments on the basis of metrics for the value of the services rendered. Under another type, payment is based on the characteristics of the patient who is being treated and that patient's diagnosis, without regard to the actual medical services that are furnished. These alternative payment models are a growing feature of the health care marketplace; as of 2017, approximately 34% of all health care payments were made on the basis of such models. *See* Health Care Payment Learning & Action Network, *APM Measurement: Progress of Alternative Payment Models*, at 3 (2018), hcp-lan.org/workproducts/apm-discussion-2018.pdf. That trend will continue to grow in the coming years. *Id.* at 12.

The price disclosure rule will impose severe burdens on hospitals that are paid through these alternative payment models, for no useful purpose. In issuing the rule, CMS acknowledged that "negotiated contracts often include methodologies that would apply to payment rates, often leading to payments to hospitals that are different than the base rates negotiated with insurers for hospital items and services." 84 Fed. Reg. at 65,551. The agency suggested that hospitals nonetheless could easily satisfy the rule by reporting their "base rates" for medical services and disregarding the upward or downward adjustments that might be applied to those base rates on the

basis of a particular contract's value metrics.  *Id.*  This ignores the reality that, in many cases, the hospital's contracts do not specify a single "base rate" for a medical service, but instead describe a complex formula that will determine the payment rate.[5]  The rule effectively requires hospitals to separately perform these calculations for each of the tens of thousands of items on their chargemaster in order to publish even what the agency calls their "base rates."  And those "base rates," in any event, do not bear any simple relationship to the actual amount that the insurer pays to the hospital.  The rule does not serve the agency's stated purpose of "providing consumers with factual price information," 84 Fed. Reg. at 65,545, by requiring hospitals to publish arbitrary figures that are only one component of the actual amount that the hospital is reimbursed.

## III.    The Rule Does Not Require Disclosure of a Patient's Out-of-Pocket Costs

Hospitals will be burdened with these obligations to no useful end.  The end result of all of the millions of computations that CMS will now require a hospital to perform and to publish will be the disclosure of all negotiated rates between an individual hospital and a specific third-party payer under a particular plan for a discrete medical service or item.  But for the vast majority of patients, this will not provide them with any meaningful information at all.  Approximately 90 percent of hospital patients have third-party coverage.  *See* 84 Fed. Reg. at 65,542.  The primary interest for these patients, of course, is to determine their own financial exposure, in the form of copays which are generally further dependent on plan deductibles, as CMS acknowledged when it proposed its price transparency rule.  *See* 84 Fed. Reg. 39,398, 39,574 (Aug. 9, 2019) ("consumers

---

[5]  *See, e.g.,* Hospital + Healthsystem Association of Pennsylvania, Comment Letter on CMS-1717-P, Medicare Program: Proposed Changes to Hospital Outpatient Perspective Payment, at 4 (Sept. 27, 2019), regulations.gov/document?D=CMS-2019-0109-3079 ("this process often includes a series of internal steps and algorithms where multiple systems within the hospital are interfacing and doing calculations 'behind the scenes' . . . .  There is much greater complexity and work involved to produce these rates in the format CMS is mandating than simply defining a few key parameters and printing an Excel spreadsheet.").

of health care services simply want to know where they can get a needed health care service and what that service will cost them out-of-pocket"). But publishing the rates that hospitals and insurers negotiate as reimbursement will not assist patients with that determination; the net out-of-pocket costs for the patient will instead turn on the specific terms of the patient's coverage, "such as the amount of cost-sharing, the network status of the healthcare provider, how much of a deductible has been paid to date, and other information." 84 Fed. Reg. at 65,528.

Moreover, it will be difficult for patients to identify the appropriate negotiated rate to begin with. To do so, patients will have to know what particular service will be performed or item provided, their specific product type out of many, as well as the corresponding code that reflects that service or item. It is often difficult for patients to ascertain the appropriate code in advance— for example, there are multiple codes for a simple evaluation and management visit, also known as an office visit, which are based on the amount of time the provider spends with the patient. For more advanced care, there is significant variability in care complexity, which also affects which codes are billed. A patient may receive ancillary services, which increase the total cost of treatment. Additionally, the publicly posted rates may be incomplete and misleading. The rule requires a hospital to display payer-specific negotiated rates for services performed by practitioners who are employed by the hospital and subject to the contractual agreement with the insurer. However, these negotiated rates do not apply in instances when medical services are performed by practitioners with independent billing arrangements who are not bound by the hospital's contract with the insurer. *See* 84 Fed. Reg. at 65,534-65,535. For patients who will be treated by a practitioner with an independent billing arrangement, the publicly posted negotiated rates between a hospital and an insurer will not provide an accurate assessment. For all of these

reasons, the rule does not assist patients in determining their individual out-of-pocket costs, and is likely to lead to greater confusion regarding their financial liability for hospital services.

## SUMMARY OF ARGUMENT

Congress imposed a relatively simple disclosure obligation on hospitals: They must publish "a list" of their "standard charges." 42 U.S.C. § 300gg-18(e). CMS's rule dramatically distorts the statutory disclosure obligation for hospitals. The rule requires hospitals to disclose the payment rates that they have privately negotiated, for each of the tens of thousands of medical items and services that they provide, with each of the hundreds, or in some instances thousands, of plans with which they have contracts. The rule further requires hospitals to publish this data in two separate formats. There is no meaningful sense in which the required disclosure could be described as "a list," in the singular, nor is there any sense in which individually-negotiated payer-specific reimbursement rates could be described as a hospital's "standard charges."

CMS's argument to the contrary rests on the statute's cross reference to the Medicare Inpatient Prospective Payment System's use of "diagnosis-related groups." But this is a red herring. Even though Medicare pays hospitals under the Inpatient Prospective Payment System (IPPS) on the basis of a patient's diagnosis rather than on a service-by-service basis, hospitals are still required to report to Medicare their standard charges for each service that they provide to Medicare inpatient beneficiaries. A hospital's "standard charges" for its services are the same, whether those services are paid by private insurers or by Medicare.

If there were any doubt as to the meaning of the statute, it should be construed narrowly so as not to impose a more burdensome disclosure obligation than is needed. Congress has shown that it knows how to speak with specificity when it intends to impose an obligation on private parties to publicize confidential commercial information, such as their individually-negotiated

contract rates.  The statute should also be read narrowly to avoid the First Amendment difficulties that would arise from any rule that compels speech.

And the rule not only raises First Amendment concerns, it flatly violates the amendment's protection of the freedom of speech, no matter whether *Zauderer* or *Central Hudson* applies.  The rule imposes severe burdens on hospitals, to no useful purpose; the rule will only serve to raise prices in the health care market and, further, will mislead the public, given that many patients may confuse their insurer's overall reimbursement rate for a given medical service with their individual out-of-pocket expense for that service.

## ARGUMENT

### I.     CMS Lacks the Statutory Authority to Impose the Price Disclosure Rule

42 U.S.C. § 300gg-18(e) requires a hospital to disclose "a list" of its "standard charges" for the items and services that it provides, and nothing more.  The statute does not empower CMS to require hospitals to disclose multiple lists, matrixes, or databases of the reimbursement rates that have been discretely negotiated with each of the various insurers with which the hospital has contracted.  The rule is therefore unlawful because it violates the "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."  *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 328 (2014); *see also SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018) ("Where a statute's language carries a plain meaning, the duty of an administrative agency is to follow its commands as written, not to supplant those commands with others it may prefer.").  The words of a statute generally must be given their ordinary meaning, and an agency cannot assume ambiguity for the convenience of giving itself authority to achieve a policy goal.  *See Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167, 175 (2009) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.") (internal

quotation marks omitted).  The rule cannot be squared with the statute's ordinary meaning, and should accordingly be set aside.

A.     **The Rule Requires the Disclosure of Far More than "A List" of the Hospital's "Standard Charges."**

As an initial matter, CMS seeks to require hospitals to disclose far more than "a list" (in the singular) of a hospital's charges.  The rule will require each hospital to calculate, and to disclose, reimbursement rates for each of the tens of thousands of items and services that the hospital provides, broken down into five different forms (the "gross charge" from the chargemaster, the individually-negotiated reimbursement rate for each of the hospital's contracted plans, the minimum negotiated price, the maximum negotiated price, and the cash discount price), leading to the disclosure of dozens or hundreds of points of pricing data for a given item or service, depending on how many third-party payers have contracted with the hospital and the number of benefit plans offered by those payers.  That information must be separately broken down again for each of a hospital system's locations, to the extent that reimbursement rates vary by location.  And this information must be published twice—first, in a machine-readable format and, second, for 300 shoppable services, in a "consumer-friendly" display.

This disclosure obligation can no longer fairly be described as the disclosure of "a list" of standard charges.  Hospitals could only comply with each of these wide-sweeping disclosure obligations by publishing multiple databases or matrices of pricing information for all of their contracted plans, consisting of millions of sets of data.  But Congress made a deliberate choice to require only the publication of "a list," in the singular, rather than multiple sets of different lists or matrices.  Congress's choice of wording in this regard should be respected.  *See, e.g., Hertz Corp. v. Friend*, 559 U.S. 77, 93 (2010) (Congress deliberately phrased a statutory term in the singular).

What is more, the rule requires hospitals to publish a great deal more data beyond simply the hospital's "standard charges."  The term "standard," in its adjectival form, means "normal, familiar, or usual."  American Heritage Dictionary of the English Language 1703 (5th ed. 2011); *see also Standard*, Merriam-Webster.com (2020), merriam-webster.com/dictionary/standard ("regularly and widely used, available, or supplied").  In other words, a hospital's "standard" charges are its normal or usual charges for items or services, before it negotiates particularized contractually discounted reimbursement rates with any one insurer.  These normal or usual charges are typically the charges listed for each item or service on the hospital's chargemaster.  These uniform charges serve as the baseline for contractual negotiations between hospitals and payers.

The payer-specific rates that a hospital negotiates on an individual basis with each of the dozens or hundreds of payers with which it contracts cannot be described as the hospital's "standard" charges that serve as a baseline for all payers.  Individually-negotiated, insurer-specific charges are the *opposite* of "standard" charges.  As this Court has noted in a similar context:

> [T]he terms "standard agreement" or "standard contract," as referenced by other courts, invariably denote a "normal" or "typical" agreement between parties in a given contractual situation, often in conformance with one party's boilerplate form of terms and conditions, rather than a single, particularized agreement between two named signatories.

*Flynn v. S. Seamless Floors, Inc.*, 460 F. Supp. 2d 46, 52-53 (D.D.C. 2006) (collecting authorities). A hospital's "standard" charges, then, are the "normal" or "typical" charges that it holds out as a matter of course to *all* comers—typically, the charges listed for each item or service in the hospital's chargemaster.  CMS misreads the statute to authorize it instead to compel hospitals to disclose reimbursement rates negotiated in "particularized agreements."  *Id.*

The "ordinary meaning," *Gross*, 557 U.S. at 175, of the term "standard" cannot bear the meaning that CMS is attempting to ascribe to it.  If Congress had intended to require hospitals to disclose the individualized reimbursement rates that hospitals and insurers arrive upon after

particularized negotiations over each of their contracted plans, it could have accomplished that result by phrasing section 300gg-18(e) to compel the disclosure of the hospital's "rates" or "charges" more broadly.  But Congress chose to qualify the disclosure obligation so as to require only the disclosure of "*standard* charges."  CMS is not at liberty to take a red pen to strike that qualifying term from the statute.  Instead, it, like this Court, is "obliged to give effect, if possible, to every word Congress used." *Nat'l Ass'n of Mfrs. v. Dep't of Defense*, 138 S. Ct. 617, 632 (2018) (internal quotation omitted).

**B.     The Statute's Reference to "Diagnosis-Related Groups" Does Not Expand Hospitals' Disclosure Obligations**

Section 300gg-18(e) requires hospitals to disclose their standard charges "for items and services provided by the hospital, including for diagnosis-related groups established under section 1886(d)(4) of the Social Security Act," *i.e.*, the provision of the Medicare Act that governs the calculation of payments for inpatient care to Medicare beneficiaries under the Inpatient Prospective Payment System, 42 U.S.C. § 1395ww(d)(4).  CMS contends that the statute's cross-reference to the Medicare Act shows that Congress meant the phrase "standard charges" to mean something broader than the hospital's "gross charges" for particular items and services.  ECF No. 19 (Def.'s MSJ), at 12.  CMS reasons that because Medicare pays for diagnosis-related groups (DRGs) on a bundled basis by reference to a patient's characteristics rather than on a service-by-service basis, a hospital's gross charges for its items and services are irrelevant for its IPPS payments.  It further intuits that, by referring to Medicare's use of a DRG-based payment system, Congress must also have meant to incorporate payment rates "[u]nder a *commercial* DRG-based payment system," which uses "a base rate of payment [that] is prospectively negotiated between each insurer and hospital."  *Id.* (emphasis added; internal quotation marks omitted).  CMS argues that this shows that Congress wanted "at least some negotiated rates" to be made public.  *Id.* at 13.

14

But Congress's reference to "diagnosis-related groups established under section 1886(d)(4) of the Social Security Act" describes Medicare patients, not commercially insured patients whose insurance companies may choose to use a DRG-based payment system.  And CMS does not negotiate Medicare's reimbursement rates; the agency instead sets forth a formula in annual rulemakings that governs IPPS reimbursement, on a take-it-or-leave-it basis, for each hospital that participates in Medicare.  *See* 84 Fed. Reg. 42,044, 42,044 (Aug. 16, 2019) (setting IPPS rates, including relative weights for DRGs, for 2020).  There is no reason to believe that Congress, by referring to Medicare's payment system, obliquely meant to require the disclosure of privately-negotiated reimbursement rates.  If Congress had intended to require the disclosure of those rates, it could easily have said so directly.  *Compare Landgraf v. USI Film Prods.*, 511 U.S. 244, 262 (1994) ("petitioner's statutory argument would require us to assume that Congress chose a surprisingly indirect route to convey an important and easily expressed message").

Moreover, CMS is wrong in its premise that a hospital's charges play no role in the calculation of IPPS payments.  In fact, the hospital's charges listed on its chargemaster *are* of central relevance to the calculation of IPPS payments, and the agency accordingly requires each hospital to report its standard charges from its chargemaster for each item or service it provides to Medicare beneficiaries.  IPPS payments turn on several factors, including: (1) the "standardized amount" that "roughly reflects the average cost incurred by hospitals nationwide for each patient they treat and then discharge," *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205 (D.C. Cir. 2011); (2) an adjustment of that standardized amount upward or downward for each DRG "to account for the fact that the costs of treating patients vary based on the patients' diagnoses," *id.* at 205-06; and (3) additional adjustments, including an adjustment for "outlier" payments for hospitals that provide costlier-than-expected care; as will be explained below, this outlier calculation turns on

15

the hospital's submission of its standard charges to Medicare for each service that it furnishes to Medicare beneficiaries.  As part of this formula, CMS is given the task of organizing every inpatient encounter into diagnosis-related groups, and setting the relative weight for each DRG to determine whether, given a patient's particular diagnosis, a particular inpatient stay is likely to be more or less expensive for the hospital.  *Id.*[6]

Although Medicare does not directly pay for inpatient services to Medicare beneficiaries on an item-for-item basis, hospitals still must report each item or service that they furnish to Medicare patients, as well as their standard charges for those items and services.  *See* 42 C.F.R. § 412.84(g), (h) (hospitals' reporting on charges used to calculate outlier payments); *see also id.* § 413.20(d)(2)(ii) (requiring reporting of "charge schedules"); *id.* § 412.52 (incorporating same requirement for claims under the IPPS system).[7]  This reporting of standard charges is necessary to determine outlier payments, that is, payments to hospitals that experience unusually high costs in providing inpatient care to Medicare beneficiaries.  The calculation of a hospital's entitlement

---

[6] Stated in greater detail, the IPPS payment turns, first, on the calculation each year of the standardized amount.  42 U.S.C. § 1395ww(d)(2).  (The standardized amount under IPPS for the typical inpatient stay in 2020 is $6,263.74.)  Next, the standardized amount is adjusted by the weighting factor for the particular DRG that applies for a given inpatient stay.  *Id.* § 1395ww(d)(4).  (For example, the weighting factor for "arthroscopy" for 2020 is 1.3917, meaning that the typical reimbursement amount for this procedure is $6,263.74 times 1.3917, or $8,717.25.)  The proportion of the standardized amount that reflects hospitals' wage-related costs is further adjusted by a hospital's "wage index" to reflect geographic variations in labor costs.  *Id.* § 1395ww(d)(2)(H), (d)(3)(E).  Hospitals that treat a disproportionate number of low-income patients receive a further "disproportionate share adjustment."  *Id.* § 1395ww(d)(2)(H), (d)(3)(E).  And hospitals receive an additional adjustment to their IPPS payments that reflects their costs in treating "outlier" cases, that is, inpatient stays that prove to be significantly more expensive than expected.  *Id.* § 1395ww(d)(5)(A).

[7] CMS requires hospitals to use Form CMS-1450 to submit claims for IPPS payment.  *See* 42 C.F.R. § 424.32(b).  An example of that form may be found at CMS.gov.  Ctrs. for Medicare & Medicaid Servs, CMS-1450 (July 19, 2019), https://www.cms.gov/Regulations-and-Guidance/Legislation/PaperworkReductionActof1995/PRA-Listing-Items/CMS-1450.  Box 47 of the form requires the hospital to list the "charge" for each item or service that it provides to an inpatient Medicare beneficiary.

to, and amount of, an outlier payment depends on its cost-to-charge ratio, or the proportion of the hospital's operating costs to the hospital's typical charges for the services that it performs. *See* 42 U.S.C. § 1395ww(d)(5)(A)(ii) (outlier payments are based on "charges, adjusted to cost").

The accuracy of a hospital's outlier payments depends on the accuracy of the information that it reports to CMS, including its reporting on its charges. CMS requires hospitals to report the same "charges" for their medical services, whether those services are paid for by Medicare or by private entities. "So that its charges may be allowable for use in apportioning costs under the program, each facility should have an established charge structure which is applied uniformly to each patient as services are furnished to the patient and which is reasonably and consistently related to the cost of providing the services." CMS Provider Reimbursement Manual § 2203. "The Medicare charge for a specific service must be the same as the charge made to non-Medicare patients (including Medicaid, CHAMPUS, private, etc.). . . ." *Id.* § 2204. Thus, as a matter of law, a hospital's "standard charge" for a service that is paid for under the Medicare IPPS system is the same as its "standard charge" for the same service that is paid for under commercial coverage. By specifying that the "standard charge" to be disclosed must include the standard charge for Medicare's "diagnosis-related groups," Congress simply "remove[d] any doubt and ma[de] doubly sure," *Loving v. IRS*, 742 F.3d 1013, 1019 (D.C. Cir. 2014), that a hospital must continue to report its standard charges for the services that it provides, regardless of the payment model. It did not, as CMS contends, expand the category of pricing data that hospitals are required to disclose.

## C.    Congress Speaks Clearly When It Intends to Impose a Disclosure Obligation on Private Parties

The plain language of section 300gg-18(e) limits hospitals' disclosure obligations to "a list" of their "standard charges." That plain language cannot be stretched beyond recognition to

require hospitals also to disclose individually-negotiated reimbursement rates.  This principle is underscored by the fact that Congress knows how to speak directly when it intends to require private parties to disclose commercially confidential data, such as the discrete payment rates that they have privately negotiated with particular counter-parties.

For example, in the Protecting Access to Medicare Act (PAMA), Congress required certain laboratories to report "private payor" data to CMS on a regular basis.  42 U.S.C. § 1395m-1(a); *see Am. Clinical Lab. Ass'n v. Azar*, 931 F.3d 1195, 1199 (D.C. Cir. 2019).  Congress specified that the required report must include "[t]he payment rate . . . that was paid by each private payor for the test during the [reporting] period."  42 U.S.C. § 1395m-1(a)(3)(A)(i).  At the same time, Congress recognized the sensitive nature of this data, and prohibited CMS from disclosing the information that is reported to it "in a form that discloses the identity of a specific payor or laboratory, or prices charged or payment made to any such laboratory."  *Id.* § 1395m-1(a)(10).  Congress accordingly understood its need to speak with specificity when it sought to require private entities to disclose the results of their confidential contractual negotiations.  *See also* 42 U.S.C. § 1320b-23(c) (provision enacted as part of the Affordable Care Act that protects the confidentiality of pricing information reported by pharmacy benefit managers).  In contrast to PAMA, however, Section 300gg-18(e) does not contain any indication that Congress sought to compel hospitals to disclose the contractual reimbursement rates for medical services, or mandate that those payer-specific amounts must be made available to the general public.

Indeed, Congress knows that it must speak with precision if it intends to impose an obligation to disclose contract prices publicly, given that the compulsion of speech inevitably raises First Amendment concerns, and courts must interpret statutes to avoid constitutional difficulties.  *See, e.g., Clark v. Martinez*, 543 U.S. 371, 380 (2005).  Congress's carefully-worded

decision to require hospitals to publish a list of their standard charges must be read, then, not to impose upon hospitals the very different obligation to disclose each of their individually negotiated payment rates, given the obvious First Amendment concerns that such a broader requirement would raise.  As explained below, CMS's rule violates the First Amendment by compelling hospitals to publicize misleading information to their customers.

## II.    The Final Rule Compels the Disclosure of Misleading Information, in Violation of the First Amendment.

"[I]n the context of protected speech, . . . the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796-97 (1988).  CMS's price disclosure rule, by delineating in painstaking detail what hospitals must say with regard to their private contract rates, runs afoul of the First Amendment's guarantee of the freedom of speech.  Courts have applied varying degrees of scrutiny to governmental regulations that compel speech in the commercial arena.  CMS, in its briefing, devotes much of its efforts to arguing that the Court should apply the more lenient standard for certain commercial speech regulations announced in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985).  CMS is incorrect; the price disclosure rule goes well beyond a simple requirement to disclose truthful, non-misleading information in commercial advertising, and it is both unduly burdensome and unjustified.  At a minimum, the more searching standard of intermediate scrutiny described in *Central Hudson Gas & Electric Corporation v. Public Service Commission of New York*, 447 U.S. 557 (1980), applies instead.  In truth, though, it is merely an academic point as to which test governs here, as CMS's price disclosure rule cannot survive under either of these standards.

A.      **The Rule Fails Under** *Zauderer*

In *Zauderer*, the Supreme Court carved out a narrow category of commercial speech regulations that it would review under a relaxed standard.  This deferential standard applies only when compelled speech is "limited to 'purely factual and uncontroversial information about the terms under which . . . services will be available,'" and it requires the government to show that the compelled speech is not "unjustified or unduly burdensome."  *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2372 (2018) ("*NIFLA*") (quoting *Zauderer*, 471 U.S. at 651).  Neither condition is satisfied here.

*Zauderer* does not apply because CMS's rule does not merely require hospitals to publicize "purely factual and uncontroversial information about the terms under which services will be available."  *Id.* (citation and alteration omitted).  As an initial matter, the disclosure of the total reimbursement rate that an insurer will pay a particular hospital for a specific medical service does not reveal the terms under which services will be available to the insured patient.  Because that patient's net expense turns on information such as the amount of co-pays under the terms of his or her policy and his or her status in satisfying the policy's deductible limits, the contracted reimbursement rate paid by the insurer to the hospital will not reveal the terms on which the patient will receive medical services.

Moreover, *Zauderer*'s relaxed standard does not apply to compelled speech that risks confusing and misleading consumers; such speech is hardly "uncontroversial."  The rates that hospitals will be required to disclose will be incomplete and misleading, given that they bear no simple relationship to a patient's true financial exposure.  As CMS has acknowledged, patients' primary interest is in learning "what [a] service will cost them out-of-pocket."  84 Fed. Reg. at 39,574.  But the publication of the rates that insurers privately agree to pay a hospital for medical services will not assist patients with that determination; the net out-of-pocket costs for the patient

20

will instead turn on the specific terms of the patient's coverage, "such as the amount of cost-sharing, the network status of the healthcare provider, how much of a deductible has been paid to date, and other information." 84 Fed. Reg. at 65,528. Moreover, it will be difficult for the patient even to identify the insurer's negotiated rate, given that the patient must accurately predict in advance which codes will apply to her visit. Adding to the uncertainty, the publication of reimbursement rates for hospital-provided services will not include the rates paid for services rendered by providers not bound by the hospital contract, such as services performed by practitioners with independent billing arrangements. *See* 84 Fed. Reg. at 65,534-65,535.

At best, disclosure of negotiated rates will lead to confusion over a patient's financial obligation for services. At worst, the disclosure of negotiated reimbursement rates may in fact deter patients from obtaining medical care that they need, if individuals fail to recognize that their own financial exposure is much lower than the negotiated reimbursement rate that the insurer pays the hospital. *See* Sheetal M. Kircher et al., *Opaque Results of Federal Price Transparency Rules and State-Based Alternatives*, 15 J. ONCOLOGY PRAC. 463, 463 (July 3, 2019) ("[T]hese prices may be misleading or, at worst, harmful. It is plausible that if these costs overestimate what the patient would actually pay, it could motivate the delay or omission of care entirely because of cost concerns. Expecting to pay nearly $3,000, as listed by one chargemaster, for a screening chest CT, a test with demonstrated survival benefit, may cause hesitation.") (footnote omitted). CMS's rule thus requires hospitals to make disclosures that are "so one-sided or incomplete that they [cannot] qualify as 'factual and uncontroversial,'" *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 27 (D.C. Cir. 2014). The rule compels the disclosure of information that is "subject to misinterpretation by consumers," *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1216 (D.C. Cir. 2012), *overruled on other grounds by Am. Meat Inst.*, 760 F.3d at 22.

Even assuming that *Zauderer* applies, CMS's rule fails because it imposes a disclosure requirement that is "unjustified or unduly burdensome." *NIFLA*, 138 S. Ct. at 2376-77 (internal quotation marks omitted).  The rule imposes onerous obligations to calculate and to disclose negotiated rates for each of a hospital's tens of thousands of medical items and services, across each of the dozens, hundreds, or even thousands of plans with which it may contract, calculated in five different ways and then displayed for the public under two different formats.  The rule imposes these burdens for no useful reason; the disclosures will neither provide patients with any useful information nor serve CMS's purpose of lowering heath care costs.  CMS attempts to justify the rule by positing that the publication of negotiated reimbursement rates would increase competition on the pricing for medical services and, therefore, decrease the price of care.  This rationale is not supported in the economic literature, however.  Many economists have concluded that the publication of payer-specific negotiated rates would lead to *higher* prices for medical services, because market forces would compel providers to benchmark themselves off the highest reimbursement rates for each item, service, or service package, thereby undermining the current system in which payers and providers bid aggressively with each other.

One example of this phenomenon that is commonly cited in the economic literature involves the Danish government's attempt to regulate concrete prices.  In 1993, Denmark required that all ready-mixed concrete contracts be made public, with the hope (as CMS hopes here) that disclosure would stimulate greater competition.  "The result was an increase in average prices of 15 to 20% within a year, as the lower prices in the market rose and the higher prices edged up." David Cutler and Leemore Dafny, *Designing Transparency Systems for Medical Care Prices*, 364 N. ENG. J. MED. 894, 894-95 (Mar. 10, 2011).  The disclosure obligation changed the behavior of both sellers and purchasers, and sellers became less willing to strike favorable deals with harder-

bargaining purchasers when they were aware that the price that they struck would become public. *See* Svend Albaek et al., *Government-Assisted Oligopoly Coordination? A Concrete Case*, 45 J. INDUS. ECON. 429, 441 (Dec. 1997).

Given the "Danish concrete" phenomenon, the Federal Trade Commission has noted its concern that the public disclosure of negotiated rates for medical services "likely would undermine the effectiveness of selective contracting, a key mechanism used by health plans to drive down health care costs and improve overall value in the delivery of health care services."[8]   These disclosures may enable providers to determine whether their rates are above or below their competitors' rates, to monitor the service offerings and output of current or potential competitors, and to increase their leverage in future contract negotiations.  FTC Memorandum at 6.  As a result, a poorly-designed price transparency rule may "offer little benefit but could pose substantial risk of reducing competition in health care markets." *Id.* at 2-3 (internal quotation marks omitted).  For this reason, both the FTC and the U.S. Department of Justice have indicated that the widespread disclosure of negotiated reimbursement rates raises antitrust concerns for providers in the health care market.[9]  CMS has thus failed to meet its burden to show that the rule not is "unduly burdensome or unjustified." *NIFLA*, 138 S. Ct. at 2372 (internal quotation marks omitted).

## B.       The Rule Is Invalid Under *Central Hudson*

At a minimum, the more searching standard of *Central Hudson* applies here.  That intermediate scrutiny test requires the government to affirmatively prove that (1) its asserted

---

[8] Letter from Marina Lao, Dir., Office of Policy Planning, FTC, to the Minn. House of Representatives, at 4 (June 29, 2015), ftc.gov/system/files/documents/advocacy_documents/ftc-staff-comment-regarding-amendments-minnesota-government-data-practices-act-regarding-health-care/150702minnhealthcare.pdf ("FTC Memorandum").

[9] *See* U.S. Dep't of Justice and FTC, Statements of Antitrust Enforcement Policy in Health Care, at 49-51 (Aug. 1996), ftc.gov/sites/default/files/attachments/competition-policy-guidance/statements_of_antitrust_enforcement_policy_in_health_care_august_1996.pdf.

interest is substantial, (2) the restriction directly and materially advances that interest, and (3) the restriction is narrowly tailored.  447 U.S. at 563-64.  The price disclosure rule fails both the second and third prongs of this test.

CMS cannot provide affirmative proof that its rule will directly and materially advance the agency's asserted interests.  The agency issued the rule with the hope that the disclosure of payer-specific negotiated reimbursement rates will lower health care prices.  But it can provide no evidence that the rule actually will have this effect, and the economic literature discussed above provides strong reason to believe that the disclosure of contract prices will result in a "Danish concrete" effect that actually increases prices for medical services.  "[T]he government cannot rest on speculation or conjecture" to satisfy intermediate scrutiny.  *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 526 (D.C. Cir. 2015) (quoting *Edenfield v. Fane*, 507 U.S. 761, 770 (1993)).  Instead, the government bears the affirmative burden to prove that its regulation of speech will materially advance its asserted interest.  CMS is unable to provide such proof; indeed, it acknowledges that "the impact resulting from the release of negotiated rates is largely unknown," 84 Fed. Reg. at 65,542, but surmises that its rule will work out for the best.  This is not enough.

Nor is the rule narrowly tailored.  The government bears the burden to prove that there is at least a "reasonable fit" between its ends and the means it has chosen to accomplish those ends. *Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 286 (D.C. Cir. 2019) (quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001)).  The rule, however, requires the disclosure of a much more extensive range of data than is necessary to serve CMS's asserted interests, and to no useful end. CMS rests its defense of the rule on its assertion that about 10% of hospital patients do not rely on insurance coverage but instead are self-paying customers, and that the rule would, if nothing else, assist these patients in calculating their out-of-pocket costs.  *See* ECF No. 19 (Def.'s MSJ), at 35

(citing 84 Fed. Reg. at 65,553).  Even under CMS's own rationale, then, the rule is wildly overbroad, as it requires the disclosure of negotiated reimbursement rates from thousands of individualized contracts that would be of no use to these self-pay customers.

Rather than imposing these burdens on hospitals, CMS would have better served its interests if it had instead promoted private-sector solutions for the price transparency issue.  "[T]he existence of [these] 'numerous and obvious less-burdensome alternatives'" to the governmental regulation of speech demonstrates that the narrow tailoring requirement is not met.  *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 632 (1995) (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993)).  The Chamber has consistently promoted efforts by private entities to provide information on health care costs in the manner and format that actually will be of use to the public.  For example, the Chamber has promoted the development of insurer cost tools that can (unlike CMS's rule) provide real-time, personalized estimates for patients' out-of-pocket expenses for the most common medical services.   Many insurers already provide their policyholders with tools that provide estimates of average in-network and out-of-network costs for medical procedures.  These tools commonly provide beneficiaries with comprehensive pricing information for all stages of a hospital visit, from admission to discharge.  Hospitals, as well as insurers, are already pursuing voluntary efforts to provide patients with useful information, and to assist patients, through financial counselors, in contacting their insurers to determine their cost-sharing obligations.  The Chamber supports these voluntary efforts, which certainly present a less burdensome means to promote CMS's goal of price transparency.  The price disclosure rule, then, cannot satisfy the First Amendment, given CMS's failure to pursue this less burdensome path.

## CONCLUSION

The Court should set aside the Secretary's Final Rule.

Respectfully submitted,

/s/ Jeffrey S. Bucholtz

Daryl Joseffer                           Jeffrey S. Bucholtz (D.C. Bar No. 452385)
Tara S. Morrissey                        Joel McElvain (D.C. Bar No. 448431)
U.S. CHAMBER LITIGATION CENTER           KING & SPALDING LLP
1615 H Street, NW                        1700 Pennsylvania Ave., NW
Washington, DC 20062                     Washington, DC 20006
Telephone: (202) 463-5337                Telephone: (202) 737-0500
Email: tmorrissey@uschamber.com          Email: jbucholtz@kslaw.com

                                         *Counsel for Amicus Curiae*

Dated:  February 28, 2020