UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


AMERICAN HOSPITAL ASSOCIATION,  .
et al.,                        .
                               .   CA No. 19-3619 (CJN)
          Plaintiffs,          .
                               .
     v.                        .
                               .   Washington, D.C.
ALEX M. AZAR, II,              .   Thursday, May 7, 2020
                               .   2:00 p.m.
          Defendant.           .
. . . . . . . . . . . . . . . .


TRANSCRIPT OF MOTIONS HEARING
(VIA VIDEO TELECONFERENCE)
BEFORE THE HONORABLE CARL J. NICHOLS
UNITED STATES DISTRICT JUDGE



<u>APPEARANCES</u>:

For the Plaintiffs:          CATHERINE E. STETSON, ESQ.
                             Hogan Lovells US LLP
                             555 Thirteenth Street NW
                             Washington, DC 20004
                             (202) 637-5491


For the Government:          MICHAEL H. BAER, ESQ.
                             U.S. Department of Justice
                             Federal Programs Branch
                             1100 L Street NW
                             Washington, DC 20530
                             (202) 305-8573


Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001
                             (202) 354-3186



Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

THE DEPUTY CLERK:  Civil action 19-3619, American Hospital Association, et al., versus Azar.

Counsel, please identify yourselves for the record.

MS. STETSON:  Good afternoon, Your Honor.

This is Cate Stetson representing the plaintiffs.

THE COURT:  Ms. Stetson, good afternoon.

MR. BAER:  Good afternoon, Your Honor.  This is Michael Baer from the Department of Justice on behalf of the Secretary.  I'm joined at my virtual counsel table with my colleague, Eric Beckenhauer.

THE COURT:  Good afternoon.

Will you be taking the lead, Mr. Baer?

MR. BAER:  I will.

THE COURT:  So, obviously -- is there anyone else on the line?  Sorry.  This is a little different than typical in-court argument, and obviously I'm very cognizant of the odd situation that we find ourselves in.  So I thought laying out just a couple of very brief ground rules, it will be helpful.

In many ways, this is easier than a teleconference because I can see whoever's speaking, but if you could just introduce yourself again when you go ahead and speak, that would be helpful.  Obviously, I appreciate that there may be technological issues: Somebody may get dropped, or we may not be able to hear someone.  If that's the case, we can just pause and wait for

1   everyone to reconvene.  I will ask that everyone who is not

2   speaking at a particular time, and I really think that means

3   that will be one advocate who is unmuted and then me, and if

4   everyone else can mute, then we'll just be very clear about when

5   we can move on to the next advocate.  All pretty basic stuff.

6        In terms of an argument today, of course I've reviewed all

7   of the materials: the briefs, the amicus briefs, a fair amount

8   of the administrative record, including the proposed and final

9   rules.  I think this is going to be the most efficient way,

10  at least for me, to proceed, which is I would like to hear

11  Ms. Stetson first.

12       Ms. Stetson, I would like you to cover all of your

13  arguments in roughly a half an hour.  I don't have any hard-

14  and-fast rules, but that seems likely sufficient.  And then

15  if the government could then be prepared to respond in, call it

16  30 minutes as well, then, Ms. Stetson, you'll have some time for

17  rebuttal.  You don't have to reserve time.  We'll figure it out.

18  We can call it 10 minutes now, but it doesn't have to be set in

19  stone now; and if the government would like, I'd be happy to

20  give you surrebuttal.  So, other than that, I have no ground

21  rules.

22       Ms. Stetson, I would treat this as a typical oral argument,

23  just done by video teleconference and with those general

24  constraints.

25            MS. STETSON:  Understood, Your Honor.  Thank you.

1    Shall I dive in?

2              THE COURT:  You may.

3              MS. STETSON:  Okay.  Thank you.  And thank you,

4    and I also want to thank Ms. White and the other folks in

5    the courtroom for gathering today.  I know these are surreal

6    circumstances, and we appreciate it.

7         So just to set the table a little bit on why we're here,

8    a federal statute requires hospitals to publicly disclose a

9    list of their standard charges for items and services provided

10   by the hospital including for diagnosis-related groups

11   established under the Medicare Act.

12        The Final Rule under challenge interprets that statutory

13   requirement of "a list of standard charges" to mean hundreds

14   of lists of all third-party payers' negotiated payment rates, a

15   list of maximum payment rates, a list of minimum payment rates,

16   a list of gross charges, and a list of cash discount payment

17   rates for every item on a chargemaster list that CMS understands

18   can run tens of thousands of lines long.

19        There is simply no way, under any mode of analysis, that

20   that statute can give rise to that requirement.  And I want to

21   start by talking about standard charges, but I do want to then

22   pay some attention to the phrase that had kind of a cameo role

23   below but has now been elevated I think to a centerpiece of

24   the government's argument, and that's this "including for

25   diagnosis-related groups" phrase.

1          But just to start with the standard charges, and not to

2     put too fine a point on it, but standard charges are standard

3     charges.  And just to break those two things out, we already

4     know what charges are because CMS, though the Medicare Provider

5     Reimbursement Manual, tells us exactly what they are, and they

6     are the chargemaster charges that are contained on every

7     hospital's master list of regular charges.

8          So if you look at Section 2202.4 of the Provider

9     Reimbursement Manual, what you'll find is the definition of

10     "charges," and what it says is, "Charges refer to the regular

11     rates established by the provider for services rendered both

12     to beneficiaries," and that's Medicare beneficiaries, "and to

13     other paying patients.  Charges should be related consistently

14     to the cost of the services and uniformly applied to all

15     patients."

16          So that's what "charges" means.  And more to the point

17     of this particular statutory provision, for the last several

18     years, ever since this was issued in 2010, CMS has interpreted

19     "standard charges" exactly as we say it should be interpreted

20     and, of course, as the Provider Reimbursement Manual says, which

21     is if you look at the their statements in 2014 in the Federal

22     Register, they reiterate that "Our guidelines for implementing

23     Section 2718(e) of the Public Health Service Act are that the

24     hospitals either make public a list of their standard charges,

25     whether that be the chargemaster itself or in another form of

1    their choice, or their policies for allowing the public to

2    view a list of those charges in response to an inquiry."

3    That was 2014.

4        2018, CMS updates that slightly to say we're requiring

5    hospitals to make available a list of their current standard

6    charges via the Internet in a machine-readable format and

7    again in the form of the chargemaster itself, that master list

8    of charges, or another form of the hospital's choice.

9        So that is how CMS, both in the Provider Reimbursement

10   Manual and for the last several years, has consistently

11   understood that simple and modest directive: a list of the

12   hospital standard charges.

13       What we now encountered, starting in the middle of last

14   year with the Proposed Rule, is a transmutation from standard

15   charges to what the CMS calls a second type of standard charges,

16   and those are what they can at least say are payer-specific

17   negotiated charges.  That is what they are now expanding

18   "standard charges" to.

19       Negotiated charges with respect to a particular group

20   of people are not standard charges.  And maybe the best way

21   to understand this is to look at the perspective of the two

22   entities that are involved in any of these transactions.

23       The hospital is the one who is implementing these standard

24   charges, the chargemaster list, and those standard charges, as

25   you can tell from that Provider Reimbursement Manual, those are

a constant.  Those are articulated in every single bill the

hospital sends out, no matter to what payer, no matter whether

to Medicare or to a private third-party payer, precisely because

that's what CMS tells it it must do.  So the output from the

hospital are the standard charges.

What comes back in to the hospital by way of payment can be

very, very different depending on the insurer and the particular

plan that that particular enrollee has with that insurer, and

that second thing, those insurers and those plans, are the level

of detail that CMS now wants to introduce into what the statute

says are standard charges.

But there is nothing standard about those at all, of course.

They're actually quite specific, as the Cleveland Clinic said,

and you can find this in the joint appendix.  Cleveland Clinic

makes the point that across its system it has 3,000 different

contracts with different payers and different groups within

those payers, and all of those contracts have different payment

rates and methodologies and groupings and methods for paying for

items, services, or groups of items or services.

THE COURT:  Wouldn't you agree -- sorry to interrupt

you, but talking about the chargemaster -- I'll put it this way,

"amounts," just to not use a loaded term.  Is it correct that

something like 10 percent or fewer items or services nationwide

are paid for at the chargemaster amount?

MS. STETSON:  I think at a basic level that is

1     correct.  But I wouldn't take from that what the government

2     extrapolates from that, which is if that few percentage are

3     paid from the regular charged amount, the standard charge,

4     it can't be a standard charge, because the government itself,

5     both in prior final rules and in this one, has emphasized how

6     important that chargemaster is.

7         Even in this Final Rule, the government says the

8     chargemaster is the baseline from which those other more

9     particularized payer-specific and privately negotiated

10     charges are negotiated.  That's essentially the starting point.

11         THE COURT:  How do you define -- and I know you

12     started here, and I had not seen this as highlighted in your

13     briefs, I think.  How do you define what a charge is?  Is the

14     charge the amount that the hospital bills and expects to be paid

15     by the third-party payer in the example of a third-party payer

16     situation, or is it an amount that the hospital tells the

17     third-party payer is its chargemaster rate even though everyone

18     in the transaction understands that that is not the amount

19     that's being billed in the traditional sense nor the amount

20     that will be paid?

21         MS. STETSON:  Judge Nichols, I think it's actually

22     somewhere in between.  I think it is not the amount that the

23     hospital normally bills and expects to be paid, nor is it an

24     amount that is simply a rate on the chargemaster sheet.  It

25     is the charge that the hospital -- it's the hospital's output,

1    what charge shows up on any hospital bill.

2         But what comes back in, as I said, are those individualized

3    payment rates depending on what's been negotiated with that

4    particular payer with respect to that particular level of plan

5    and with respect to that particular enrollee.  So I think part

6    of this -- and this is very well highlighted, I think, in the

7    amicus brief that the 37 state hospital associations filed, has

8    some very good background information about how we got to where

9    we are.

10        And part of the background of that, including some helpful

11   congressional testimony from someone who, if I remember

12   correctly, was at CMS at the time that the prospective payment

13   system was designed, part of the problem is that, because of a

14   huge convergence of different forces -- market forces, insurance

15   and so forth -- the hospital chargemaster charges have, over

16   time, developed into something that is the reference charge,

17   the regular charge for all other payers, but, as you pointed

18   out, used as a final charge that I think is a creature of this

19   incredibly complicated, incredibly difficult sort of multi-

20   facetted payer world that the hospitals are forced to exist in.

21        THE COURT:  The reason I ask -- sorry to interrupt --

22   is obviously the parties spent a lot of time defining or

23   attempting to define what it means for something to be standard,

24   and I want to understand whether there's an agreed-upon

25   definition as between the parties or not about what a change

1    is in this context.

2         MS. STETSON:  Well, I think Mr. Baer will have a

3    difficult time saying that a charge here is anything different

4    than the charge as defined by the CMS Provider Reimbursement

5    Manual.  I think what the agency said below is it made reference

6    to the reimbursement manual in one page of its Final Rule, and

7    what it said is, yes, that defines "charges," but here we're

8    talking about standard charges, and that means we don't need to

9    look as closely to the reimbursement manual.

10        The problem with that is that the reimbursement manual

11   actually supplies the answer to that as well, because the quote

12   I read you earlier from the manual says charges refer to the

13   regular rates established by the hospital and that are billed

14   uniformly across all participants, whether Medicare or other.

15        So what you can tell from that is, because the statute

16   says "standard charges" and charges are defined as regular

17   rates, I suppose the statute could have said "standard regular

18   rates;" it could have said "regular rates."  But everybody

19   understands what those are because, in fact, the chargemaster

20   rates, in a whole host of other minor regulations not important

21   here, the chargemaster rates are the linchpin for all sorts of

22   cost and charge determinations that hospitals have to submit to

23   CMS in order to get paid and in order to get paid certain other

24   things like outlier payments and the like.

25        So I think it's difficult for the government to recede from

1    acknowledging that a charge is the regular rate, and I think

2    it's equally difficult for the government to back away from

3    saying the regular rate is the chargemaster charge.  And I think

4    that's why -- just to pivot, if I could, over to this "including

5    for diagnosis-related groups" phrase, I think that is why the

6    government now puts so much truck in that, because when you look

7    at just a list of standard charges alone, that seems pretty

8    straightforward.  And we haven't even talked about "a list,"

9    of course.  These are many, many dozens or hundreds of lists.

10        So what the government has done in its briefing -- and as

11   I mentioned, this was sort of floated on one page of the Final

12   Rule below, but in its briefing what it says is, no, no, because

13   this statute talks about "including for diagnosis-related groups,"

14   that necessarily means that because diagnosis-related groups

15   aren't themselves separately called out in the master list of

16   charges, those diagnosis-related groups must include DRG.

17        It's not just established under Medicare, by the way.

18   That's not the whole government's theory.  It must include

19   groupings of items and services including those paid for by

20   all private payers.  And that, in turn, backs them all the

21   way into all private payers' rates for all items and services

22   including for any proprietary groupings of items and services

23   that that particular payer sets forth.

24        There are a number of different ways -- and, you know, the

25   government kind of calls us out in its final reply for pointing

1    this out.  There are any number of ways that you can interpret

2    that phrase, but the one thing that's pretty clear is that you

3    cannot take that phrase and kind of manhandle it into a blanket

4    permission to require hospitals to do something that, by the

5    way, no other state, in all of their state-transparency

6    programs, no other state has required a hospital to do this.

7         So that phrase, I think, put very simply cannot -- to

8    overuse a phrase, cannot bear the weight that the government

9    puts on it.  "Including for diagnosis-related groups" just means

10   chargemaster charges including for those groups of items and

11   services.  The way that a lot of hospitals have interpreted

12   that, they've included the chargemaster list, that list of

13   standard charges, and at the end they've taken every Medicare-

14   specified DRG, diagnosis-related groups established under the

15   Medicare Act, and they have amalgamated, essentially, all of

16   the standard charges that go into that DRG.

17        And that, by the way, just to harken back to something

18   I said before, even those standard charges show up on any

19   hospital bill involving a diagnosis-related group.  Those

20   charges are broken out in addition to the DRG code.

21        So it's not entirely surprising that a simple directive

22   from Congress that says a list of standard charges for items

23   and services, including groups of items and services established

24   under Medicare, would contemplate that kind of summation of

25   standard charges for items and services.

```
 1         But I think as far as the text is concerned, I think that
 2    is -- the government's argument about including for DRGs is a
 3    far, far cry from being able to read in the kind of deep
 4    ambiguity into that text that the government suggests.
 5              THE COURT:  I have a few questions, but I did want
 6    to note that we seem to be getting some feedback.
 7         Ms. White, I don't know if you're hearing that as well.
 8    And it's not particularly bothering me, I'm able to concentrate,
 9    but I know that can often be distracting for advocates.  So I
10    don't know if everyone is also hearing that or if there's
11    anything that can be done to try to eliminate it.
12              THE DEPUTY CLERK:  No, Your Honor.  I do hear it.
13         Is everyone muted besides you and the current speaker?
14              THE COURT:  Am I able to tell that?  I can't recall
15    if I'm able to do that on here.
16              THE DEPUTY CLERK:  No, I'm asking everyone if
17    they've muted themselves if they're not speaking.
18              THE COURT:  Sounds likely.  So my apologies in
19    case this gets a little bit distracting.
20         So, Ms. Stetson, is there any relevance, in your view,
21    to Congress's use of two verbs in the statute?  It says not
22    just that the hospital shall make public a list of standard
23    charges, but actually shall establish, which suggests to me
24    that whatever it is that shall be published is something that
25    did not previously exist or might not have previously existed.
```

1    Obviously, though, I'll ask the government for its view.

2    I don't think the government focuses much on the fact that there

3    are two verbs in the statute rather than one, but, in your view,

4    is there any relevance to the fact that Congress required both

5    the establishment and the publication of the relevant list?

6         MS. STETSON:  No.  I don't think that -- I don't think

7    that the fact that there are two verbs operating in that statute

8    changes the scope of the statute.  I think probably -- who

9    knows?  We can all speculate about what Congress was thinking.

10   But one of the things that was true, and certainly was true

11   ten years ago, is that when we talk about a chargemaster, that

12   master list of charges, those are not uniform from hospital to

13   hospital.  As I understand it, there are actually different

14   software systems; there are actually different providers of

15   those systems that create those master charge lists for each

16   hospital.

17        So it's possible to imagine -- and maybe this is why that

18   qualifier is in there, too, two qualifiers: "and update" and

19   then "in accordance with guidelines developed by the Secretary."

20   Maybe that's why the Secretary, in 2014 and 2018, when they made

21   the point in the Federal Register notices that the form could be

22   in the form of the chargemaster or another form that the hospital

23   desires, it's possible to see someone taking the chargemaster

24   information that they have and creating a different form of

25   list.  That would be establishing the list and publicly

1    disclosing it.

2         So it probably is just designed to give a little bit of

3    leeway to the fact that not all master lists of charges look

4    exactly the same.  And Congress wasn't requiring uniformity

5    across the fees, and in fact the Secretary, in 2014 and 2018,

6    wasn't requiring uniformity across the fees.

7         THE COURT:  If I were to conclude that this provision

8    is ambiguous -- I understand that there are questions about

9    whether the agency's interpretation is nevertheless reasonable,

10   but just hypothetically, if I were to conclude that the

11   provision is ambiguous, is it your view that the requirement

12   to publish discounted cash prices would be an unreasonable

13   interpretation of an ambiguous statute?  Again, assuming the

14   statute is ambiguous.

15        MS. STETSON:  Assuming it's ambiguous -- and just

16   to take the first view from the top, we would say and we argue

17   in our brief it's certainly unreasonable, even under a *Chevron*

18   deference regime where you're at step two, to interpret a list

19   of standard charges to mean maximum negotiated, minimum

20   negotiated, and all of hundreds of payer-negotiated rates,

21   to set that aside.

22        On the cash discount rate, I think it is candidly a closer

23   question, but I think you still run into the same kind of

24   cognitive dissonance that you have with what those standard

25   rates are.  And this is where I think a lot of the declarations

1    that were filed in support of our summary judgment motion, a

2    lot of the comments that you saw on the joint appendix are

3    useful here because they explain -- you know, as with a few

4    other elements of this, it's just not as straightforward as

5    CMS, I think, would prefer it to be.  There is no -- in almost

6    all circumstances, there's no standard cash discount rate.

7         In fact, what hospitals have told CMS and have told you in

8    their declarations is, if we were to post a cash discount rate,

9    that gives the impression to, say, a poor, uninsured payer, that

10   there are no other discounts available when in fact there are

11   all sorts of combinations and permutations of discounts.  There

12   are prompt-pay discounts for cash payers.  There are cash

13   discounts just based on someone's sheer need: If someone walks

14   into the hospital and simply cannot pay, that cash discount is

15   going to be steep.

16        THE COURT:  But nothing in the rule would prohibit

17   a hospital from saying those things.  In fact, nothing in the

18   rule prohibits hospitals from otherwise explaining what it

19   is that they're required by the rule to publish.  Correct?

20        MS. STETSON:  I think that's right, but I think

21   it's also a little bit of a -- it's built on a foundation that's

22   not quite right, which is if this speech is unlawful -- before

23   we even get to kind of First Amendment considerations, if this

24   speech is not permissible in terms of what the Secretary can

25   require under his authority, the fact that we could further

1    caveat that to further explain it doesn't rescue it from

2    unlawfulness; it just means we have to say more.  But, you're

3    right.  It's possible to put all sorts of additional speech

4    around it, but that's doesn't cure the underlying unlawfulness.

5              THE COURT:  I was in some respects -- and I get that

6    point.  I was to some extent pivoting a little bit to the First

7    Amendment claim, so if you wouldn't mind going there and giving

8    me your best argument on the First Amendment.

9              MS. STETSON:  Sure.  I'd actually like to start,

10   before we get into kind of the commercial speech, *Zauderer*,

11   *Central Hudson* rubric, I want to start by pointing out something

12   that may have gotten lost in the briefing, which is the

13   government, at around the same time they published this Final

14   Rule, it published a proposed rule pertaining to disclosures

15   that the government plans to require of insurers.

16        And I want to call your attention to that because I think

17   both with respect to First Amendment and just with respect to

18   common sense, I think what the government is proposing at least

19   in part in that proposed rule is important to look at, and this

20   is 84 Federal Register 65464.  There's two kinds --

21             THE COURT:  Ms. Stetson, is that the so-called

22   "Transparency in Coverage" rule?

23             MS. STETSON:  Yes.  That is.  That is.

24        So there are two parts of it.  One of the parts, of course,

25   is essentially the mirror image of this rule, which is insurers

1    are required to disclose all of their negotiated rates.
2    My clients have the same problem with that requirement as
3    they do in our own disclosure rule.  But there's a different
4    independent component of that rule that I want to draw your
5    attention to, and that's the first part of it.

6        The first part of the insurer disclosure rule essentially
7    says, insurers shall be required to disclose, upon a request
8    of one of their enrollees or participants with respect to a
9    particular provider in service or item that person's cost-
10   sharing liability -- and that means things like do they have
11   to pay up to their deductible; how much is left; coinsurance
12   requirements; what is the accumulated amount of that person's
13   liability both in terms of how many, for example, treatments
14   they have left and how much money they have left in their
15   deductible; the negotiated rate for that particular item of
16   service, with one exception that I think is important, the
17   out-of-network allowed amount; the list of contents for a
18   service; and the prerequisites to coverage like prior
19   authorization or step therapy or so forth.

20       That basket of disclosures, which is all designed to be
21   disclosed to a participant on that participant's request when
22   a participant comes and says: I've been referred for a knee
23   replacement; these are the two providers; can you walk me
24   through what my options are?  That gives that patient everything
25   that we've been talking about that the hospitals can't give them

1    up to and including the negotiated rate that the hospitals are

2    being forced to disclose.

3         And the reason I wanted to front-load that is -- there are

4    a couple, really, but one of them is, when we talk about fit and

5    we talk about undue burden, even if you take it at the basic

6    *Zauderer* level, what you have in that proposed requirement is

7    exactly the kind of fit with a much more minimal burden on all

8    concerned, frankly, than what is being proposed here.

9         And I mentioned that with respect to those individual

10   participants' requests, negotiated rates are usually provided.

11   But they're not in some circumstances, and I want to land on

12   this because I think it is a telling contrast with what's

13   required here.

14        The Department acknowledges in that particular Proposed

15   Rule that if the negotiated rate between the hospital, for

16   example, and the insurer doesn't impact that individual's cost-

17   sharing liability, if there's a flat co-pay or what have you,

18   disclosure of the negotiated rate would not be required if it's

19   not relevant for calculating cost-sharing liability.

20        So that tells you that in those circumstances we have,

21   the participant and all of the particulars of that plan

22   participant's needs and contributions, that there is this much

23   more tailored, much more appropriately tailored way to give the

24   same information all at the same time to that participant that

25   we're talking about.

1        And I want to be clear that my clients are highly

2   supportive not just of that, but as we've said in our briefs,

3   no one is against the basic principle of transparency of

4   pricing.  The problem that we have here is that this is not

5   price transparency; this is disclosure of privately negotiated

6   insurance rates, tens of thousands of them.  So I wanted to

7   start with that separate rule because I think it is very telling

8   with respect to the First Amendment issue.

9        On the First Amendment, I'll run through the listings

10   briefly.  The first hurdle I think is one that you needn't

11   spend a lot of time on, just because I think the answers get

12   you to our requested relief no matter where you land, but I

13   think there's an open question both under the D.C. Circuit's

14   precedents and elsewhere about whether this type of disclosure

15   really even is commercial speech.  One of the most recent

16   decisions we've had from the D.C. Circuit says it is much easier

17   to explain what commercial speech isn't than what it is.

18        THE COURT:  Is that because the publication of

19   prices is not speech, or because it's not commercial speech?

20        MS. STETSON:  Because it's not commercial speech, I

21   would say.  You know, the classic commercial speech, if you go

22   all the way back to *Virginia Board of Pharmacy* or *Central Hudson,*

23   is speech that is proposing a transaction.  But as I said, you

24   can pause there, and that's an interesting academic question,

25   but if you take it to the next level and you ask, all right,

1    assuming this is commercial speech, what level of scrutiny

2    should this get, I would refer you back to that same case

3    I just mentioned, which is the D.C. Circuit's decision in

4    *National Association of Manufacturers.*  That decision came

5    out, I think, in 2016 or 2017.

6          So it had the benefit, among other things, of an *en banc*

7    decision from the D.C. Circuit a couple years earlier in the

8    *AMI* case.  And what *National Association of Manufacturers* said

9    is, one thing that's clear both from *AMI*, from *Zauderer*, from

10   *Milavetz* which the government cites, from *Hurley,* from a number

11   of statements, is that *Zauderer* applies in the context of

12   essentially point-of-sale communications: advertising, or

13   as in *AMI*, the labeling on a package.  *Zauderer* does not apply

14   simply to every compelled disclosure.

15         And as you can imagine and I think Your Honor probably

16   knows, there's some discomfort on the Supreme Court even with

17   the idea that a separate standard applies at all to any kind of

18   compelled disclosure.  I think there's tolerance for the idea

19   that if it's compelled to dispel confusion, it's appropriate;

20   but where it's simply a compelled disclosure, it's not entitled

21   to any lesser commercial speech protection than if it was a

22   restricted disclosure.

23         So, in our view, the D.C. Circuit's current statement

24   of the law on *Zauderer* is that it applies to point of sale or

25   advertisement, and those are neither of these.

 1          Under *Central Hudson*, of course, one of the things

 2     that you have to establish is that the disclosure requirement

 3     directly and materially advances the interest that the

 4     government's talking about.  And here I would say at best

 5     you have what I would call an indirect and marginal impact on

 6     what the government is talking about, and that's why I sort of

 7     started with where I did with respect to the insurance coverage

 8     disclosure rule.

 9          That is a direct and material advancement of exactly what

10     the government's talking about, which is how do I get the most

11     information relevant to a person's out-of-pocket costs to them

12     in the most efficient way possible?  And that way, of course,

13     is by someone going to her insurer and saying, tell me what my

14     options are and tell me what it's going to cost me.

15          So under the *Central Hudson* analysis, you have a highly

16     indirect and quite marginal impact on that same thing because,

17     of course, all that the hospitals would be compelled to disclose

18     -- and say "all" in air quotes -- are hundreds and -- potentially

19     hundreds of millions of lines of insured negotiated payment

20     rates which a patient would then have to reverse-engineer with

21     consulting her own insurer and her own plan in order to figure

22     out what her out-of-pocket obligations are.

23          That seems like a long way around when you can simply

24     achieve the same result by implementing the first component

25     of the insurance disclosure rule, that patient-focused,

out-of-pocket disclosure rule.

The issue with *Zauderer*, to drop down to the *Zauderer* analysis, what you set aside at that point, you still need a substantial government interest.  But under *Zauderer*, one of the things that was made clear by now-Justice Kavanaugh's concurring opinion in *AMI* is that you don't get some kind of rational-basis free pass which you get to *Zauderer*.  It is still a rigorous inquiry.

There are things that are satisfied in terms of fit just because of the nature of the inquiry that you're at at that point.  But one thing that's very clear, including something the Supreme Court said last year I think in the *NIFLA* case, is one of the things you look at even in a *Zauderer* inquiry is, is this rule unduly burdensome?

And it should be clear from Your Honor's review of the joint appendix and from the briefs and from the amicus briefs submitted by not just the state associations but by the Chamber of Commerce, that what the government thinks will be the commitment from these hospitals compared to what that commitment actually is, is orders of magnitude different.

If you look at some of the comments in the proposed rulemaking, they include things like "the government's estimate is grossly understated," "simply laughable," "woefully inaccurate," "vastly understated."  And I'll go back to the example I gave with the Cleveland Clinic.

1    So Cleveland Clinic is that system that has 3,000

2    contracts.  It's got a chargemaster of 110,000 items.  So you

3    are talking about, with a list of items and services, tens of

4    millions of lines of data, all of which is in the possession

5    of all of those various insurers, but very little of which in

6    the first instance is in the possession of the hospital,

7    precisely because the hospital, as we were saying earlier,

8    doesn't generate bills based on those individualized amounts.

9    The hospital always bills the same thing.

10   So the idea that the hospital can spend 12 hours just

11   gathering this information and sending it out to the world is

12   a complete and total fiction.  And I would emphasize that, now

13   more than ever -- you may have seen the news, as I did, two days

14   ago that the American Hospital Association has reported that

15   COVID itself will cost hospitals by mid-June -- so for half a

16   year -- $200 billion.

17   And I think before the government seeks to impose an

18   absurdly burdensome and very round-about requirement on the

19   hospitals when it understands, through appending rulemaking,

20   that it could do the same thing much more quickly, efficiently,

21   and effectively using a different disclosure requirement that is

22   personalized to a particular patient and provider and treatment,

23   I think even under *Zauderer* this is not a close call.

24   THE COURT:  Could you say a brief piece on the

25   enforcement penalty argument?  I suppose -- would you walk

1    me through your argument there?

2         MS. STETSON:  Sure.  So on the penalties I think --

3    first thing that I would point out is something that presumably

4    -- which struck me at least as odd about the statute, which

5    is you have a statute where this particular requirement, this

6    standard master charges requirement, is subsection (e).  The

7    penalties requirement is baked into a subprovision of subsection

8    (b), and there I think lies in the problem.

9         As we explain in our brief in some detail, one of the

10   things that happens during this massive sort of sausage-making

11   process is that those subsections having to do with rebating now

12   and certain health insurer coverage showing got amalgamated in

13   with other requirements including things demanded of the

14   National Association of Insurance Commissioners, including this

15   particular standard hospital charge list requirement.

16        And one of the things that I think happened is that

17   penalties requirement that was baked into the rebate and the

18   sort of ratio requirements of the first part of that statute,

19   the provision, got essentially assigned to the whole section,

20   because that's what it says.  But both structurally and just

21   logically, it doesn't make any sense.

22        We pointed out in our brief, among other things, that

23   if you take that at face value, it would mean that CMS has

24   the authority to punish the National Association of Insurance

25   Commissioners for not doing its job, which is of course absurd.

The government's response to that is, well, we wouldn't do that. But that's not an entirely satisfying response.

Just because they would opt not to enforce doesn't go to the statutory question here, which is can you read that statute really to suggest that they could enforce against their partner in this kind of effort. But they both, because of the placement of BME and because of the history that we've set out in the briefs, I think it's clear that there were not penalties associated with this simple requirement of publishing a list of the hospital standard charges.

THE COURT:  Thank you.  I understand there are other issues in the case, but I think it would be helpful for me to turn to the government, let the government both respond to you and make whatever arguments it would like affirmatively, and then of course you'll have an opportunity to respond.  So thank you, Ms. Stetson.

Mr. Baer, you'll have roughly half an hour, but whatever makes the most sense.

MR. BAER:  Thank you very much, Your Honor.  Again, Michael Baer from the Department of Justice on behalf of the Secretary.

Your Honor, patients deserve to know how much it's going to cost when they get hospital care, and they deserve to know it before they open a medical bill and, indeed, before they choose where they want to receive that care.  That basic fundamental

1    transparency is not only a key feature of almost every market

2    that we can think of in this country, it's a foundation of

3    competition.  It forces providers to be better, and it allows

4    consumers to make more informed choices.

5        Congress, in enacting Section 2718 of the Public Health

6    Service Act, brought some of that basic transparency to the

7    market for healthcare services.  HHS's Price Transparency Rule

8    furthers that purpose, and it does so in a manner that is

9    statutorily and constitutionally permissible.

10        I want to start with the statutory argument, and before

11   I dive in there, I do want to note -- and Your Honor I think

12   recognized this in the back-and-forth with plaintiffs' counsel

13   -- that the focus of the statutory discussion has sort of

14   shifted over the course of the briefing of argument with

15   "charges," to my knowledge, not meaningfully appearing in

16   plaintiffs' opening brief, to then in a footnote at page 3 in

17   their reply brief being defined as the amount demanded for an

18   item or service.  And to Your Honor's question, I think the

19   government agrees that that's the charges or amount demanded

20   for an item or service.

21        And now it becomes sort of the linchpin of plaintiffs'

22   argument in this oral argument that, well, standard charges

23   have to mean chargemaster rates because "charges" only has one

24   meaning, and I think just the plain meaning that the plaintiffs

25   pointed to in their opposition and reply brief forecloses that.

1    If I negotiate with a contractor and say, all right,
2    it's going to be $10,000 to do a repair of my kitchen, and the
3    contractor comes back and says, yes, it's going to be $10,000;
4    that's how much you're going to have to pay me, but just so you
5    know, I like to add a zero at the end of all of my invoices, so
6    when you see that, just be prepared, but you know you only have
7    to pay me $10,000.

8    If I was telling my friends about that conversation, I
9    would say, well, you know, my contractor's charging me $10,000
10   for this.  I wouldn't inflate it by a factor of 10 just because
11   of the quirk of the contractor's billing.  And I think another
12   reason why "charges" has to mean more than just sort of a set
13   rate, which, to be clear, is what plaintiffs' definition would
14   mean, that there was only one definition of "charge" that
15   plaintiffs have in mind.

16   Plaintiffs cite from the Christensen article from the
17   Administrative Record, and there that article says expressly,
18   for purposes of that academic analysis, there is only one
19   charge.  All payers are charged, you know, the same charge,
20   and then everything else is sort of a question of payment.

21   But if that's what Congress thought, if Congress really
22   thought that "charge" had one meaning and, as Ms. Stetson
23   suggests, Congress just wanted to use the sort of technical
24   meaning of "charge" as it's used in the CMS provider manual,
25   then Congress would have said "charge."  It wouldn't have added

1    the modifier "standard" to the term.

2        In order for "standard" to be doing any work, "charge" has

3    to have the meaning that plaintiffs' own dictionary definitions

4    would suggest, which is the amount demanded for a particular

5    service.  So with that sort of foundational point out of the

6    way for the moment, I do want --

7        THE COURT:  Let me pause you, though, just to make

8    sure that I understand.  Your position, then, is that the word

9    "charge" in this statute has to mean something different than

10   in the provider manual and that it has to have its ordinary

11   dictionary meaning, I take it, but different from that provider

12   manual definition.  And just to be very specific about this

13   market, it is, in the context of Hospital A and Insurance

14   Company B for Service C, the charge is the amount, I take it,

15   that the hospital expects to be paid by the third party, by the

16   insurer, for that service.

17       MR. BAER:  Yes.  And I would say the amount that

18   they expect to be paid is the same as the amount that they're

19   demanding to be paid.  So whether you phrase it as an

20   expectation or demand, yeah.

21       THE COURT:  What about plaintiffs' argument here that

22   relies on the Provider Reimbursement Manual?

23       MR. BAER:  So the agency dealt with this in the rule's

24   preamble.  It noted that this meaning of "charge" exists, and it

25   actually notes that in the provider manual.  It says charges

should be listed at the gross rate, which is how you get to the

term "gross charges" in the course of the rule.

In other words, I think even in the provider manual,

because "charges" are identified as being listed at the gross

rate, there's a sense that you could have sort of different

rates within a concept of "charges," and the CMS provider manual

is choosing one uniform definition for administrative simplicity.

I think Ms. Stetson talked about how this definition of

"charge" is used as a result of Medicare's complicated scheme

of regulations and reimbursements and outlier payments, and so

I think it makes perfect sense for Medicare to have that more

technical definition of "charge."

But as the agency noted in the rule's preamble, surely if

Congress had wanted to just adopt that, it would have referenced

either the fact that Medicare uses that term, or it just would

have used the word "charge."  It wouldn't have modified it with

anything like "standard."

So I think there's both textual reasons based on the

structure of the statute and how Medicare regulations are

structured, but also just sort of common-sense intuition here,

that if we're talking about standard charges, as plaintiffs

acknowledge, there has to be some universe of nonstandard

charges, which means "charges" has to have more than just one

meaning.  And I sort of understood until maybe the opposition

reply brief, or possibly till argument, that the parties were

1    in agreement on that point.

2            THE COURT:  So to stick with points that were maybe

3    less developed in the briefs, although this one is more from me

4    than anyone else, in your view does the verb "establish" when

5    paired with "and make public" matter at all to your argument?

6            MR. BAER:  Yes, Your Honor.  And I think the way in

7    which it most helpfully illustrates our argument is to make

8    clear that Congress meant something other than just chargemaster

9    rates.  And I think this sort of core statutory interpretation

10   division here between the parties is plaintiffs think that

11   "standard charges" means only and exclusively chargemaster

12   rates, and the government thinks that it's a broader term that

13   includes sort of the most important point here, is negotiated

14   rates, that those are the principal set, in fact, of standard

15   charges that hospitals levy.

16       And so I think, as we note in our brief, if Congress

17   had wanted to just have chargemaster rates be what hospitals

18   published, it could have used that term, and I think the point

19   Your Honor made about the verb "established" reinforces that

20   point.  If the chargemaster rates are something that hospitals

21   have already had for decades and the rule's preamble makes clear

22   that these are universal to each hospital, then there wouldn't

23   be a need for the hospital to establish that list in any

24   meaningful way.

25       So I do think the text of the statute in using "establish"

1    suggests that Congress didn't mean for something that wasn't

2    already preexisting, that could just be uploaded in a matter

3    of seconds to be the object of its disclosure requirement,

4    and I think the rule reflects that fact.

5         THE COURT:  But on the question of -- and I appreciate

6    that.  To go back to where you were before on the question of

7    standard charges, at least as it relates to negotiated charges,

8    it seems to me that, at least in certain hospital contexts

9    including the one that Ms. Stetson referenced before, the

10   Cleveland Clinic or some other systems, that at least in theory

11   one could have, for any particular item or service, a large

12   number of charges that would have to be required because the

13   hospital or hospital system has negotiated with both a large

14   number of payers who themselves have differently situated

15   patients and plans.

16        So at least, hypothetically, a hospital for a particular

17   item or particular service might be required by this rule to

18   publish a large number of amounts as standard charges, and it

19   seems at least potentially counterintuitive that you could have

20   a large number of charges for the same item or service all

21   considered standard.

22        MR. BAER:  So, Your Honor, at bottom I agree with

23   your characterization that there could be a large number of

24   standard charges under this rule for a particular item or

25   service.  I think the reason why that sounds, you know, maybe

initially counterintuitive is that there just is not another
market that looks like the market for hospital services.

As Your Honor noted in the back-and-forth with Ms. Stetson
earlier, roughly 90 percent of patients are going to face a
negotiated rate when they receive care from a hospital.  And so
to say that you would write off from the outset 90 percent of
paying patients in conceiving of what a standard charge means,
that seems totally atextual to me.

What the agency's explanation in the rule does is it sort
of walks through this point and says, well, all right, the first
thing you have to figure out is, you know, how does this market
structure charge for different kinds of groups?  And there are
self-pay patients, and then there are patients covered by, you
know, third-party payers, by insurance companies, essentially.

And so if you start from that premise, then, okay, there's
a set of rates, you know, perhaps a chargemaster rate or a
standardized discounted cash price that applies to the self-pay
patients, but then when you start to look at the lion's share of
the patients, those with coverage, there needs to be some way to
identify what the standard charge is.

And the best way -- and candidly, Your Honor, I think
the only way that anyone in this case has suggested to define a
standard charge that actually applies to those patients is to
just look at them, sort of group of patient by group of patient,
look at the rates that have been set in advance for a defined

1    group of patients, and that may mean that you have a number

2    of different charges because the way this market is structured

3    results in a bunch of different insurance companies negotiating

4    with hospitals.  But that fact is sort of downstream from the

5    initial point, which is that the term has to capture, in some

6    meaningful way, this lion's share of patients.

7         And the only other quick point I would note on this, Your

8    Honor, to the question about, well, you know, are you going to

9    have 3,000 different charges along the lines of the Cleveland

10   Clinic, there's a distinction between the number of charges

11   for an item or service and the number of different contracts

12   or rate plans at issue.  In other words, a hospital could have

13   a thousand different contracts with insurers, and yet those

14   contracts for a particular item all have, you know, only ten

15   different charges.  So it's quite possible that you're actually

16   dealing with a smaller number of charges just across a larger

17   number of plans.

18        THE COURT:  It seems to me that both are possible

19   and that in the context where, even if you have a huge number

20   of payers with a large number of plans where the hypothetical

21   possibility was 3,000 different charge amounts but you actually

22   only land on 10, the hospital still has to disclose for each of

23   the 10 which of the very many payers is in the bucket that

24   you're talking about.

25        And so while there may only be ten dollar amounts, you

1    still have, right, a bunch of iterations that is, you know,

2    dollar amount A applies to both Aetna and United Healthcare

3    and Cigna, dollar amount B applies to 78 insurers, and dollar

4    amount C applies to something else.

5          So I get your point that there are potentially going to

6    be overlapping amounts where different insurance companies have

7    negotiated the same charge with a hospital, but it's not as if

8    the rule requires just the charge amount.  It requires the

9    charge amount and the payer's name.  Correct?

10         MR. BAER:  Absolutely, Your Honor.  And it does that

11   again -- this is sort of downstream of the structure of the

12   market.  It does that because, for each patient, the charge that

13   you're going to face depends on that information that's going to

14   be displayed.  The charge that the hospital levies for my care

15   when I go to a hospital will depend on the rate that my insurance

16   company has negotiated with that hospital, and that rate is set

17   from the moment I walk in the door.

18         Plaintiffs, in their briefs, try and analogize this to

19   other contexts where we think of one-off negotiations as being

20   nonstandard, like if you're negotiating for a lower price from

21   a restaurant for a particular catered event or if you're

22   negotiating with an automaker.  But there you're talking about

23   direct consumer-to-supplier negotiations in the context of a

24   one-off transaction.

25         If I am similarly situated when I walk through a hospital's

1    doors to everyone else on my insurance plan in terms of the

2    standard charges that are going to apply to me and like the

3    90 percent of patients that receive hospital care who have

4    third-party payer coverage, that same structure applies to all

5    of us I think is the best reading of the statute and, at a

6    minimum, certainly a reasonable reading of the statute to define

7    standard charges in a way that has some direct meaning for that

8    large category of patients.

9         THE COURT:  I note in this argument -- and I apologize

10   for interrupting, awkwardly, I suppose, on the video -- but at

11   least as it relates to the statutory interpretation *Chevron*

12   question, don't the maximum and minimum -- I forget the term of

13   art -- the de-identified maximum and minimum charges, at least

14   for statutory interpretation purposes, don't they stand or fall

15   with the payer-negotiated rate definition?  Is there any

16   argument that those are somehow more standard than all of the

17   other payer-negotiated rates?

18        MR. BAER:  No, Your Honor.  I agree that if you're

19   thinking about just the definition of "standard charges," they

20   also certainly rise or fall.  I think the only way in which

21   you would get to a different result is if somehow the number

22   of standard charges was the point that was giving Your Honor

23   particular pause, then de-identified minimum and maximum is

24   just a smaller number of lines in the spreadsheet.  But I think

25   otherwise, yes, they are -- as we describe them in the brief,

1    that's essentially a data display requirement, that if all

2    payer-specific negotiated rates are going to be published,

3    then it's helpful for consumers to see the minimum and maximum

4    range, essentially, that they would be subject to from that

5    particular hospital.

6          THE COURT:  So can you answer this question for me,

7    which is, under this rule, what charges need not be published?

8          MR. BAER:  So, Your Honor, under this rule, the

9    principal category of charges that need not be published for

10   all of the bespoke negotiated rates that patients arrive at with

11   hospitals.  For instance, the rule explains that the discounted

12   cash price applies to discounts that are sort of universally

13   available, and so discounted cash prices that depend more on a

14   patient's circumstances, those rates need not be published under

15   the rule because those are more tailored.

16      Similarly, there are lots of instances where a patient

17   who is self-pay may come to a hospital and try to negotiated

18   a different rate based on what they can or can't afford, and

19   all of those sort of one-off negotiated prices would not be

20   published under the rule and wouldn't have to be published.

21         THE COURT:  Does the agency or do you know, at least

22   roughly, what percentage of transactions occur with respect to

23   items or services that would fit within this category of not

24   requiring publication?

25         MR. BAER:  I don't, Your Honor.  But I would just

1    note, I would think it actually is a mark in favor of the rule.

2    There's a fairly narrow category of rates that are not standard.

3    I think in most contexts we think that rates tend to be more

4    standardized and that we would also think that when Congress

5    required the publication of standard charges, it wanted to put

6    out information that was useful to patients.

7         And so the upshot of the agency's definition of standard

8    charges is that you have a rate that most patients are going to

9    be able to look at, and that's the rate that's going to apply to

10   them.  That's, I think, the net benefit of the statute.

11        And I wanted to turn briefly to the question of items and

12   services and service packages and to DRGs.

13             THE COURT:  Yes, please.

14             MR. BAER:  Because even if you disagree with

15   everything that I've just been saying -- again, the two

16   interpretations at issue here are "standard charges" means

17   chargemaster rates, or it means some definition that includes

18   negotiated rates; but the agency's definition is the only one

19   that's even before us on that score.  But it cannot mean

20   chargemaster rates for three reasons:

21        The first is the reason that we've already been discussing,

22   just in terms of why intuitively it wouldn't make sense for

23   Congress to define a rate that only applies really to 10 percent

24   or fewer of patients, but the second comes directly from the

25   statute's text, which is, before requiring the publication of

1  standard charges, Congress specified that this was for items and

2  services.  And Congress gave an example of those kinds of items

3  and services: diagnosis-related groups established under the

4  Medicare Act.

5      Now, the agency, in going through the relevant statutory

6  definitions in the rule, defines "items and services" before

7  it gets to the definition of "standard charges."  And I don't

8  understand plaintiffs to have ever taken issue with at least

9  the high-level agency definition of "items and services" as

10  including service packages.  But as the agency notes in the

11  rule, service packages don't appear on hospital chargemasters.

12  Chargemasters are individual items and services.

13      So if the parties agree that items and services includes

14  service packages, and service packages don't appear on hospital

15  chargemasters, then there is not a rate that plaintiffs have

16  pointed to or that I'm aware of that could count as a standard

17  charge for any kind of service package, whether it's a

18  diagnosis-related group or one of the other kind of service

19  packages that hospitals use.

20      And if we could talk specifically about the diagnosis-

21  related group aspect part of this, the reason why that so

22  clearly illustrates why plaintiffs' definition isn't viable is

23  because diagnosis-related groups are a way of charging based,

24  unsurprisingly, on a diagnosis as well as other patient

25  characteristics.  And, importantly, it's not tied to the number

1    of items and services that a patient consumes or otherwise

2    receives from a hospital.

3        So the same patient who's in, let's say, an appendectomy

4    diagnosis-related group would face the same charge regardless

5    of, let's say, the number of bags of IV fluid or particular

6    pain pills or other variables like time spent in a hospital bed.

7    There are sort of outlier cases, but as a general rule, that

8    characterization is true, which means you couldn't have a

9    chargemaster rate for a diagnosis-related group because you'd

10   be trying to set a rate for a not-fixed amount of items and

11   services.

12       So that alone renders it textually impossible that when

13   Congress included "diagnosis-related group" in Section 2718, it

14   meant for only chargemaster rates to be published.  And that's

15   a principal reason why I think the government wins here under

16   step one of *Chevron,* because we have the best reading of the

17   statute and the only reading that sort of makes textual sense

18   of that phrase.

19       But if we get to *Chevron* step two, I would note that

20   plaintiffs do not really put forward another alternative in

21   between "standard charges" means only chargemaster rates and

22   "standard charges" means the regular rates as the government has

23   defined here.  So, regardless of what level of *Chevron* analysis

24   you're looking at, the only alternative on the table is that

25   "standard charges" means only chargemaster rates, and that's

1    the one category of charge that we know unequivocally Congress

2    couldn't have meant, because the inclusion of diagnosis-related

3    groups forecloses it.

4        The final point I would note on the statutory interpretation

5    question is there's another text-based reason why the government

6    has the better reading here, and that's the statutory purpose,

7    which here appears in the provision text.  Section 2718 is

8    entitled "Bringing Down the Cost of Healthcare Coverage."

9        And I don't think there's a dispute that publishing

10   standard charges in a way that applies to a larger percentage

11   of patients who had actually faced them -- in other words, in a

12   way not just limited to the 10 percent that might be the benefit

13   under a system where you just publish the chargemaster rate.

14   Publishing that broader set has a much more likely and more

15   direct effect on bringing down the cost of healthcare and

16   healthcare coverage, which is another reason why it's the better

17   reading of the statute.

18           THE COURT:  I want to put a pin there for one

19   second because I think it's a question that I want to get

20   to in connection with the First Amendment question.

21           MR. BAER:  Yes.

22           THE COURT:  But on the *Chevron* point, plaintiffs

23   make some arguments about the fact that this was not just an

24   agency rulemaking arising out of a statute, but was of course

25   following an EO, and the Executive Order does have some

1    substantive kick to it.  So my question is, in your view,

2    could the agency have disregarded the EO and defined "standard

3    charges" to be just chargemaster charges?

4         MR. BAER:  In the Final Rule?  Yes.  The Executive

5    Order requires the agency to propose a rule with a certain

6    definition of "standard charges."  That definition included

7    payer-specific negotiated rates, but the Executive Order didn't

8    require the agency to adopt that rule following notice and

9    comment.

10        In fact, one of the items that the agency asked for

11   comment on was the standard charges that it has already defined

12   in the Proposed Rule that was just chargemaster and payer-

13   specific negotiated rates.  So it asked for comment on that

14   specifically, and it also asked for comment on whether there

15   were other standard charges that should be included.

16        And, of course, the definition that the agency arrived

17   at, including, among other things, discounted cash prices,

18   is different than the definition that the Executive Order

19   put forward.  And as I think we note in the brief, the agency

20   doesn't cite the Executive Order as, you know, a sort of

21   authoritative basis for setting the definition here once

22   it had arrived at the Final Rule.  So I just don't see how

23   the Executive Order could change the *Chevron* analysis.

24        And I would note that that's the only argument that

25   plaintiffs raise as to why sort of the *Chevron* framework

1    shouldn't apply here.  In other words, they don't contest that

2    if Your Honor finds this to be an ambiguous provision, this

3    would be the normal sort of case where HHS had interpretive

4    authority under -- I believe it's Section 300gg-92 of Title 42,

5    which is the rulemaking authority for the PHS Act.  And if the

6    agency is acting pursuant to that authority, then it has the

7    normal *Chevron* ability to interpret ambiguous terms.

8         THE COURT:  Right.  I'm not in a particularly good

9    position to question the overall applicability of *Chevron* in

10   agency interpretations of their own statutes.  That's for people

11   above my pay grade, so to speak.

12       Can we now go to the First Amendment question?

13            MR. BAER:  Yes, Your Honor.

14            THE COURT:  I want to get some clarity around -- and

15   maybe the easiest question is if you could just articulate as

16   clearly as possible what specifically the governmental interest

17   in this rule is or that the rule is designed to empower.

18            MR. BAER:  Yes, Your Honor.  There are two interests,

19   and they come directly from the text of the rule's preamble.

20   The rule identifies the two substantial interests as, first,

21   providing consumers with factual information about the cost

22   of healthcare, and second, as lowering the cost of healthcare

23   coverage.

24            THE COURT:  So as to the first, if that were

25   sufficient, wouldn't that mean, essentially, that any disclosure

1  regime would pass First Amendment muster because that interest

2  would always be linked, or linked enough, to the disclosure?

3       MR. BAER:  So a couple things on that, Your Honor.

4  First, I don't mean to suggest that a disclosure of any

5  information is automatically sufficient to clear the interest

6  hurdle of the First Amendment, but I do think factual pricing

7  information about the costs of healthcare is, of course,

8  sufficient to clear that hurdle given that I don't take there

9  to be any disagreement about the opacity of the market for

10 healthcare services and frankly the demand on the part of

11 patients to know how much their care is going to cost.  The

12 agency found overwhelming interest in that information in the

13 rule's comments.

14     But I would also note, Your Honor, that the *en banc* court

15 in *AMI* sort of took that same premise that frankly came to the

16 conclusion that, actually, yes, most disclosure requirements

17 will pass scrutiny under *Zauderer* because they have a self-

18 evident tendency to promote the disclosure of the information

19 that was sought to be released.

20     And so I don't think Your Honor needs to endorse that more

21 robust version in order to rule for the government here given

22 how undisputably important pricing information about healthcare

23 is and accurate information about healthcare pricing, but I

24 think under *AMI* almost -- in other words, under *AMI,* a disclosure

25 requirement that was less effective than this one I think would

1    still pass muster under *Zauderer.*

2        And a principal reason for that, Your Honor, shifting out

3    to that question of the application of *Zauderer*, *Zauderer*

4    applies to the disclosure of purely factual and noncontroversial

5    information and permits the government to require those

6    disclosures as long as they're not unjustified and unduly

7    burdensome in a manner that chills commercial speech.

8        So taking the first part of that, of purely factual and

9    noncontroversial, I find it hard to believe that accurate

10   pricing information could ever be considered nonfactual or

11   even controversial, at least within how those terms have been

12   used in applying *Zauderer.*  This is a core, fact-based

13   disclosure requirement.

14       And I take plaintiffs' only real challenge to those

15   threshold requirements to be their claim that, well, this is

16   misleading because some consumers might be confused by that.

17   But as an initial matter, when it comes to First Amendment

18   law, the Court -- and it says this in *Central Hudson* -- has

19   consistently found that disclosing more factual information

20   is generally less likely to be misleading.

21       I would also note that it's interesting that plaintiffs

22   don't seem to take issue with disclosing chargemaster rates,

23   which, although we certainly wouldn't think that disclosure of

24   chargemaster rates is misleading, there's no question that the

25   disclosure of payer-specific negotiated rates is more relevant

1    to more people than chargemaster rates is.  So there's sort of

2    some, I think, selective outrage or application going on there.

3        But much more fundamentally, I think the reason why

4    disclosure isn't misleading is because it's so significantly

5    better than the information that's available to patients under

6    the status quo.  We note the sort of core options that a lot of

7    patients have today including Google or going to crowdsourcing

8    websites or finding other ways of trying to track down how much

9    a procedure is going to cost.

10       And I thought it was telling that Ms. Stetson began her

11   presentation on the First Amendment by comparing what happens

12   under this rule to the Transparency in Coverage Rule because

13   I thought that echoed a theme from the briefs, which was to

14   compare and contrast the Price Transparency Rule, this rule,

15   with some sort of idealized version of perfect information or

16   transparency as opposed to what I think should actually be the

17   baseline here, which is does this make the market for healthcare

18   services better?  Does it make patients more informed?  Does it

19   lower healthcare cost?

20       THE COURT:  So on that question -- right.  Okay.

21   So you're about to get there, which is my next question, which

22   is, so on the second government interest that you identify,

23   which is the lowering of healthcare costs, what's the evidence

24   that you have that this rule will --

25       MR. BAER:  So, Your Honor, we set this out first

1    in our opening brief.  We sort of set out three categories

2    of evidence.  And I think walking through this here, the agency

3    basically relies on -- and I think the most empirical evidence

4    is sort of two principal buckets.

5         The first is general economic theory about price

6    transparency, and here there are -- you know, there's the CRS

7    report that documents price transparency initiatives in a number

8    of different industries and concludes that price transparency

9    efforts generally tend to reduce costs by promoting competition,

10   but then there are a series of articles in the administrative

11   record that apply this specifically in the context of healthcare

12   and of hospital services.

13        So, for instance, there are several articles that deal

14   with medical imaging services.  I think the Zach Brown articles

15   which are at, I think, 4926 of the administrative record and

16   right around 5000 of the administrative record, those do a great

17   job of walking through how similar price transparency efforts in

18   New Hampshire, where payer-specific negotiated rates were

19   disclosed, led to real cost savings on medical imaging procedures.

20        So, in particular, for patients with deductibles, those

21   patients could save an average of $200, or roughly 36 percent,

22   for their services, for medical imaging services.  And across

23   the board, patients save, I think, roughly 5 percent on medical

24   imaging services.

25        There are then other studies that look at -- and these

1   are in particular the Lieber article and the Whaley study that

2   look at different corporate price transparency efforts.  So

3   that gave patients access to tools and tracked how they used

4   the tools to search for prices, to search for lower prices and

5   compare costs, and each of those articles also concluded that

6   price transparency efforts brought down costs.  And those

7   effects were particularly pronounced in a context of what the

8   rule calls "shoppable services."

9        So, in other words, in dealing with services that a patient

10  can schedule in advance, it makes sense that the patient's going

11  to be able to sort of, in that context, take time, look at

12  different prices, and arrive at what is the best option and the

13  most affordable.

14       The one thing I would note in particular about the Brown

15  article -- sorry to jump back to that for a second -- is it

16  helpfully lays out two different mechanisms as to why the rule

17  will lower costs.

18       The first is sort of the demand side of things, and here

19  the intuition is simple:  If I'm the patient and I'm looking

20  at different prices, I'm going to choose the lower-cost option.

21  So that means I'm spending less.  And then if you're looking

22  sort of systemwide, people are spending less overall.

23       But the other mechanism it identifies is what it refers to

24  as the supply-side mechanism.  In other words, once hospitals

25  know that patients can be engaged in that kind of comparison,

1    that forces them to be more sensitive about the prices that they

2    charge and the rates they negotiate with insurance companies.

3         The article modeled and found evidence of both of those

4    effects at play in New Hampshire in the context of the market

5    for medical imaging services, and I think that's a pretty robust

6    reason to think that this rule is going to have effect both on

7    how patients use the tools that the rule will allow to come into

8    existence and in terms of how hospitals will react to those tools.

9         So, Your Honor, if we were -- you know, before we started

10   talking in the weeds about these substantial interests, we were

11   at the sort of *Zauderer* stage of the inquiry of unjustified and

12   unduly burdensome I think is where we come to because we've sort

13   of been through the factual and noncontroversial.

14        The one thing I would note in terms of whether a restriction

15   on speech is unjustified or unduly burdensome is it's not a

16   question of whether it's unjustified in the abstract or

17   burdensome in the way that the APA might require courts to

18   investigate.  The burden in a First Amendment case is, of course,

19   the burden on speech.

20        So even if one -- we'll sort of -- we can get to it in a

21   minute if Your Honor would like, the Transparency in Coverage

22   Rule, but the thing I would just note at the outset is that when

23   Ms. Stetson is pointing to that as an alternative, there's no

24   suggestion that there is a different burden on speech between

25   the rule that HHS promulgated here and the rule that's under

consideration there.  In fact, plaintiffs concede in their

opposition to our reply brief that the rule doesn't chill

commercial speech.

So if the rule doesn't chill commercial speech, it almost

*a fortiori* can't be unjustified and unduly burdensome with

respect to its effect on speech.  So the sort of cost burdens,

the notion that this is somehow going to cripple hospitals,

that may be relevant under the arbitrary and capricious

analysis, and we can turn to that in just a moment, but under

*Zauderer*, in terms of assessing the burden on speech, that's

not the inquiry for the Court to engage in.

THE COURT:  Is that a relevant inquiry under

*Central Hudson*?

MR. BAER:  No, Your Honor, because as cases like

*McCullen v. Coakley* which plaintiffs cite indicate, the

relevant question for intermediate scrutiny is whether there's

an alternative that burdens substantially less speech.

So, again, the Court's question of comparing alternatives,

which is what I took Ms. Stetson to be doing in bringing up the

Transparency in Coverage Rule, that only matters if you're at

the *Central Hudson* point of the inquiry.  But even there, the

difference between alternatives is a question of the burden on

speech, not whether the agency has chosen the perfect means of

accomplishing a particular goal.

And I would just note briefly, in thinking about the

1  Price Transparency Rule versus the Transparency in Coverage

2  Rule -- which, as an aside, they are far too similarly named,

3  so I apologize for that.

4      One thing that you get from the Price Transparency Rule

5  that the Transparency in Coverage proposed rule, which has not

6  yet been promulgated -- you know, who knows what if any changes

7  there will be to what was proposed to be promulgated, but even

8  if it were to be promulgated as proposed, it wouldn't allow

9  patients to compare prices within a hospital.

10      And so one of the articles in the administrative record,

11  the *Consumer Reports* article on discounted cash prices notes

12  that for patients with high deductibles, it can actually be

13  more affordable to choose a discounted cash price than it can

14  be to go through an insurance company's reimbursement mechanism.

15  So if a patient with a high deductible finds out that it's

16  cheaper to go through a hospital's discounted cash price,

17  that patient could save significant sums of money on care.

18      But the Transparency in Coverage Rule, because it just

19  regulates insurers rather than providers, wouldn't allow for

20  that same sort of comparative.  Having that all together on

21  the same website and the same spreadsheet is a unique benefit

22  to consumers that only comes from this.

23          THE COURT:  Mr. Baer, I don't think you need to

24  spend time on the arbitrary and capricious argument, not

25  because I don't think it's important, but because I think

1    I have a very good handle on it.  But could you respond, I'd

2    say briefly so we have time for Ms. Stetson to do rebuttal

3    and then a surrebuttal for you if you'd like, to talk about

4    the penalties question?

5            MR. BAER:  Yes, Your Honor.  And I think the important

6    point to start with here is that the parties agree that, as

7    written, the statute authorizes the imposition of penalties,

8    which means that to get to the conclusion that the Court

9    shouldn't read the statute as written, there has to be an

10   invocation of the scrivener's error doctrine.  And I don't

11   see any point in plaintiffs' brief where they cite to or

12   meaningfully attempt to show that they have met the high

13   standard that must be necessary to invalidate a provision of

14   a statute under a scrivener's error theory.

15       And as an initial matter, the first thing you need in order

16   to invalidate such a provision is sort of a clear, instant sense

17   that Congress got it wrong.  But, of course, here that would

18   mean thinking that Congress chose not to make a disclosure

19   requirement enforceable, a disclosure requirement that, as this

20   very case illustrates, many hospitals don't want to comply with.

21       And so I think the sort of -- if you're starting from an

22   intuitive look at the statutory structure, it makes sense that

23   Congress would put a new requirement on hospitals and at the

24   same time make that requirement enforceable.  Otherwise, you

25   know, hospitals could get away with not publishing the

information that Congress had required patients to now have
access to.

    But getting into the weeds of it, I think the most
compelling argument against plaintiffs' position here is their
own theory as to how Congress allegedly screwed this up, right?
Because their theory is, look, the ACA, the drafting was
complicated, we were putting together a bunch of different
positions, and you initially had one bill that dealt with
medical loss ratio.  That bill became what are now subsections
(a) and (b) of Section 2718.

    Then you had other provisions, including the standard
charges provision, which are now subsections (c), (d), and (e).
And when Congress fused those all together, it just didn't pay
attention to how those provisions would interact, and so it
forgot that in subsection (b) it used the term "section" when
describing the scope of the penalties authority when it meant
something else.

    As a brief aside, in their opening briefs, plaintiffs
suggest that something else is "subsection," but we note that
"subsection" wouldn't have corrected the error as plaintiffs
see it, because then the penalties wouldn't apply to subsection
(a) of 2718; it just would have applied to subsection (b).  And
both parties agree that that is not what Congress intended.

    But setting aside that more minor point, in subsections
(c) and (d) of the statute, 2718(c) and (d) each reference

1   subsection (a) or subsection (b).  In other words, Congress

2   paid attention to how those subsections interact with the

3   medical-loss ratio provisions.  And so it's not just that

4   Congress had to be careless under plaintiffs' reading, but

5   that Congress had to be selectively careless, that it paid

6   attention to how (c) and (d) interact with (a) and (b) but

7   not how (b) interacts with subsection (e).

8        And so with apologies for getting a little too alphabetical

9   there, Your Honor, I think that fact all but defeats the

10  scrivener's error argument.  It's just not plausible that

11  Congress was careless in that particular way.  And even if it

12  was theoretically possible, plaintiffs haven't come close to the

13  showing that would be necessary to invalidate the enforcement

14  provision as applied to subsection (e) on a theory of

15  scrivener's error.

16            THE COURT:  Thank you.

17       Ms. Stetson -- I'll let you mute, Mr. Baer, and

18  Ms. Stetson, you can unmute.  I'm happy to hear any and all

19  things you would like in rebuttal.  I would like you to address

20  at some point -- you can start with it or do it as you see fit,

21  but my question is, in your view, what does the statute require

22  to be published with respect to DRGs?

23            MS. STETSON:  I think in our view -- I'd like to

24  start otherwise with the text of the statute, and that's as

25  good a place to start as any.  I think what the statute requires

is what the statute sets forth, which is standard charges
including for DRG.  And I think I mentioned in my first outing
here that our interpretation of that is, just as a hospital is
required to publish standard charges for items and services,
it's also required to post standard charges for groups of items
and services.

Now, Mr. Baer made the point that, depending on a
particular patient, there may be different groups of items and
services within a particular DRG.  Somebody might need three
doses of ibuprofen; another person needs two.  I think the way
that a lot of hospitals have chosen to think about that is by
averaging what their standard charges are for the groupings of
items and services across DRGs.

The other way to look at what standard charges, including
for DRGs is, is just a reminder that in other places in the
Medicare statute and regulations, the payments that Medicare
that are not negotiated in the least, the payments that Medicare
imposes for DRGs are published.  So whether you look at it as a
grouping of standard charges or you look at it as the reminder
that the payment rates for DRGs are published, I think those
are the two most reasonable interpretations of that phrase.

What is not a reasonable interpretation of that phrase
is some kind of a sort of Rube Goldberg extrapolation from
the mention of DRGs to the presence of hundreds of privately
negotiated third-party payer rates.

1    But I want to go back to the whole text for a minute

2    because I found it telling that Mr. Baer omitted something

3    in his discussion.  He talked about the title, he talked

4    about standard charges, and he talked about "including for

5    diagnosis-related groups."  What he missed was those two words,

6    "a list."  And I think that omission is probably understandable

7    because there is simply no way, no way, to characterize what

8    the government is requiring of each and every hospital in the

9    country as being the publication of "a list."

10    I think the government below, and maybe a little bit in

11    its brief, tries to pass off this idea that it's really -- yes,

12    it may be a massive, massive data set, but it's really just one

13    super big list.  But if you look at page 65574 of the Final

14    Rule, you'll see that CMS itself understands exactly what it's

15    doing.

16    It says, "We clarify that the hospital must identify and

17    clearly associate each set of payer-specific negotiated charges

18    with the name of the third-party payer and plan."  This is a

19    point that you made earlier, Judge Nichols.

20    For example, the hospital's list of payer-specific

21    negotiated charges for Payer X's Silver Plan could be in one

22    tab or column in a spreadsheet titled Payer X Silver Plan, while

23    the list of payer-specific negotiated charges for Payer Y's Gold

24    Plan could be in another tab or column.  The propagation from

25    "a list" of standard charges to many dozens or hundreds of

1    highly particularized charges is where the textual argument

2    falls down, and I think that's why you didn't hear a response

3    on that from Mr. Baer.

4         With respect to charges themselves, I think what Mr. Baer

5    returned to was something that I mentioned earlier and that was

6    discussed in the preamble, which is this idea that because the

7    Provider Reimbursement Manual just talks about charges and the

8    Final Rule talks about standard charges, I think what Mr. Baer

9    says is that means that there has to be more than one charge;

10   and, accordingly, I guess where the logical leap is, is so there

11   has to be more than one standard charge.  There are a couple

12   elements of problem with that.

13        The first is, as I mentioned earlier, the Provider

14   Reimbursement Manual definition of "charges" specifically says

15   charges are the regular rate.  So what you have, if you take

16   that definition and you import it into the statute, is the

17   standard regular rate.

18        If you take standard charges and you understand, as

19   Your Honor also pointed out, that there may be circumstances

20   where the charges are not standard, that doesn't entitle the

21   government to create hundreds and hundreds of new types of

22   standard charges.

23        This is not a question about who is paying the most

24   uniform charge among the most people.  The question is what is

25   the standardized charge that the hospital is publishing to all

1   payers, whether it's Medicare or a third-party payer.  What is

2   the standardized charge?  This isn't a standard as in let's

3   find out how many people are paying the most amount and that

4   will be the charge.  That's a concept that was used in the two

5   cases that Mr. Baer cited in his brief or some other definition

6   of "standard charge."  It's not what we're talking about here.

7       So I think what CMS is bounded by, in addition to the

8   statute and to that concept of a list of standard charges,

9   is a couple of different constraints.  One of them is just

10  the reality of the hospital charge system, and the other one

11  is that CMS definition of "charges."

12      Because what I heard Mr. Baer do after pivoting from

13  "standard charges" has to mean that there are different types

14  of charges, therefore there are different types of standard

15  charges, what he ended up saying was something along the lines

16  of it simply doesn't make sense if so few people are subject

17  to the chargemaster charge; we have to find a way to capture

18  the meaning of that along the lines reflecting the lion's share

19  of patients.  That's what he said.

20      I think that is the point at which CMS departs from the

21  statute and starts imposing its own quite different legislative

22  prerogatives on that particular statute.  It very well could be

23  that a different legislature could have enacted something that

24  said hospitals must publish all of their negotiated payment

25  rates.  You would, by the way, expect to see at least a sentence

of legislative history on that if that were the case, and there
is nothing related to legislative history on this particular,
very modest directive.

But what you can't do, and I think what CMS is trying
so hard to do here, is to solve a problem with a tool that it
doesn't have.  What CMS is claiming is the authority to impose
this massive listing of multiple charges across thousands of
contracts by reference to a list of standard charges.  And it
could be, as I said, that in another universe there might have
been a different way to do that, but the government can't take
that statutory authority and expand it to this particular set
of circumstances.

I think when Your Honor asked the question of Mr. Baer
about what charges need not be published, that was quite a
telling answer, because what Mr. Baer said was, well, all of
those one-off charges, when a patient comes in and negotiates
a different discount, when a self-pay patient comes in, for
example, all of those what he called one-off charges wouldn't
be standard charges.  So, basically, standard charges are every
single charge except for a few charges that are really unusual.

And you see this in the government's brief as well.  If you
look at page 12 of their brief, they talk about these groups
of patients, and that's their shorthand for this second type of
standard charge, these groups of patients that the grouping is
based on the patient's diagnosis and other factors such as age.

1   So the granularity of what the government apparently thinks

2   is a standard charge goes pretty deep, all the way, apparently,

3   to the one-off circumstances that the government is willing to

4   concede are not themselves standard charges.  That completely

5   explodes the definition of what it means to be a standard

6   charge, particularly when you couple it with a list of standard

7   charges.

8   On the First Amendment issue, I would say a couple things.

9   The first is no one -- as I said earlier, no one is disputing,

10   least of all the hospitals that are in the thick of this every

11   day, how important it is that patients understand how much they

12   may have to pay for their services.

13   The question on which we depart is, is this a

14   constitutionally appropriate method, to force the hospitals to

15   disclose not the out-of-pocket rates, as I said earlier, but the

16   payer-negotiated, privately-negotiated rates that the hospitals

17   have worked out over many months of negotiations with each of

18   these payers, which, by the way, as we say in our brief, is

19   confidential, trade-secret protected information.

20   It took Mr. Baer awhile to get around to the undue burden

21   point, but I do have to take issue with the idea that the only

22   thing you look at from an undue burden argument is the burden

23   on speech.  That's not the way that I understand the undue

24   burden requirements to demand.  The undue burden requirement

25   is essentially the *Zauderer* version of the fit requirement.

So what you're asking is, is there a less burdensome way for
the government to compel the disclosure of the information
it's interested in?

And the reason that I landed so hard on that first
component of the insurance coverage rule is not because it is,
as Mr. Baer says, some idealized version of what we'd like;
it is a very real version of what is possible and efficient
and practicable, because the government's already proposed it
in another rule.

So it's not a question about whether this also can serve
some minor, marginal, indirect benefit.  The question with
respect to either *Central Hudson* or *Zauderer* is does this rule
do anything to directly and materially advance the government's
interest in doing what all of us frankly want, which is get
patients the information about their out-of-pocket expenses in
as efficient and practical a way as possible.

With respect to -- I want to mention one thing, because
Mr. Baer mentioned the state of New Hampshire, and I said
earlier and CMS has said, and I think it's also in its insurance
coverage rule, that states have really been in the forefront of
transparency requirements.  I think there are over 30 different
states that have transparency requirements.  New Hampshire is
one of them, as Mr. Baer mentioned.

New Hampshire set up its own state department to which
payers submit encrypted claims information for the department

1    to then average and publish across kind of an average list of

2    payers, which I think there are four main payers that it lists

3    with respect to certain items and services.  That is a far, far

4    cry from requiring hospitals to publish all of their negotiated

5    rates.

6        So I think the fact that there is no other state that

7    I have found that comes even close to requiring hospitals to

8    publish privately negotiated, third-party payer rates tells

9    you a great deal about whether this particular regulation is

10    in the right lane or not.

11        So whether you look at that as a First Amendment issue,

12    how does this directly and materially advance the government's

13    interest, how burdensome is it on hospitals that are crushed

14    under other obligations right now to have to propagate tens of

15    millions of lines of data, whether you look at it under either

16    of those two standards, I think the First Amendment argument

17    gets you to the same place.  But, again, one of the things that

18    this Court and other judges are always enjoined to do is to not

19    arrive at a First Amendment argument unless you have to.

20        So one of the things, I think, to return back to is that

21    question that you mentioned, Your Honor, which is, is this a

22    reasonable interpretation in the end?  And back to the statutory

23    interpretation, particularly in light of that nest of First

24    Amendment issues that would await if this interpretation is

25    found to be reasonable, I think that is yet one more thumb on

1  the scale while you simply cannot say that a list of standard
2  charges can mean in any universe -- *Chevron I*, *II*, or zero --
3  that a list of standard charges can mean hundreds of lists of
4  privately negotiated charges.
5          THE COURT:  Thank you, Ms. Stetson.
6      Mr. Baer, happy to hear, frankly, as long as you would
7  like, up to 10 minutes or so.
8          MR. BAER:  Thank you, Your Honor.
9          THE COURT:  No requirement to take 10 minutes.
10         MR. BAER:  Hopefully, we'll keep it under that,
11 especially because I realize I probably ran a little long at
12 the outset.  The clock on the microwave that is directly behind
13 the computer here is harder to read than when I was initially
14 setting up my own Rube Goldberg contraption for this argument.
15         THE COURT:  Certainly, I am capable of shortening
16 advocates' time if I deem necessary, and I did not, so it's as
17 much my issue as yours.  So don't worry about it.  Take the time
18 you need.
19         MR. BAER:  Thank you, Your Honor.  I'd like to start
20 with the statutory interpretation question, and I'd like to
21 start sort of very narrowly at the risk of buying more into
22 this replacing all of our weight on DRG point, because I don't
23 think we are, and we'll get into that in a second.
24     But on the language that Ms. Stetson quoted from page 12
25 of our brief, she said the government's reading has to be wrong

1   because look at how granularly they are defining the types of

2   standard charges at issue here not just based on the diagnosis,

3   but based on other factors such as age.  That's on page 12 of

4   our opening brief.  But, Your Honor, that wasn't how we were

5   defining "standard charges."  That was during a part of the

6   brief where we're recounting how diagnosis-related groups work.

7   That's how each of the Medicare diagnosis-related groups is

8   structured.

9       And so what I think that intuition that you just heard

10  from Ms. Stetson, that, well, how can something that granular

11  constitute a standard charge, shows you exactly why, when

12  Congress chose to include Medicare DRGs as among the items

13  and services for which standard charges must be listed, it

14  absolutely was envisioning a version of standard charges that

15  is more granular than just the chargemaster rate.

16      In other words, all 600 or so MS DRGs, Medicare System

17  DRGs, make those same granular determinations, and yet Congress

18  chose them not just as an example.  That is literally the only

19  example in the statute to list the kind of items and services

20  for which hospitals needed to make standard charges public.

21      And on that point, when Your Honor pressed Ms. Stetson

22  about, well, what does a standard charge for a DRG look like in

23  plaintiffs' world?  I'm still not entirely sure I have my head

24  around what the answer is, but as I understood it, it was one of

25  two things:

1      One was some sort of average across DRG -- for a

2  particular DRG, and I think there is no evidence that when

3  Congress required the publication of standard charges, it

4  required hospitals to calculate some new rate, to essentially

5  invent a rate for the sake of publishing it.

6      And the second option was, well, maybe it's Medicare

7  reimbursement rates for DRGs.  But as Ms. Stetson, I think,

8  noted in the next sentence, those are already public, and

9  Medicare is the entity that publishes that.  So those aren't

10 even meaningfully the hospital's charges, and they're certainly

11 not charges established by the hospital, because Medicare is the

12 entity setting those rates.

13     And so what this gets us back to is, as I noted during my

14 opening presentation, plaintiffs just don't have an answer for

15 how this statute accounts for service packages, whether that's

16 diagnosis-related groups or any other kind of service package

17 that would not be listed on a chargemaster, and you can't square

18 the circle of this statute when you don't have a clear answer as

19 to what Congress meant by including diagnosis-related groups as

20 the one example of items or services.

21     But stepping back, even though I think, as we put it in our

22 reply, the diagnosis-related groups issue is kind of the nail in

23 the coffin for plaintiffs' interpretation of the statute, it's

24 by no means the linchpin of the government's reading, because

25 the focus of our reading of "standard charges" stems from the

premise that you need to look at different groups of patients
in order to figure out what the regular rates are because that's
how the hospital market is structured.

And there -- you know, I think Ms. Stetson noted in her
reply or in her rebuttal that it would be reasonable for
Congress to have used the term "standard charge" to mean a
charge that only applied to a small group of patients, you know,
let's say 10 percent.  And in certain contexts, perhaps that
would be true.  You know, you could imagine standard charges in
some markets applying to a larger set of patients and standard
charges applying to a smaller set.

But our point isn't just the absolute number of patients
who are ultimately charged the chargemaster rate.  It's that
the chargemaster rate doesn't meaningfully come into play for
the 90 percent of patients with third-party coverage.

So it's not just what a patient ultimately ends up paying;
it's a question of can you look at a standard charge and get
something useful for the patients for which you are claiming it
is standard.  And the agency's point was that you need to look
at patients based on how they're paying for hospital services
before you can figure out what it makes sense to define as the
standard rate.

Turning then to the First Amendment point, I want to --
actually, sorry.  Before I go to the First Amendment point,
I want to just briefly note on the "a list" argument, which

1    received a little more attention in Ms. Stetson's rebuttal.

2         First of all, if a hospital wanted to, it could list, with

3    just two columns, all of the standard charges that are required

4    here.  So to the extent that a -- so, yes, CMS suggested in the

5    rule that you could do it in a multi-tab spreadsheet.  That's

6    just a question of how you display the data.  I don't think

7    there's anything inherent in "a list" that would prevent a

8    hospital from, you know, doing this all in just two columns

9    with a lot of different rows.

10        But more to the point, the Providence chargemaster

11   that we cite, Providence being one of the hospital plaintiffs

12   here, has three tabs on its chargemaster spreadsheet, one for

13   inpatient services, one for pharmaceuticals, and I believe one

14   for outpatient services.

15        And there's no argument from plaintiffs that a chargemaster

16   is somehow more than a list.  How hospitals choose to display

17   that data within an Excel file doesn't change the meaning of

18   "a list" as Congress used in the statute, and we give an example

19   in our reply brief.

20        If Congress had said that hospitals must publish a list

21   of every rate they have charged and every payment they have

22   accepted from all patients in the previous year, a hospital

23   couldn't avoid the clear import of that requirement just by

24   claiming that "a list" wouldn't allow for it even though that

25   "a list" in those circumstances would clearly have hundreds of

1    millions more rows and entries than the list that is required

2    here.

3         But finally, turning to the First Amendment, Ms. Stetson,

4    in talking about burden, started out by contesting the premise

5    that the burden that matters from a First Amendment perspective

6    is just the burden on speech.  She reframed the issue as, well,

7    is there a less burdensome way to accomplish the goal?

8         But I think the assumption that's still lurking there is:

9    less burdensome with respect to what?  And, again, all of the

10   First Amendment cases that the parties have cited in the briefs

11   pay attention to the burden on speech, not the burden in

12   collecting the information.

13        I think the hospitals' argument would be similar here if,

14   rather than a disclosure requirement, a hospital's just required

15   to keep a list of these same charges on hand for the government

16   to inspect when it so chose, sort of like the way OSHA requires

17   recordkeeping in the workplace requirement.  They wouldn't have

18   any different argument about the cost or burden on hospitals for

19   collecting that information, yet I think there'd be no argument

20   that that was in any way a burden on speech.

21        And so if at the end of the day the burden stems from like

22   the collection and colation of the data rather than any burden

23   on their rights as speakers, any limit on commercial speech, then

24   that just reenforces that this isn't a First Amendment question

25   principally; this is a question about whether or not the agency

1    chose a reasonable means of accomplishing the rule's end.

2         And I want to close on that point because Ms. Stetson, in

3    her opening presentation, talked about, you know, the comments

4    during the rulemaking period that suggested that the burden here

5    was going to be, you know, massive, undue, the agency totally

6    underestimated it.

7         Well, Your Honor, the agency significantly revised upwards

8    its estimate of average cost in arriving at the Final Rule and

9    reached an estimate of roughly $12,000 in the first year and

10   $3600 in the second year, which was -- I'm forgetting the exact

11   factor, but an order of magnitude more than the agency had

12   initially estimated.  So the agency paid attention to those

13   concerns for hospitals.

14        And in the briefing, I don't know that the plaintiffs cite

15   any comment in the record that criticizes the ultimate amounts

16   or methodology that the agency used for arriving at the estimate

17   cost, certainly not anything that is significant enough to call

18   into question the overall reasonableness of the agency's

19   assessment.  So, in other words, even if the agency got that

20   $12,000 estimate off by a little bit, we're talking about at

21   least a sustained relative ballpark.

22        And when you're weighing the cost and benefits here, the

23   notion that a $12,000 per hospital cost or maybe slightly more

24   even compares to the access to information that millions and

25   millions of patients would get under the rule, patients, many

1    of whom have high deductibles such that, until they get their

2    deductible, every payer-specific negotiated charge that they see

3    is likely to be the charge that they'll face, patients who could

4    face differences of thousands or even tens of thousands of

5    dollars for procedures across different healthcare providers,

6    those are the patients who this rule helps.  Those patients

7    will, for the first time -- as Ms. Stetson acknowledged, this

8    rule requires significantly more information to be displayed

9    than most other states presently do.

10        That's an argument in favor of the rule, in favor of the

11   transparency that the rule creates, and is the reason why, at

12   the end of the day, patients here are directly and materially

13   better off.  Healthcare costs go down.  And this rule, even if

14   it has a significant effect on the healthcare industry from

15   the perspective of patients' welfare, is certainly worth the

16   marginal additional costs that hospitals have to bear.

17            THE COURT:  Thank you, Mr. Baer.

18        First of all, thank you both for the excellent argument

19   today and in the briefs, which I thought were just terrific.

20   I'm going to take the cross-motions under advisement.  I very

21   well understand the effective date of the rule, also the

22   possibility that one or the other of the sides that doesn't

23   like how I come out here might want to go to the Court of

24   Appeals, and so I have no intention of sitting on this.

25   But on the other hand, this is not -- you know, this is not

1  a simple case.

2      So my goal is to, of course, write something and to do so

3  relatively quickly.  I can't promise any particular deadline,

4  but I certainly understand that this is not a money-damages case

5  that has no particular deadline, but there's a looming effective

6  date.  So I will endeavor to get something out very quickly.

7      Other than saying that, I really am going to take it under

8  advisement.  I'm not prepared, because I'm actually not sure,

9  but I'm certainly not prepared to give you any preview of where

10  I think that's going to come out other than to say that I think

11  the parties and the amici all did a terrific job both in the

12  papers and today, and for that I appreciate your efforts very

13  much.

14          MS. STETSON:  Thank you, Your Honor.

15          MR. BAER:  Thank you, Your Honor.

16          THE COURT:  Thank you.  And I suppose -- I guess

17  the last thing to say is that if for any reason -- I suppose

18  if something came up today that one or the other of you felt

19  was not fully explored and you decided you wanted to submit

20  something, you know, you can ask, of course, and I'll consider

21  it.  But I think more importantly, if anything changes on the

22  regulatory timeline -- I suspect the answer is it's not going

23  to, but if anything does change, I would like to be notified

24  of that immediately, and I think that's really a question or

25  request of you, Mr. Baer.

1          MR. BAER:  Absolutely, Your Honor.  If I can verify

2     anything on the regulatory timeline specific to the effective

3     date, or did you have a broader conception?

4          THE COURT:  It's primarily that, but I suppose if

5     there were anything that you felt substantially affected my

6     consideration of the issues.  But I was really thinking about

7     the timeline.  I am cognizant of the effective date looming.

8     I guess it's a little bit less than seven months from now if

9     I'm counting correctly, maybe it's eight.  But in any event,

10    certainly much less than a year from now.  That's a relevant

11    date, and I will move quickly.  But if that were to change for

12    some reason, please let me know.

13         MR. BAER:  Of course.

14         THE COURT:  Thank you all.

15         MR. BAER:  Thank you, Your Honor.

16        (Proceedings adjourned at 2:50 p.m.)

17

18

19

20

21

22

23

24

25

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


*Bryan A. Wayne*
BRYAN A. WAYNE