**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE AMERICAN HOSPITAL ASSOCIATION, et al., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 1:19-cv-03619 (CJN) |
| ALEX M. AZAR II, Secretary of Health and Human Services, | |
| *Defendant*. | |

## <u>MEMORANDUM OPINION</u>

The Affordable Care Act requires each hospital operating within the United States to establish and make public "a list of the hospital's standard charges for items and services provided by the hospital." 42 U.S.C. § 300gg-18(e) (2018). In November 2019, the Centers for Medicare and Medicaid Services (CMS), an agency within the Department of Health and Human Services (HHS), issued a final rule defining "standard charges," delineating hospitals' publication requirements, and laying out an enforcement scheme. Plaintiffs contend that the final rule exceeds the agency's statutory authority, violates the First Amendment, and is arbitrary and capricious under the Administrative Procedure Act. For the reasons discussed below, the Court rejects those challenges, denies Plaintiffs' Motion for Summary Judgment, ECF No. 13, and grants Defendant's Motion for Summary Judgment, ECF No. 19.

## I.     Background

"The impenetrability of hospital bills is legendary."  AR 4766.[1]  Dubbed an "arcane

art[]," *id.*, and "mystifying," AR 262, hospital billing has been the target of regulations at the

state and federal level for years.  In 2006, the Bush administration called for greater price

transparency in federal health care programs to make "data on Medicare hospital payment rates

and quality more accessible to the public."  AR 5266; *see also* AR 4778.  And many states have

required "hospitals to publish their full price lists (chargemasters) or prices of most commonly

used services."  AR 5266.

In 2010, as part of the Affordable Care Act, Congress enacted section 2718 of the Public

Health Service Act.  *See* Patient Protection and Affordable Care Act, Pub. L. No. 111-148

§ 10101(f), 124 Stat. 119, 887 (2010).  Entitled "Bringing down the cost of health care

coverage," and as most relevant here, the statute mandates that

> [e]ach hospital operating within the United States shall for each year
> establish (and update) and make public (in accordance with
> guidelines developed by the Secretary) *a list of the hospital's
> standard charges for items and services provided by the hospital*,
> including for diagnosis-related groups established under section
> 1395ww(d)(4) of this title.

42 U.S.C. § 300gg-18(e) (emphasis added).  In 2014, CMS "remind[ed] hospitals of their

obligation to comply with" this provision, 79 Fed. Reg. 27,978, 28,169 (proposed May 15,

2014); 79 Fed. Reg. 49,854, 50,146 (Aug. 22, 2014), and pointed to its implementation

guidelines, which provided that "hospitals either make public a list of their standard charges

(whether that be the chargemaster itself or in another form of their choice), or their policies for

---

[1] Citations to "AR" refer to the administrative record, ECF Nos. 31, 31-1 to -3, 33-2.

allowing the public to view a list of those charges in response to an inquiry." 79 Fed. Reg. at 50,146.

Hospitals were thus able to comply with section 2718(e) by making public something called a chargemaster, which is a document maintained by each hospital that contains a list of prices for "each [individual] item and procedure offered," AR 4768. *See* 84 Fed. Reg. 65,524, 65,539 (Nov. 27, 2019). Each item and procedure (which may number in the thousands) is usually assigned a billable procedure code and typically corresponds to a description and dollar amount. *Id.*; *see also* AR 5154–55. Chargemasters, and the dollar amounts associated with the listed items and procedures, are considered a critical "accounting tool" that hospitals rely on as a starting point in negotiating reimbursement payments, especially with third-party private payers. AR 5159–60; *see also* AR 6735–36. But chargemaster rates are highly inflated and often "bear little resemblance" to the actual payment tendered to a hospital by a patient or third-party provider (private insurance companies or Medicare and Medicaid). AR 4769.[2] In fact, one study

---

[2] There appear to be numerous complex reasons for the large gap between a hospital's chargemaster charges and the amounts it is actually paid. Chargemasters, which date back to the mid-20th century, are a relic of an old Medicare reimbursement system that disincentivized efficient care and was vulnerable to manipulation. *See What Is a Chargemaster, and What Do Hospital Administrators Need to Know About It?*, The George Washington Univ. Sch. of Bus. Blog (Dec. 17, 2019) [hereinafter *What Is a Chargemaster?*], https://healthcaremba.gwu.edu/ blog/chargemaster-hospital-administrators-need-know (cited in Pls.' Mot. at 4); 84 Fed. Reg. at 65,538. Additionally, market changes in the 1980s and 1990s increased the clout of third-party payers, who then contracted for lower fee schedules or negotiated rates. AR 5153. Chargemaster rates thus applied to a smaller proportion of patients. *See id.* This resulted in "reduced margins" and losses (in part from treating publicly insured patients and "high-cost patients"), which forced hospitals to become "aggressive 'price setters'" and mark up their chargemaster charges. AR 5160. One consequence is that chargemaster prices now typically apply to the patients with the least bargaining power—the uninsured. *See* AR 5158. In fact, "hospital charge and cost data show[] that uninsured and self-pay patients are charged, when confronted with the full list price, on average, about 2½ times more than what insurers pay hospitals, and about three times Medicare-allowable costs." AR 4773.

found that "[o]n average, insurers and patients paid hospitals [only] about *38%*" of the amounts on chargemasters.  *Id.* (emphasis added) (citation omitted).

In 2018, CMS announced that, effective January 1, 2019, it was updating its guidelines to require hospitals to post their standard charges online in a machine-readable format and update the information annually.  *See* 83 Fed. Reg. 20,164, 20,549 (proposed May 7, 2018); 83 Fed. Reg. 41,144, 41,686–88 (Aug. 17, 2018).  CMS emphasized that regardless of format, the list should contain the charges as reflected in the hospital's chargemaster.  83 Fed. Reg. at 41,686–88.  At the same time, CMS expressed concern that chargemaster "data are not helpful to patients for determining what they are likely to pay for a particular service or hospital stay."  *Id.* at 41,686.  CMS indicated it was contemplating taking additional actions to increase transparency and to help patients compare charges and understand the financial impact of hospital visits.  *See id.*; *see also* 83 Fed. Reg. at 20,549.  Throughout 2018, CMS solicited public comments on the definition of standard charges under section 2718(e), as well as the types of information that would be most relevant to patients.  83 Fed. Reg. at 20,549.  CMS specifically sought comments on whether a chargemaster functions as the best measure of a hospital's "standard charges" or if a hospital's "standard charges" should instead be defined as a type of average or median rate—for instance, the average rate for items on the chargemaster, average discounts off the chargemaster, or average contracted rates.  *Id.*  And, for what appears to be the first time, CMS requested comments on how to enforce section 2718(e), including whether monetary penalties should be imposed on hospitals for failing to comply.  *See id.*

On June 24, 2019, the President issued an executive order related to "informing patients about actual prices."  Exec. Order No. 13877, Improving Price and Quality Transparency in American Healthcare to Put Patients First, 84 Fed. Reg. 30,849 (June 24, 2019),

https://www.whitehouse.gov/presidential-actions/executive-order-improving-price-quality-

transparency-american-healthcare-put-patients-first.  The order directed the Secretary of HHS to

"propose a regulation, consistent with applicable law, requir[ing] hospitals to publicly post

standard charge information, including charges and information based on negotiated rates and for

common or shoppable items and services," in easy-to-understand formats so as to "inform[]

patients about actual prices."  *Id.* at 30,850.

In August, the HHS Secretary and CMS Administrator issued CMS's annual notice of

proposed rulemaking.  84 Fed. Reg. 39,398 (Aug. 9, 2019) (the "Proposed Rule"); *see also*

Compl. ¶ 29, ECF No. 1; Def.'s Mot. for Summ. J. ("Def.'s Mot.") at 7, ECF No. 19.  Consistent

with the executive order, the Proposed Rule addressed, among other issues, hospitals' obligations

under section 2718(e) to publish their standard charges.  84 Fed. Reg. at 39,571, 39,574.  Citing

the related FY 2019 proposed rule, requests for information, and listening sessions, CMS

expressed its concern about a persistent lack of pricing transparency in the health care market

and signaled a shift away from its prior positions.  *See id.* at 39,574.  The agency stressed that its

review of comments from 2018 showed that "simply put, hospitals do not offer all consumers a

single 'standard charge' for the items and services they furnish."  *Id.* at 39,577.  In the agency's

view, in the health care market, a "standard charge . . . varies depending on the circumstances

particular to the consumer."  *Id.*

The agency proposed a new definition for "standard charges" that would account for two

identifiable groups of hospital patients:  those who are self-pay and those who have third-party

payer coverage (i.e., health insurance).  *Id.* at 39,578.  Self-pay patients normally pay either

chargemaster rates ("gross charges") or discounted cash prices.  *See id.*  Third-party payers, in

contrast, pay rates that vary based on fee-for-service ("FFS")[3] arrangements or privately

negotiated rates and discounts, which often apply to "service packages" (bundles of services).

*See id.* at 39,576–79.  Approximately 90% of hospital patients "rely on a third-party payer to

cover a portion or all of the cost of health care items and services, including a portion or all of

the cost of items and services provided by hospitals." *Id.* at 39,579.  Under the proposed rule,

"standard charges" would be defined as "gross charges" and "payer-specific negotiated charges,"

corresponding to the charges paid by the two primary patient-groups. *Id.* at 39,578–80.

The agency received comments from a variety of stakeholders, including patients, patient

advocates, hospitals and health systems, private insurers, health benefits consultants, health

information technology organizations, and academic institutions. *Id.* at 65,527.  The majority of

commenters praised the move toward transparency and the agency's general objectives, but

commenters varied on whether the proposed rule furthered those objectives. *See id.*

Individual consumers generally lauded the agency's proposals.  They shared their

experiences dealing with the opaqueness of health care billing and expressed frustrations at the

inability to anticipate costs before receiving treatment at a hospital. *Id.*  Some commenters

hailed the proposed rule, remarking that "knowledge of healthcare pricing in advance would

benefit consumers and empower them to make lower cost choices." *Id.*

Hospital and insurer organizations and advocacy groups, on the other hand, objected to

the Rule on a number of grounds.  Many disputed that the agency had the statutory authority to

require disclosures of specific negotiated charges, *id.* at 65,537–38, or to require the publication

---

[3] FFS rates are relevant for patients covered by Medicaid and Medicare.  Medicaid FFS rates are
set by states while Medicare FFS rates are determined by CMS.  *See* 84 Fed. Reg. at 65,538.  The
agency did not focus on these rates in issuing its Rule, in part because they are already publicly
available. *See id.* at 65,542.

of information they believed to constitute trade secrets, *id.* at 65,543.  Hospitals were especially skeptical that the disclosures would lead to lower costs or would benefit consumers because the disclosed charges often will not represent patients' actual out-of-pocket costs.  *See id.* at 65,527–28.  And hospitals expressed concerns regarding the compliance burden, which could ultimately "get in the way of providers spending time with patients."  *Id.* at 65,529.

Commenters also engaged with the agency on its proposed definition of "standard charges."  Some offered alternative definitions, recommending, for example, the use of regional and market averages of negotiated rates instead of the specific rates themselves.  *See id.* at 65,554.  Patient advocates, however, expressed that the use of averages or medians would not provide individual consumers with data relevant to them and would instead cause confusion.  *Id.* Several commenters indicated that the most useful information would be the payer-specific negotiated charges in conjunction with de-identified minimum and maximum negotiated charges, which can provide patients with a more extensive understanding of hospital charges.  *Id.* at 65,553–55.

CMS ultimately severed the Proposed Rule from the rule on Medicare payment systems and issued as a stand-alone rule the Price Transparency Requirements for Hospitals to Make Standard Charges Public, 84 Fed. Reg. 65,524 (Nov. 27, 2019) (to be codified at 45 C.F.R. subch. E) (the "Final Rule" or "Rule").  *See* Mem. in Supp. of Pls.' Mot. for Summ. J. ("Pls.' Mot.") at 9, ECF No. 13-1; Def.'s Mot. at 7–8.  The Rule finalized CMS's proposed definition of standard changes "to mean the regular rate established by the hospital for an item or service provided to a specific group of paying patients."  84 Fed. Reg. at 65,540; 45 C.F.R. § 180.20 (2020).  The agency included in its definition of "standard charges" both gross charges and

payer-specific negotiated charges, as well as three other categories:  discounted cash prices and de-identified minimum and maximum negotiated charges.  84 Fed. Reg. at 65,540.

The final rule therefore requires hospitals to publish five types of "standard charges." First, a hospital must publish for each item or service its "gross charge," which is "the charge . . . that is reflected on a hospital's chargemaster, absent any discounts."  *Id.* at 65,541; 45 C.F.R. § 180.20.  Gross charges appear as the first charge on an explanation of benefits. 84 Fed. Reg. at 65,541.  These charges are often the amount paid by uninsured patients or patients who seek out-of-network care, and thus, CMS explained, are the "standard" charges for those subsets of patients.  *Id.* at 65,540, 65,552.

Second, a hospital must publish its "discounted cash price," which is the "charge that applies to an individual who pays cash (or cash equivalent) for a hospital item or service."  *Id.* at 65,553; 45 C.F.R. § 180.20.  According to the agency, this information benefits two types of self-pay consumers:  uninsured patients and patients who may have some coverage, but due to various factors, will still need to absorb the full cost of certain services.  84 Fed. Reg. at 65,552. The second subgroup—patients who have some form of coverage—may include patients who "[h]ave insurance but who go out of network; have exceeded their insurance coverage limits; have high deductible plans but have not yet met their deductible; prefer to pay through a health savings account or similar vehicle; or seek non-covered and/or elective items or services."  *Id.* The agency excluded from the definition of "discounted cash price" any non-standard "charity care or bill forgiveness that a hospital may choose or be required to apply to a particular individual's bill."  *Id.* at 65,553.

Third, a hospital must publish its payer-specific negotiated charges, which are "the charge[s] that a hospital has negotiated with a third-party payer for an item or service."  *Id.*

at 65,555; 45 C.F.R. § 180.20.  Charges can vary based on the insurance provider, and thus the standard charges for these patients are the "usual or common rate for the members of" "a specific plan through a specific insurer."  84 Fed. Reg. at 65,546.  CMS recognized that, unlike gross charges and discounted cash prices, "payer-specific negotiated charge[s] do[] not, in isolation, provide a patient with an individualized out-of-pocket estimate."  *Id.* at 65,543.  But CMS ultimately determined that payer-specific negotiated rates are still relevant for patients to be able to estimate their out-of-pocket liability.  *See id.* at 65,543.  CMS also clarified that the payer-negotiated rates are the formalized rates generally reflected in hospitals' contracts and the associated rate sheets (also known as rate tables or fee schedules), recognizing that the actual paid amounts may vary based on other factors and are thus "unlikely . . . [to] be considered . . . standard."  *Id.* at 65,546.

Finally, hospitals must publish de-identified minimum and maximum charges, which are the highest and lowest charges that a hospital has negotiated with all third-party payers for an item or service but are not linked to the particular third-party payer.  *See id.* at 65,554; 45 C.F.R. § 180.20.  CMS stated that this information would allow insured patients to analyze their insurers' abilities to negotiate effectively and "promote value choices in obtaining a healthcare insurance product."  84 Fed. Reg. at 65,555.  Uninsured patients could also use the ranges to negotiate with hospitals for a reduced rate from the inflated gross charges.  *See id.*[4]

Each hospital is therefore required to publish a list containing the foregoing types of five charges for all of its "items and services" (which are defined as "all items and services, including individual items and services and service packages, that could be provided by a hospital to a

---

[4] In the interest of minimizing the burden on hospitals, CMS did not require publication of median negotiated charges it had once considered as a possible definition of standard charges, concluding that the ranges would be more helpful to patients.  84 Fed. Reg. at 65,555.

patient in connection with an inpatient admission or an outpatient department visit for which the hospital has established a standard charge"). *Id.*; 45 C.F.R. § 180.20.  Hospitals must also publish "public payer-specific negotiated charges[,] . . . discounted cash prices, the de-identified minimum negotiated charge, and the de-identified maximum negotiated charge, for 300 'shoppable services,'" which are services that can be scheduled by a health care consumer in advance.  84 Fed. Reg. at 65,525.  Taken together, the agency concluded, this information would help patients navigate the health care industry, including by allowing patients to determine whether to pay cash or process their claims through their insurance and enabling patients to estimate their out-of-pocket costs and compare their financial obligations across hospitals.  *Id.* at 65,554–55.  This is especially true for shoppable services, which the Rule mandates must be displayed in a consumer-friendly way to make it easy for patients to compare costs.  *See id.* at 65,556.

CMS also concluded that under section 2718(b)(3), it was authorized to develop an enforcement scheme, which would include first providing a written warning to the hospital, then requesting a corrective action plan, and finally, imposing and publicizing a civil monetary penalty.  *See* 84 Fed. Reg. at 65,539, 65,584, 65,588.

The Final Rule is scheduled to go into effect on January 1, 2021.  *See* 45 C.F.R. § 180.50. On December 4, 2019, Plaintiffs American Hospital Association, Association of American Medical Colleges, Federation of American Hospitals, National Association of Children's Hospitals, Memorial Community Hospital and Health System, Providence Health System doing business as Providence Holy Cross Medical Center, and Bothwell Regional Health Center, filed suit, alleging that the agency exceeded its statutory authority under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(C) (2018), Compl. ¶¶ 79–85; that the Rule violates the First

Amendment, Compl. ¶¶ 86–94; and that the Rule is arbitrary and capricious, also in violation of the APA, § 706(2)(A), Compl. ¶¶ 95–101.  Plaintiffs and Defendants cross-moved for summary judgment, ECF Nos. 13, 19, and these motions are now ripe for decision.

## II.      Legal Standard

In a motion for summary judgment seeking review of a final agency action, "[t]he 'entire case' on review is a question of law," and there is "no real distinction between questions presented in a Rule 12(b)(6) motion to dismiss and motion for summary judgment." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (citing *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)).  The Court's role is limited to "determin[ing] whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (quotation marks and citation omitted).

## III.      Analysis

### A.      Statutory Authority

Plaintiffs contend that the Final Rule exceeds CMS's statutory authority.  "Standard charges," Plaintiffs contend, is an unambiguous term that can only refer to a hospital's chargemaster charges, and the term cannot be stretched to apply to custom negotiated charges with third-party payers.  *See* Pls.' Mot. at 12–13.  For its part, the agency disputes that "standard charges" refers to chargemaster rates and maintains that its interpretation, which accounts for the rates that are actually paid and the different types of patients and payers in the market, is either the best reading of the statute, or at minimum, a reasonable one.  *See* Def.'s Mot. at 2.

Under the well-known framework articulated in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the Court must apply the ordinary tools of statutory construction to determine "whether Congress has directly spoken to the precise

question at issue.  If the intent of Congress is clear, that is the end of the matter . . . ."  *Merck &*
*Co. v. U.S. Dep't of Health & Human Servs.*, 385 F. Supp. 3d 81, 88 (D.D.C. 2019) (quoting *City*
*of Arlington v. FCC*, 569 U.S. 290, 296 (2013)), *aff'd* No. 19-5222, 2020 WL 3244013
(D.C. Cir. June 16, 2020).[5]  But where a statute is ambiguous and "Congress has explicitly left a
gap for the agency to fill," the Court must determine "whether the agency's answer is based on a
permissible construction of the statute."  *Chevron*, 467 U.S. at 843.  "Such legislative regulations
are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the
statute."  *Id.* at 844.

1.      **Chevron *Step One***

*Standard Charges.*  The analysis begins, as always, with the text.  Section 2718(e)
requires each hospital to "establish (and update) and make public . . . a list of the hospital's
standard charges for items and services provided by the hospital, including for diagnosis-related
groups established under section 1395ww(d)(4) of this title."  42 U.S.C. § 300gg-18(e).  The
statute does not define "standard charges," nor does the term appear elsewhere in the Affordable
Care Act.

Plaintiffs nonetheless argue that "standard charges" unambiguously means "chargemaster
charges."  Relying principally on several judicial decisions (including unpublished ones),
Plaintiffs argue that, in the hospital industry, "standard charges" has long meant "chargemaster

---

[5] Plaintiffs question the current viability of *Chevron* deference, *see* Pls.' Reply in Supp. of Pls.'
Mot. and Pls.' Opp'n to Def.'s Mot ("Pls.' Reply") at 11, ECF No. 27, which may "preclude[]
judges from exercising [their] judgment, forcing them to abandon what they believe is 'the best
reading of an ambiguous statute' in favor of an agency's construction."  *Michigan v. E.P.A.*, 135
S. Ct. 2699, 2712 (2015) (Thomas, J., concurring) (citation omitted); *see also Gutierrez-Brizuela*
*v. Lynch*, 834 F.3d 1142, 1149 (10th Cir. 2016) (Gorsuch, J., concurring) (noting that it may be
time to "face the behemoth" that has "permit[ted] executive bureaucracies to swallow huge
amounts of core judicial and legislative power").  Until the Supreme Court revisits *Chevron*,
however, it of course remains binding on this Court.

charges" and that "Congress is presumed to have been aware of" and thus adopted that

longstanding definition.  Pls.' Mot. at 12 (citing *Morissette v. United States*, 342 U.S. 246, 263

(1952)).[6]

The presumption that Congress has adopted a particular meaning of a word or phrase

attaches to "terms of art in which are accumulated the legal tradition and meaning of centuries of

practice."  *Morissette*, 342 U.S. at 263.  But Plaintiffs point to only a handful of cases using the

term "standard charges" in the hospital industry, and in none of those opinions did the court

actually interpret the term, let alone state (or hold) that it means chargemaster.  Indeed, most do

not even include the term "chargemaster."  Instead, in the cases on which Plaintiffs relies, the

courts referenced the phrase "standard charges" in disputes over other matters or appeared to

assume, based on the specific contract, that "standard charges" were "chargemaster charges."

*See, e.g.*, *Webster Cty. Mem'l Hosp., Inc. v. United Mine Workers of Am. Welfare & Ret. Fund of

1950*, 536 F.2d 419, 419–20 (D.C. Cir. 1976) (per curiam) (referring to a "negotiated . . . series

of contracts" that "provide[d] that individual beneficiaries will not be required to pay the

difference, if any, between the per diem figure and the Hospital's standard charge"); *Lefler v.

United Healthcare of Utah, Inc.*, 72 F. App'x 818, 821 (10th Cir. 2003) (discussing hospital

billing practices as explained in specific affidavits before the trial court); *Brown v. Blue Cross &

Blue Shield of Mich., Inc.,* 167 F.R.D. 40, 41 (E.D. Mich. 1996) (explaining reimbursement in

---

[6] Plaintiffs also cite CMS's previous guidance permitting hospitals to make public the
chargemaster only, seemingly to show that this guidance reflected the common understanding
that "standard charges" referred to "chargemaster charges."  *See* Pls.' Mot. at 13 (citation
omitted).  But that was before the agency engaged in formal notice-and-comment rulemaking
and solicited comments on how to define standard charges.  Plaintiffs do not seriously contest
that the agency was bound by its initial definition.  *See Chevron,* 467 U.S. at 863–64 ("An initial
agency interpretation is not instantly carved in stone.  On the contrary, the agency, to engage in
informed rulemaking, must consider varying interpretations and the wisdom of its policy on a
continuing basis.").

hospital contract under the diagnosis-related group methodology, which "was not based on each hospital's standard charge, i.e., the customary rate, but on a discounted charge which generally was less than the hospital's standard charge"), *vacated*, No. 94-CV-75033, 1997 WL 858746 (E.D. Mich. Jan. 23, 1997); *NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, No. 17-CV-05005, 2017 WL 6059299, at *2 (N.D. Cal. Dec. 7, 2017) (describing agreement between a hospital and health plan in which the hospital "agreed to accept a standardized percentage of its 'charge master rate' (the standard rate a hospital charges for the services it provides)").[7]

Perhaps more importantly, had Congress intended to require the publication of just a hospital's chargemaster or chargemaster rates, it could easily have done so by using the term "chargemaster" in section 2718(e).  *See* Def.'s Mot. at 15.  "Chargemaster usage dates back to the mid-20th century,"[8] and as recently as 2008, a Congressional Research Service report on health care price transparency described the role of the chargemaster in hospital billing (including the attenuated relationship between chargemaster prices and actual payments), *see, e.g.*, AR 4769–80.  If anything, then, "*chargemaster*" is a term of art in the health care market,[9]

---

[7] Because *NorthBay* postdates the Affordable Care Act's enactment, it cannot support the argument that in 2010 Congress was aware of a long-standing meaning of "standard charges."

[8] *What Is a Chargemaster?*, *supra* note 2.

[9] *See, e.g.*, *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 263 (3d Cir. 2008) ("[The hospital] has a uniform set of charges (casually known as the 'Chargemaster') that it applies to all patients, without regard to whether the patient is insured, uninsured, or a government program beneficiary."); *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 523 n.1 (5th Cir. 2007) ("The 'chargemaster' is an exhaustive and detailed price list for each of the thousands of services and items provided by [clinic foundation]."); *Vencor, Inc. v. Webb*, 33 F.3d 840, 842 (7th Cir. 1994) (discussing the use of a "'chargemaster' which contained standardized charges and terminology for the various procedures [plaintiff] hospitals followed"); *U.S. ex rel. Whitten v. Cmty. Health Sys., Inc.*, 575 F. Supp. 2d 1367, 1371 (S.D. Ga. 2008) (explaining how certain billing practices "were handled in a like fashion by use of a 'Chargemaster,' which is a billing program used by the Hospitals, listing hospital goods and services and corresponding prices");

and the fact that Congress chose not to use that term is strong evidence that "standard charges" does not mean (or at least that it does not unambiguously mean) only "chargemaster charges."[10]

Plaintiffs' argument that "standard charges" necessarily means "chargemaster rates" is also inconsistent with the statute's use of the term "standard," which even Plaintiffs admit means "usual, common, or customary."  *See* Pls.' Mot. at 11–12 (citing Dictionary.com (2019) ("serving as a basis of weight, measure, value, comparison, or judgment"); Merriam-Webster (2019) ("regularly and widely used, available, or supplied"); Oxford English Dictionary (2019) ("[h]aving the prescribed or normal size, amount, power, degree of quality, etc."); Black's Law Dictionary (11th ed. 2019) ("A model accepted as correct by custom, consent, or authority.").  It is undisputed that chargemaster rates are not the amounts paid on behalf of *90%* percent of hospitals' patients, and thus it is hard to see how they can be considered usual, common, or customary.  *See* 84 Fed. Reg. at 39,579; Def.'s Mot. at 2; May 7, 2020 Hr'g Tr. at 8–9, ECF No. 34.  According to one study, chargemaster prices—which are typically paid by uninsured patients with no discounts, *see* AR 4774—are approximately "2.5 times what most health insurers pay," Barak D. Richman et al., *Battling the Chargemaster:  A Simple Remedy to Balance Billing for Unavoidable Out-of-Network Care*, 23 Am. J. Managed Care e100, e101

---

*Kizzire v. Baptist Health Sys., Inc.*, 343 F. Supp. 2d 1074, 1079 (N.D. Ala. 2004) (reciting allegation that AHA "publications . . . encourage[s] [defendant hospital] and its other nonprofit hospital members to inflate its chargemaster prices, which only [defendant hospital's] uninsured patients are charged"), *aff'd*, 441 F.3d 1306 (11th Cir. 2006).

[10] Plaintiffs' theory that "standard charges" means "chargemaster charges" also appears inconsistent with the use of the term "establish" in the statute, which requires hospitals to "establish . . . a list of . . . standard charges."  The plain meaning of "establish" is "to bring into existence" or "to bring about, effect."  *Establish*, Merriam-Webster (2020), https://www.merriam-webster.com/dictionary/establish.  The implication is that a list of "standard charges" did not exist at the time of the statute's enactment because hospitals were mandated to bring them about.  Lists of chargemaster prices, however, have long existed.

(2017), https://www.ajmc.com/journals/issue/2017/2017-vol23-n4/battling-the-chargemaster-a-simple-remedy-to-balance-billing-for-unavoidable-out-of-network-care (cited at 84 Fed. Reg. at 65,538 n.45).

Plaintiffs' answer to this, although not well-developed, appears to be that the term "charge" is itself a term of art in the health care market.  *See* Pls.' Reply at 3–4.  Plaintiffs' argument seems to be that in this market at least, each item or service has a "charge" that is something like the undiscounted amount that the hospital associates with that item or service. *See id.* (citing AR 6733).  The hospital includes that amount on all of its bills, even though it is usually not the amount the hospital expects to be paid, especially in connection with patients who are insured or who are paying cash.  *See* 84 Fed. Reg. at 65,541.

But this argument does not appear to clear up any ambiguity.  The word "charge" means "the price demanded for something."  Pls.' Reply at 3 n.2 (citing Merriam-Webster).  Yet chargemaster rates are rarely demanded for payment—again, chargemaster rates are paid for only about 10% of hospital patients, making them anything but the "standard" price demanded for a hospital's services.  Plaintiffs also endorse the CMS Medicare Provider Reimbursement Manual's definition of charges:  the "regular rates established by the provider."  *See* May 7, 2020 Hr'g Tr. at 10–12 (citing CMS Medicare Provider Reimbursement Manual § 2202.4).  But if that definition were adopted, then the statute would require the publication of hospitals' "standard" "regular rates," rendering the term "standard" superfluous.  It is, of course, a "cardinal principle of statutory construction that courts must give effect, if possible, to every clause and word of a statute," and thus this Court "must give independent meaning" to both "standard" and "charge." *Williams v. Taylor*, 529 U.S. 362, 364, 404 (2000) (citation omitted).

There is yet another problem with Plaintiffs' interpretation. The statute's use of the term "standard" certainly implies that hospitals also have non-standard or irregular charges, but Plaintiffs have resisted this implication, contending that they have only one set of charges: those reflected in their chargemasters. *See, e.g.*, Br. of Amici Curiae Thirty-Seven State Hospital Associations in Supp. of Pls.' Mot. for Summ. J. ("Br. of 37 State Hospital Associations") at 15 ("[T]he 'chargemaster' remains a hospital's *only* universal list of charges for services."), ECF No. 25-1;[11] AR 1768–69 (asserting "hospitals ***charge*** every patient the same"); *cf. DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 264 (3d Cir. 2008) (finding that in the context of a specific agreement, "'all charges' unambiguously can only refer to [the hospital's] uniform charges set forth in its Chargemaster"). If that's right, then there would be no non-standard charges, and the word "standard" in the statute would again be superfluous.

*Diagnosis-Related Groups.* Finally, Plaintiffs' interpretation that "standard charges" are chargemaster charges is inconsistent with the requirement that hospitals publish "a list of the . . . standard charges for items and services provided by the hospital, *including for diagnosis-related groups* established under section 1395ww(d)(4) of this title." 42 U.S.C. § 300gg-18(e) (emphasis added). To understand why requires a brief understanding of diagnosis-related groups ("DRGs") and the evolution of their usage. A DRG is part of a payment methodology essential

---

[11] It is not clear whether Plaintiffs and their amici agree on the definition of "charges." When pressed for a definition at oral argument, Plaintiffs stated that a charge is "somewhere in between" the chargemaster rate and the amount billed, noting that it is "not the amount that the hospital normally bills and expects to be paid, nor is it an amount that is simply a rate on the chargemaster sheet." May 7, 2020 Hr'g Tr. at 8:21–25. This position appears to be in some tension with the proposition that a chargemaster contains all charges. *See* Br. of 37 State Hospital Associations ("[T]he "chargemaster" remains a hospital's *only* universal list of charges for services."); *cf. DiCarlo*, 530 F.3d at 264 (finding that in the context of a specific agreement, "'all charges' unambiguously can only refer to [the hospital's] uniform charges set forth in its Chargemaster") (cited in Br. of 37 State Hospital Associations at 8 n.16).

to Medicare reimbursement.  *See* AR 4769; AR 5285–86.  In contrast to retrospective methods of payment, under the DRG methodology, hospitals and insurers agree in advance on a flat-fee reimbursement for inpatient care; "[u]pon each hospital discharge, all of the diagnoses, procedures, complications[,] co-morbidities, and other patient characteristics are coded" and assigned to medical-severity DRG groups.  AR 5285.  To simplify:  Medicare reimburses hospitals through "bundled" payments for certain inpatient treatments, and a hospital's reimbursement for a particular patient does not vary based on certain supplies or medication amounts used, such as how many pain pills or bags of IV fluid the patient requires (assuming relevant predefined factors were unaffected).  *See* Def.'s Mot. at 12–13.  Commercial insurers have followed suit, *see* AR 5285, relying on Medicare's list of DRGs but using different reimbursement formulas, particularly because they can extract additional discounts from hospitals, *see* AR 4769.

A DRG combines the relevant items and services into a single charge, which is not listed on a chargemaster.  Def.'s Mot. at 13.  And in the context of private insurers, the DRG charge is generally the product of negotiations.  As a result, the agency contends, the statute's requirement that the list of standard charges include those for DRGs is, at a minimum, inconsistent with Plaintiffs' argument that "standard charges" unambiguously means chargemaster charges.  *See* Def.'s Mot. at 12–14.

The Court agrees.  The statute requires each hospital to post "a list of [their] standard charges for items and services provided by the hospital, *including* for diagnosis-related groups." 42 U.S.C. § 300gg-18(e) (emphasis added).  But it is undisputed that the costs or bundled charges associated with DRGs do not appear on a chargemaster, which only lists the prices of individual items and services.  84 Fed. Reg. at 65,539.  That alone suggests that "standard

charges" has to mean something other than just the "chargemaster charges."  After all, "the term 'including' is not one of all-embracing definition[] but connotes simply an illustrative application of the general principle." *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) (citations omitted); *see also P.R. Mar. Shipping Auth. v. Interstate Commerce Comm'n*, 645 F.2d 1102, 1112 n.26 (D.C. Cir. 1981) ("It is hornbook law that the use of the word 'including' indicates that the specified list of carriers that follows is illustrative, not exclusive." (citation omitted)); Antonin Scalia & Bryan A. Garner, Reading Law:  The Interpretation of Legal Texts 132 (2012) ("[T]he word include does not ordinarily introduce an exhaustive list . . . .").

Although section 2718(e) references the DRGs established *by* Medicare, it does not limit the "items or services" to those provided *to* Medicare patients.  As noted above, third-party payers use the Medicare DRGs to negotiate their own DRGs and bundled packages that are coded differently than DRGs, and which also may be priced differently than Medicare rates.  *See* 84 Fed. Reg. at 65,534 (discussing the use of payer-specific codes or a Healthcare Common Procedure Coding System to identify service packages based on procedures).  But none of that information appears on a hospital chargemaster, which at a minimum suggests that "standard charges" is not limited to chargemaster charges.[12]

---

[12] Plaintiffs' and amici's varying explanations of the DRG clause's purpose further underscore the ambiguity here.  The State Hospital Associations argue that it was intended to make clear that this subsection did not supersede the already-existing Medicare transparency requirements for DRGs.  Br. of 37 State Hospital Associations at 11 n. 33.  Plaintiffs and the Chamber of Commerce argue that this clause simply clarifies that certain existing reporting procedures were to be left intact as part of Medicare's DRG reimbursement scheme, which provides for outlier payments (in connection with "costlier-than-expected care") based on the individual items or services.  Br. of Chamber of Commerce of the United States of America as Amicus Curiae in Supp. of Pls.' Mot. for Summ. J. ("Br. of Chamber of Commerce") at 15–17 (citing 42 C.F.R. § 412.84(g)–(h)) (other citations omitted), ECF No. 26-1; *see also* Pls.' Reply at 7–8.  But it is not entirely clear why Congress would have needed to address that issue in a provision that does

*   *   *

For the foregoing reasons, Plaintiffs' argument that "standard charges" unambiguously means "chargemaster charges" is unpersuasive.  But that does not resolve the statutory question, as under *Chevron* step two, CMS's interpretation must still be reasonable.

## 2. Chevron *Step Two*

The agency explained when it promulgated its Rule that there is no "singular 'standard' that applies to all identifiable groups of patients," and thus it attempted to define what is "standard" by reference to different patient subsets.  84 Fed. Reg. at 65,541.  The agency argues that the Final Rule's five categories of charges are "standard" for each of those patient subgroups and that its interpretation of the statute is, at a minimum, a reasonable one.[13]

As discussed above, Plaintiffs argue that the statute unambiguously requires the publication of only one category of information—the chargemaster rates (gross charges).  But with respect to *Chevron* step two (that is, once the Court has decided that the statute is ambiguous), Plaintiffs' principal argument is that it is an unreasonable interpretation to require publication of payer-negotiated charges.  *See, e.g.*, Pls.' Mot. at 11, 13, 15; *see also* May 7, 2020 Hr'g Tr. at 15 (admitting that if the statute is ambiguous, the question of whether a requirement to publish discounted cash prices is reasonable is a "closer question").  Plaintiffs argue that for

---

not disturb the Medicare reimbursement scheme and simply addresses pricing transparency to the public at large.  In fact, section 2718(e) refers only to section 1395ww(d)(4), while discussions of outlier payments are in section 1395ww(d)(5).

[13] The agency argues that its construction, which requires the disclosure of prices for the "vast majority of patients" and gives effect to the DRG clause, is the best reading of the statute.  Def.'s Mot. at 10–11.  But it also recognizes that the Court need not decide that issue, *id.*, because under step two of *Chevron*, the Court need only determine whether the "agency's definition [of 'standard charges'] is 'based on a permissible construction of the statute, which requires only that its construction be a reasonable one," *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1320 (D.C. Cir. 1998) (quoting *Chevron*, 467 U.S. at 843, 844) (internal quotation marks omitted).

20

each item or service a hospital may (and often does) negotiate particularized reimbursement amounts with different third-party plans, and as a result, the Final Rule could require an individual hospital to publish a list of charges that is "300 lines long with dozens of columns or could lead to 100,000 rows of data with millions of fields."  Pls.' Mot. at 25 (citing 84 Fed. Reg. at 65,575).  The sheer number of charges that might have to be published, Plaintiffs contend, is entirely inconsistent with any of these being standard.

It is a close call whether the agency reasonably interpreted "standard charges" to include rates negotiated with third-party payers.  After all, the more charges published for any one item or service, the less any one of those charges can be considered "usual" or "customary."  But in this exceptionally unique market, the Court cannot conclude that CMS's interpretation is unreasonable.  It is undisputed that different groups (or sub-groups) of patients have different economic relationships with both hospitals and third-party payers; that some patients have no third-party coverage; and that the amounts paid to hospitals for items and services differ across those various patient groups.  The agency's decision to define "standard charges" based on the different patient groups is thus a reasonable construction that accounts for the peculiar dynamics of the health care industry.  For self-pay patients, for example, "standard charges" are typically the gross charges or discounted cash prices.  But such patients make up far less than 50% of the market, and for the remaining patients, there simply is no single "standard charge."  Instead, amounts paid to hospitals for patients with third-party coverage depend not only on the specific insurer or plan, but also on various other factors, including patients' particular insurance plans. *See* 84 Fed. Reg. at 65,546–47.  Given the complex economic relationships among the insured patients, hospitals, and third-party intermediaries, the agency reasonably interpreted "standard charges" as including the rates negotiated with third-party payers.  And the agency specifically

focused on the contracted rates as the standard charges because such rates can be made public in advance and are not dependent on the (sometimes unpredictable) variables that impact the actual amounts paid to the hospital. *See id.*[14]

Plaintiffs' attempts to analogize charges in the hospital billing to prices in other industries only highlight the uniqueness of this market. *See* Pls.' Reply at 3–4. For instance, Plaintiffs use menu prices to argue that the Rule requires publication of non-standard rates. They argue that a restaurant's menu price for a sandwich is the standard charge; if the restaurant offered to supply hundreds of sandwiches for a discounted price at a certain event, those prices would not be standard. *See id.* This analogy seems inapt here. In the restaurant context, the price on the menu is the amount most customers will pay, with discounts being the exception. The situation is flipped in the hospital market, where the listed prices (i.e., the chargemaster rates) are paid by only about 10% of patients—and are substantially higher than the amounts insurers actually pay. *See* Richman, *supra*, at e101. And unlike the modest discounts that restaurants (or sellers in other industries) may offer, hospital "discounts" are significantly more than the actual payment rendered, several times over. One study found that hospitals may inflate the costs in the chargemaster "more than fourfold" and that some services can "have charge-to-cost ratios of almost 30."[15]

---

[14] The agency recognized that "the actual paid amounts are dependent on information that the hospital does not have without contacting the insurer to determine the specifics of the patient's obligations under the patient's contract with the insurer." 84 Fed. Reg. at 65,546–47. And in the DRG context, the agency only required the base negotiated rate, which does not account for adjustments that may affect final payment. *See id.* at 65,547.

[15] *What Is a Chargemaster?*, *supra* note 2. Further illustrating the inapplicability of the menu analogy is the following data from California in 2002: "The average chargemaster price for an appendectomy . . . was $18,229; the indigent uninsured paid $1,783, the Medicare payment was $4,805, the managed care payment $6,174, and payments by the non-indigent uninsured was $8,143.3." AR 4772.

In sum, the agency's definition cannot be considered "manifestly contrary to the statute," *Chevron*, 467 U.S. at 844, as it is the only construction that includes the amounts paid for the items and services provided by hospitals to most patients.  Where, as here, the goal of the statute is "[b]ringing down the cost of health care coverage," it is reasonable for the agency to have construed the statute to require the publication of charges that would impact the largest group of patients.  *See Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 439 (2011) ("The title of a statute or section can aid in resolving an ambiguity in the legislation's text." (citation and alteration omitted)).  Viewed "in light of the Act's text, legislative history, and purpose," the agency's decision to account for the complexities of hospital billing and establish a definition based on actual payment rendered is certainly permissible.  *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 68 (D.C. Cir. 2000) (citation omitted).

For similar reasons, the agency's construction requiring the publication of privately negotiated DRG rates also does not render it unreasonable.  As noted above, Plaintiffs argue that, even assuming "standard charges" can mean paid rates, the DRG clause only applies to payments by Medicare, not private insurers.  *See* Pls.' Reply at 7–9.  But Medicare reimbursement for DRGs are set through a formula that is part of the agency's annual rulemaking for Medicare's inpatient prospective payment system, *see, e.g.*, *id.*; 84 Fed. Reg. at 42,044, whereas section 1395ww(d)(4) primarily gives the Secretary the authority to establish DRGs.  Moreover, a different statute already requires Medicare rate information for DRGs to be published, *see* 42 U.S.C. § 1395ww(d)(6), so it would be odd to think Congress required its publication (and the publication of nothing else) again in section 2718(e).  The agency's interpretation thus reads the DRG clause to have independent meaning and to include third-party negotiated rates for service

packages, which have become increasingly more prevalent between hospitals and private insurers.  *See* AR 5285; AR 4769.

As for the de-identified minimum and maximum charges, the agency's decision to include them as "standard charges" is also reasonable.  After all, these charges are a subset of payer-negotiated charges and supplement the list by providing a range of the highest and lowest charges that a hospital has negotiated with all third-party payers for an item or service.  *See* 84 Fed. Reg. at 65,554.  They therefore act as a "meaningful anchor" for consumers who are using the negotiated rates to compare their options, further advancing the statute's objectives. *See id.* at 65,554–55 (discussing how knowledge of payer-specific negotiated charges in addition to the de-identified charges could ultimately "promote value choices in obtaining . . . healthcare services[] and may also promote value choices in obtaining a healthcare insurance product").[16]

To be sure, there may have been other reasonable interpretations of the statute.  The Court is "mindful[, however,] that [its] role is not to determine . . . the most reasonable interpretation of the statute, but to make sure that the [agency's] interpretation is reasonable, that is, 'rational and consistent with the statute.'"  *S. Calif. Edison Co. v. FERC*, 116 F.3d 507, 517 (D.C. Cir. 1997) (citation omitted).  The agency's Rule is exacting, but the demands flow from

---

[16] Plaintiffs further argue that a rule that requires multiple sets of charges violates the statutory mandate that hospitals publish "a list."  Pls.' Mot. at 13–14.  The agency does not dispute that the statute mandates the publication of only a single list but rejects Plaintiffs' suggestion that the provision forecloses the publication of multiple types of charges on that list.  Def.'s Mot. at 20. The agency is right that a list can contain multiple categories, an argument reinforced by the fact that hospitals can publish their charges in a single data file.  *Id.*  Section 2718(e) expressly authorizes the Secretary to issue guidelines as to how hospitals shall establish and make public the list of standard charges, and there is nothing unreasonable about the Secretary requiring that several categories be compiled into one list that takes the form of a single date file.

the congressional determination about the role of price transparency in bringing down health care costs and the reality of hospital billing.[17]

Plaintiffs make a final argument against the agency's interpretation by resisting altogether the application of the *Chevron* framework.  In their view, the agency's interpretation warrants no deference because the Final Rule emerged not as a product of the agency's expertise but as a response to the President's executive order, which "prescribed the very definition of 'standard charges' that the agency adopted."  Pls.' Reply at 10; *see also* Pls.' Mot. at 14.  The executive order, however, mandated only that the agency *propose* a rule that included standard charges.  Def.'s Mot. at 22.  And importantly, CMS had been exploring new definitions for "standard charges" well before the President's order.  *See* 83 Fed. Reg. at 20,549.  The Final Rule recites the steps the agency had taken to obtain input on price transparency issues for the eighteen months before the Rule was finalized—including hosting listening sessions and sending out requests for information in 2018.  *See* 84 Fed. Reg. at 65,594; *see also id.* 39,573–74.  Although the President may have directed the agency to propose the rule, that, without more, does not mean that *Chevron* is inapplicable.

### 3.     Penalties

Plaintiffs argue separately that the statute does not empower CMS to impose penalties for failures to comply with the publication requirements.  *See* Pls.' Mot. at 16–19.  Section

---

[17] The D.C. Circuit recently held that a different HHS price transparency regulation exceeded the agency's authority.  *See Merck*, 2020 WL 3244013.  There are crucial differences between *Merck* and this case.  Perhaps most importantly, in *Merck*, the agency relied on its general authority to promulgate rules necessary to efficiently administer its Medicare and Medicaid functions and was unable to show a nexus between the rule and the implementation of those programs.  *See id.* at *5. (citation omitted).  Here, in contrast, the Affordable Care Act expressly requires that hospitals publish their "standard charges" and the agency used its expertise to interpret the term in the absence of a congressional definition.

2718(b)(3), from which CMS draws its authority, reads: "The Secretary shall promulgate regulations *for enforcing the provisions of this section* and *may provide for appropriate penalties*." (emphasis added).  Despite this express language, Plaintiffs contend that the word "section" is a scrivener's error, and that Congress authorized the Secretary to enforce only subsections (a) and (b).  *See* Pls.' Mot. at 16–19.  Pointing to the ACA's "complex" legislative process, Plaintiffs argue that when the enforcement provision was first drafted, it was intended to apply to the medical loss ratio ("MLR") provisions (subsections 2718 (a), (b)) only, and that the provision requiring the publishing of standard charges, on the other hand, had no such enforcement authorization.  *Id.* at 16–17.  The provisions were eventually consolidated, but according to Plaintiffs, the enforcement provision was never intended to reach the "standard charges" subsection.  *See id.* at 18–19.

The language authorizing the Secretary to impose penalties does indeed appear in a strange location in the section—subsection (b)(3), in a section ranging from (a) to (e).  Even so, subsection (b)(3) expressly provides that in enforcing the *section*, the Secretary may impose penalties.  And although the "standard charges" provision did not have an enforcement provision early on in the drafting process, Plaintiffs point to nothing in the legislative process that indicates Congress did not want the Secretary to enforce section 2718(e) once Congress saw fit to combine the MLR and standard charges provisions into one section.  It can hardly be said that authorizing the Secretary to impose penalties to enforce the entire section is "demonstrably at odds with the intentions" of Congress.  Def.'s Mot at 25 (citing *Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991)).  This is particularly true in light of the fact that subsections (c), (d), and (e), which were drafted separately from the MLR provision, reference the provisions in subsections (a) and (b), indicating that Congress was aware of the interplay between the consolidated MLR and standard

charge subsections. *See id.* at 26 (citing 42 U.S.C. § 300gg-18(c), (d)).[18]  And, as the agency

notes, because the MLR provisions are in subsections (a) *and* (b), Plaintiffs' alternative

interpretation does not make sense because it would foreclose the Secretary from enforcing

subsection (a).  *Id.* at 25–26; *see also* Pls.' Reply at 13 n.14 (admitting that replacing "section"

with "subsection" only would be insufficient to correct scrivener's error).

Plaintiffs insist that reading the statute to permit the Secretary to enforce the entire

section and "provide for appropriate penalties" would lead to an "absurd result" because it would

authorize the Secretary to penalize the National Association of Insurance Commissioners.  Pls.'

Mot. at 18; Pls.' Reply at 14 (citation omitted).  But the statute is permissive, and an over-

inclusive permissive provision is certainly not unthinkable.  *See* Def.'s Mot. at 27 (citation

omitted).  To the extent Plaintiffs are concerned about the Secretary penalizing the representative

of separate State sovereigns, Pls.' Mot. at 18–19, the enforcement provision itself is limited to

the imposition of *appropriate* penalties.  In short, while the enforcement provision may have an

awkward placement, its plain language forecloses Plaintiffs' argument.

## B.  First Amendment

Plaintiffs mount an independent attack on the Final Rule, contending that it compels

speech in violation of the First Amendment.  The Parties dispute whether the Rule should be

subject to strict scrutiny, or, if it regulates commercial speech, which of the standards addressing

commercial speech should apply:  the more deferential one under *Zauderer v. Office of*

*Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985), or the more exacting one

---

[18] For instance, subsection (c)—a subsection that was moved around from drafting to the
enactment—charges the National Association of Insurance Commissioners with "establish[ing]
uniform definitions of the activities reported under subsection (a)," while subsection (d) permits
the "Secretary [to] adjust the rates in subsection (b)."  42 U.S.C. 300gg-18.

under *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980).  Plaintiffs contend that the Rule fails to satisfy any of the standards, while the agency argues that it meets each one.

### 1.      Standard of Review

As for the standard of review, Plaintiffs argue that the Rule is not directed at commercial speech because it does not regulate advertising and because it "imposes an affirmative obligation on hospitals to speak" and, as a result, is subject to strict scrutiny.  Pls.' Mot at 19–21.  Plaintiffs' half-hearted argument here relies on several inapposite cases that applied strict scrutiny where the government sought to regulate communicative content or target a specific message or speaker.  *See* Pls.' Mot. at 19 (citing *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) (regulation requiring crisis pregnancy centers to post information about how to obtain abortions—"the very practice that petitioners are devoted to opposing")); *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015) (sign restrictions that varied and "depend[ed] entirely on the communicative content of the sign"); *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) (regulation "disfavored marketing, that is, speech with a particular content," as well as specific speakers who were engaged in marketing on behalf of pharmaceutical manufacturers); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572–73 (1995) (state's application of public accommodation laws required private citizens marching in a parade to incorporate a group bearing a message the parade marchers did not want to convey, thereby "alter[ing] the expressive content of their parade.").  But Plaintiffs do not identify what expressive message or communicative content is being altered, suppressed, or compelled by the Final Rule.[19]

---

[19] In *National Association of Manufacturers v. SEC*, the D.C. Circuit stated that the Supreme Court's decision in *Hurley* had stressed that outside of commercial advertising, speakers—

Relying on *Spirit Airlines, Inc. v. Dep't of Transp.*, Plaintiffs argue that commercial speech is limited to "proposing a commercial transaction." Pls.' Mot. at 20 (citing 687 F.3d 403, 412 (D.C. Cir. 2012) (upholding airfare advertising rules)). But the Court in *Spirit Airlines* was weighing whether price advertising was *merely* proposing a commercial transaction; to the extent it was, advertising regulations triggered only the level of scrutiny applicable to commercial speech. 687 F.3d at 412. It does not follow that a requirement to publish prices is the regulation of non-commercial speech and should therefore be subject to strict scrutiny. Indeed, plaintiffs in *Spirit Airlines* argued that their price advertising went beyond proposing a transaction by making a political point about the burdensome taxes imposed on airfare and that a regulation prohibiting disclosing government taxes and fees "prominently" should therefore trigger strict scrutiny. *Id.* at 411. The D.C. Circuit rejected this argument, stating that even where "speech cannot be characterized merely as proposals to engage in commercial transactions, it is nonetheless commercial in certain circumstances, for instance when it is an advertisement, refers to a specific product, and the speaker has an economic motivation for it" and ultimately applying *Zauderer*. *Id.* at 412, 414–15 (alterations, international quotation marks, and citation omitted). To the extent that the publication of charges qualifies as a form of expression, the Final Rule is a regulation of commercial speech and is thus not subject to strict scrutiny.

---

including business corporations—"ha[ve] the right to tailor the[ir] speech" and that such a right "applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." 800 F.3d 518, 523 (D.C. Cir. 2015) (quoting *Hurley*, 515 U.S. at 574). But the fact that a statement of fact merits First Amendment protection does not resolve what level of scrutiny is triggered; indeed, the D.C. Circuit did go so far as to decide the applicable standard in *NAM*, concluding that the regulation at issue did not satisfy *Central Hudson* or strict scrutiny. *Id.* at 524.

But even if strict scrutiny does not apply, is the Final Rule subject to intermediate scrutiny under *Central Hudson* or the "reasonable" standard under *Zauderer*?  The D.C. Circuit once explained that "where laws are 'directed at misleading commercial speech,' and where they 'impose a disclosure requirement rather than an affirmative limitation on speech,' *Zauderer*, not *Central Hudson*, applies."  *Spirit Airlines,* 687 F.3d at 412 (quoting *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010)).  But more recently, the D.C. Circuit, sitting en banc, has held that *Zauderer* is not limited just to situations in which the government's interest is to protect against deception.  *Am. Meat Inst. v. U.S. Dep't of Agric.* ("*AMI* "), 760 F.3d 18, 22 (D.C. Cir. 2014) (en banc).

Plaintiffs argue that *AMI* should be read in light of *National Association of Manufacturers v. SEC* ("*NAM*"), 800 F.3d 518, 523 (D.C. Cir. 2015), which refused to apply *Zauderer* to "compelled disclosures that are unconnected to advertising or product labeling at the point of sale."  *Id.* at 523–24.  But *NAM* reached that conclusion because issuers were required to disclose online and in their reports to the Securities and Exchange Commission whether their minerals were "conflict free"; issuers were thus required to convey a message that their products were ethically tainted and that they had "blood on [their] hands."  *Id.* at 530; *see also id.* at 523 (citing *United States v. United Foods, Inc.*, 533 U.S. 405 (2001) (holding that the First Amendment "may prevent the government from compelling individuals to express certain views or from compelling certain individuals to pay subsidies for speech to which they object.")).  In fact, the regulation there was "directed at achieving overall social benefits" and was different from the Commission's ordinary investor protection rules because it "was not 'intended to generate measurable, direct economic benefits to investors or issuers.'"  *Id.* at 521–22 (citation

omitted).  The court therefore concluded that "*Zauderer* has no application to this case."  *Id.* at 524.

Here, in contrast, the Final Rule requires the publication of the payments that hospitals receive for their items and services for differently situated patients; that information does not contain any expressive component similar to *NAM*.  And this information—unlike the *NAM* compelled disclosure which was "unconnected" to labeling at the point of sale, 800 F.3d at 522—is directly relevant to "the terms . . . under which the services will be available," *AMI*, 760 F.3d at 22 (quoting *Zauderer*, 471 U.S. at 651).  To be sure, payer-negotiated rates may be subject to further adjustments between hospitals and insurers and, in certain situations, hospitals may offer self-pay patients additional discounts or charitable forgiveness.  *See* Pls.' Mot. at 23, 27–28.  But information that hospitals must publish under the Final Rule is closely linked to the payment rendered, whether by the patients themselves or third-party payers, and is thus far more connected to the mechanics of hospital billing and patients' economic benefits than a loaded description of conflict minerals directed at alleviating social harm generally is to the sale of securities.

The application of *Zauderer* here is also consistent with more recent cases.  In *National Institute of Family & Life Advocates*, for instance, the Court refused to apply *Zauderer* to a rule requiring pregnancy clinics to conspicuously post notices informing women of the existence of abortion procedures, holding such a requirement was "not limited to 'purely factual and uncontroversial information about the terms under which . . . services will be available.'" 138 S. Ct. at 2372 (omission in original) (citing *Zauderer*, 471 U.S. at 651)).  Although the Court did note that the disclosure in *Zauderer* governed "commercial advertising," it also described *Zauderer* as an "example" of how the "Court's precedents have applied a lower level of scrutiny

to laws that compel disclosures in certain contexts."  138 S. Ct. at 2372.  But the Court not only left "certain contexts" undefined, it also said nothing indicating that the *Zauderer* framework is limited to compelled advertising or point-of-sale disclosures—even as it analyzed a compelled disclosure that was not an advertisement.  *See id.*; Def.'s Reply Mem. in Further Supp. of Def.'s Mot. at 16 ("Def.'s Reply"), ECF No. 30.

 And recently, cases that have examined regulations touching on the display of prices have suggested that, to the extent that price regulations implicate the First Amendment, *Zauderer* may be the appropriate standard so long as the regulation does not impede a message the speaker would like to convey.  In *Expressions Hair Design v. Schneiderman*, for example, the Supreme Court held that a New York law banning merchants from imposing a surcharge for the use of a credit card was a speech regulation.  137 S. Ct. 1144 (2017).  Rejecting the argument that the rule regulated only conduct, the Court held that the law was a speech restriction because it regulated *how* sellers could communicate their prices (e.g., "$10, with a 3% credit card surcharge" was prohibited) and remanded the case to the Second Circuit to determine whether the *Zauderer* or *Central Hudson* framework should apply.  *Id.* at 1151.  On remand, the Second Circuit suggested that *Zauderer* would apply if the regulation simply "compel[led] the truthful disclosure of an item's credit-card price," but if it barred merchants from describing a pricing scheme or relaying any other information they wanted to express, then *Central Hudson* might apply.  *Expressions Hair Design v. Schneiderman*, 877 F.3d 99, 103–04 (2d Cir. 2017); *accord Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1176 (9th Cir. 2018) (applying *Central Hudson* where regulation prohibited retailers from posting a single sticker price and charging an extra fee for credit card use but permitted retailers to post single sticker price and offer discounts); *cf. Nicopure Labs, LLC v. FDA.*, 944 F.3d 267, 292 (D.C. Cir. 2019) (holding that a free sample ban

is a typical price restriction and the incidental effect of requiring the seller to communicate only the lawful price has "no speech component like the price-related commentary in *Expressions Hair Design* that would implicate the First Amendment").[20]

The Court therefore holds that *Zauderer* applies here, and the Final Rule must therefore be reasonably related to the agency's interests and cannot be so unjustified or unduly burdensome that it chills protected speech. *See United States v. Philip Morris USA Inc.*, 855 F.3d 321, 327 (D.C. Cir. 2017).

### 2.     Zauderer

Plaintiffs do not appear to dispute that the agency's asserted interest in increasing transparency is substantial. Instead, they argue that the Rule is unjustified because the publication of hundreds of prices will "confuse" patients and "frustrate . . . [their] decision-making." Pls.' Mot. at 27. They further contend that the regulation is unduly burdensome. *Id.*

The agency has explained it has two interests: "providing consumers with factual price information to facilitate more informed health care decisions" and "lowering healthcare costs." Def.'s Mot. at 32 (citing 84 Fed. Reg. at 65,544–45). According to the agency, publications of the five types of charges advances those interests. Patients want to make informed choices, but the lack of price transparency is one of the biggest hurdles they face in navigating the health care market to find the best value. Def.'s Mot. at 34. Case studies from various states have shown that where patients have access to pricing information, they can and will use price transparency

---

[20] Although Plaintiffs are concerned that the Rule's publication requirements may prove to be confusing to patients, they admit that nothing in the Rule prevents them from adding qualifiers explaining patients' out-of-pocket costs. May 7, 2020 Hr'g Tr. at 16–17. Plaintiffs contend that the ability to add speech "does not cure the underlying lawfulness," *id.*, but a speaker's ability to express or add a message is relevant to the question of whether *Zauderer* or *Central Hudson* applies.

tools to inform their health care choices.  *Id.* at 33.  Consumers in New Hampshire and Maine, which have required the publication of select negotiated charges, have used pricing information to their benefit, which has created downward pressure on health care costs.  *See id.*  Research suggests that greater price transparency, "when available to the entire market," can also reduce health care costs.  *Id.*  And access to pricing information allows patients and doctors to have the "cost-of-care conversations at the point of care."  84 Fed. Reg. at 65,530.  The publication of charges will allow the agency to further its interest of informing patients about the cost of care, which will in turn advance its other interest—bringing down the cost of health care.

While it is true that the published charges may not be the out-of-pocket costs for all patients, this does not mean that the disclosures are so incomplete that they are no longer "purely factual and uncontroversial."[21]  Pls.' Mot. at 26 (quoting *Zauderer*, 471 U.S. at 626).  Even *Central Hudson* recognizes that although some disclosures "communicate[] only incomplete version of the relevant facts, the First Amendment presumes that some accurate information is better than no information at all."  447 U.S. at 562 (citation omitted).  Plaintiffs do not meaningfully dispute that for some patients, such as those on high deductible health plans, the data will provide at least a useful estimate of the expense of certain hospital services, if not their actual out-of-pocket rates.  It may be that those patients will sometimes have to take additional steps to determine their out-of-pocket costs, but unlike chargemaster rates, this information will allow patients to make those calculations.  Even where patients may be unable to compute their health costs on their own, various developers have created platforms that aggregate pricing information to let consumers conduct price searches.  *See, e.g.*, AR 5415–16.  And more

---

[21] Plaintiffs take issue with the agency requiring the publication of too many charges while simultaneously arguing the Rule is inadequate because it omits additional information linked to patients' specific contractual relationships with their insurers.

generally, all of the information required to be published by the Final Rule can allow patients to make pricing comparisons between hospitals.  *See* Def.'s Mot. at 36.

Plaintiffs argue that requiring insurers to publish patients' out-of-pocket costs would be more useful to patients and point to an ongoing rulemaking that would require just that.  *See* Pls.' Reply at 18–19.  But *Zauderer* (like *Central Hudson*) does not require a perfect fit, only a reasonable one.  Plaintiffs also ignore that the Rule enables patients to compare discounted cash prices with negotiated rates to determine which option is the most affordable.  *See* Def.'s Reply at 21 (citing 84 Fed. Reg. at 65,552).[22]  Requiring insurance companies to publish patients' out-of-pocket rates does not further the agency's goals of empowering patients in precisely the same way.  And, as discussed further below, price transparency advances the government's *other* interest—lowering health care costs.

Plaintiffs focus on the logistical and financial burdens of compliance with the Rule.  But the question of whether a regulation is "unduly burdensome" looks to whether *speech* is burdened or chilled.  *See* Def.'s Reply at 21; *Zauderer*, 471 U.S. at 651 ("We recognize that unjustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech."); *Nat'l Inst. of Family & Life Advocates*, 138 S. Ct. at 2377 (describing cases holding that under *Zauderer*, disclosure requirements can "extend 'no broader than necessary'" because "[o]therwise, they risk 'chilling' protected speech" (internal citations omitted)); *AMI*, 760 F.3d at 27 ("*Zauderer* cannot justify a disclosure so burdensome that it essentially operates as a restriction on constitutionally protected speech . . . .  Nor can it

_____

[22] In particular, the information can help certain patients determine whether paying the discounted cash price is more affordable than processing claims through their insurance providers.

sustain mandates that "chill protected commercial speech." (alterations omitted) (citations omitted)).

Plaintiffs argue that the publication of payer-specific negotiated rates will chill negotiations between hospitals and insurers.[23]  Pls.' Reply at 26.  But the Rule requires only the publication of the final agreed-upon price—which is also provided to each patient in the insurance-provided explanation of benefits—and not any information about the negotiations themselves.[24]  Plaintiffs are essentially attacking transparency measures generally, which are intended to enable consumers to make informed decisions; naturally, once consumers have certain information, their purchasing habits may change, and suppliers of items and services may have to adapt accordingly.  (This was implicit in *AMI*, which recognized that consumers wanted country-of-origin labels and that the mandate was spurred in part by "buy American" interests. *AMI*, 760 F.3d at 324.)  Hospitals may be affected by market changes and need to respond to a market where consumers are more empowered, but the possibility that the nature of their negotiations with insurers might change is too attenuated from the compelled disclosure to make the Rule unlawful under *Zauderer*.  And although Plaintiffs assert that the Rule threatens to shut

---

[23] Plaintiffs argue that the government is trying to "have its cake and eat it too" by arguing that *Zauderer* applies beyond compelled advertising regulations without also accounting for burdens that go beyond chilling concerns.  Pls.' Reply at 26.  But the agency's position that *Zauderer* goes beyond advertising is rooted in the en banc D.C. Circuit's holding in *AMI*.  And although Plaintiffs want the "unduly burdensome" analysis to encompass more than just the chilling of speech, they cite no authority for that proposition and do not explain how far the analysis should extend, instead demanding that the government propose such a test.  *See id.*

[24] The fact that these charges will be revealed to consumers (after a hospital procedure) severely undermines Plaintiffs' argument that negotiated rates constitute trade secrets, Pls.' Mot. at 24–25.  *See* 84 Fed. Reg. at 65,544 (discussing the various ways these rates are disseminated to the public, including through explanations of benefits and certain state databases).

down negotiations altogether, Pls.' Reply at 26–27, this is contradicted by their arguments implying that negotiations would continue but ultimately benefit insurers, *see id.* at 17.

This brings us to Plaintiffs' final argument here: that the Rule could actually result in anti-competitive consequences and cause costs to increase, which would obviously be contrary to the agency's asserted interest of bringing down health care costs. Pls.' Reply at 17–18. Whereas *Central Hudson* requires the government to show that its regulation "directly and materially advance[s] the asserted governmental interest[,] . . . *Zauderer* employs 'less exacting scrutiny.'" *Cigar Ass'n of Am. v. FDA*, 315 F. Supp. 3d 143, 171 (D.D.C. 2018) (citations omitted). Although *Zauderer*'s means-end fit requirement may be more stringent than rational basis review, *AMI*, 760 F.3d at 33–34 (Kavanaugh, J., concurring), the "evidentiary parsing" required in *Central Hudson* is still "hardly necessary," *id.* at 26 (majority opinion) (citation omitted). And under *Zauderer,* the constitutionality of a regulation "does not hinge upon some quantum of proof that a disclosure will realize the underlying purpose. A common-sense analysis will do. And the disclosure has to advance the purpose only slightly." *Cigar Ass'n of Am.*, 315 F. Supp. 3d at 171 (citing *Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 557 (6th Cir. 2012)).

Here, the agency relies on general economic principles and specific price studies in support of its theory that price transparency could decrease health care costs. *See* Def.'s Mot. at 33–34; Def.'s Reply at 20. Traditional economic analysis suggested to the agency that informed customers would put pressure on providers to lower costs and increase the quality of care. *See* 84 Fed. Reg. at 65,526. And the record contains studies touting the benefits of price transparency, supporting the agency's finding that such measures result in "lower and more uniform prices." *Id.*; *see also* AR 5008 ("[T]his paper provides evidence that price transparency

can be effective in the long run, especially when it is available to the entire market." (discussing effects of price transparency on imaging procedures)); AR 5679 ("Use of price transparency information was associated with lower total claims payments for common medical services."); AR 6716 ("[M]erely disclos[ing] charge prices (as opposed *to a more relevant price indicator*) is unlikely to translate into consumer savings." (emphasis added)).

To be sure, the evidence in the record is not definitive.  As Plaintiffs argue, some studies caution that increased price transparency may result in anti-competitive effects.  Pls.' Reply at 17 (citations omitted).  But CMS concluded that similar measures in Maine and New Hampshire have resulted in *increased* competition.  84 Fed. Reg. at 65,544.  While those examples do not *prove* that the Final Rule will be successful, the agency reasonably concluded they are more persuasive than a decades-old case study involving Danish ready-mixed concrete contracts and research predating the transparency measures promulgated at the state level.  *See, e.g.*, AR 4760; AR 5266–67 (cited in Pls.' Reply at 17).

In sum, the weight of evidence here satisfies *Zauderer*, and the Rule is therefore constitutional.[25]

---

[25] Even if *Central Hudson* applies here, the Final Rule likely satisfies it for the reasons discussed above.  *Central Hudson*'s requirement that a speech regulation be no more restrictive than necessary appears to focus on whether speech will be burdened.  447 U.S. at 570–71 ("The Commission also has not demonstrated that its interest in conservation cannot be protected adequately by more limited regulation of appellant's commercial expression. . . .  In the absence of a showing that more limited speech regulation would be ineffective, we cannot approve the complete suppression of *Central Hudson*'s advertising.").  Plaintiffs have not demonstrated that the Final Rule will suppress or alter any expressive content.  The agency also has shown its regulation would "'in fact alleviate' the harms it recited 'to a material degree.'"  *NAM*, 800 F.3d at 527 (citing *Edenfield v. Fane*, 507 U.S. 761, 771 (1993)).  The agency's reliance on numerous studies here is hardly comparable to the pure speculation undergirding other agency actions that have been struck down under *Central Hudson*.  *See, e.g.*, *Edenfield*, 507 U.S. at 771 (holding government did not demonstrate that ban on certain solicitation advanced government's asserted interests of preventing fraud where it "present[ed] no studies" and did not "disclose any anecdotal evidence" demonstrating such dangers existed); *NAM*, 800 F.3d at 526–27 & 525 n.21

### C.     Arbitrary and Capricious

Plaintiffs' final claim is that the Rule is arbitrary and capricious, and they largely echo their First Amendment arguments:  that there is a disconnect between the Rule and the agency's goal of improving patients' decision-making and that the Rule "imposes a disproportionately large cost" on the hospitals.  Pls.' Mot. at 27–28

Under the arbitrary and capricious standard, the scope of judicial review is deferential and narrow.  *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007); *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016).  The Court must "confirm that the agency has 'fulfilled its duty to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  *Tidwell*, 816 F.3d at 127 (internal quotation marks omitted) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  And where an agency's predictive judgments are implicated, the review standard is "particularly deferential."  *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009).  Once the Court is satisfied that the agency has discharged its duty, the Court "cannot substitute its judgment for that of the agency," and it must uphold the agency's decision, even it is of "less than ideal clarity."  *Defs. of Wildlife*, 551 U.S. at 658.

Plaintiffs first contest CMS's conclusion that information about third-party negotiated rates will provide meaningful information to patients about their own out-of-pocket costs.  According to Plaintiffs, that information will instead confuse patients and might deter them from

_____

(holding that SEC's mineral disclosure rule violated First Amendment because SEC could not quantify any benefits to show that the rule alleviated the targeted humanitarian issues and where one commissioner noted the rulemaking "lack[ed] any analysis of whether the benefits will materialize").

seeking care if they assume a higher negotiated rate correlates with higher out-of-pocket costs. Pls.' Mot. at 28; *see also* Br. of Chamber of Commerce at 21, ECF No. 26-1 ("[D]isclosure of negotiated reimbursement rates may . . . deter patients from obtaining medical care that they need, if individuals fail to recognize that their own financial exposure is much lower than the negotiated reimbursement rate that the insurer pays the hospital." (citing Sheetal M. Kircher et al., *Opaque Results of Federal Price Transparency Rules and State-Based Alternatives*, 15 J. Oncology Prac. 463, 463 (2019), https://ascopubs.org/doi/pdf/10.1200/JOP.19.00354)).

But the agency considered this argument and concluded that, on the whole, the Rule furthers the government's dual interests of informing patients *and* lowering the costs of health care. *See* Def.'s Mot. at 32–37. For some patients—those who are self-pay and those willing to pay cash—the published information will tell them their out-of-pocket costs, 84 Fed. Reg. at 65,528, 65,553, a fact Plaintiffs do not appear to contest. And more generally, these and other patients (and third-party analysis groups) will be able to make comparisons among and between the hospitals by reference to the amounts that different hospitals are paid for similar items or services.

Because the agency is exercising its predictive judgment in assessing the effects of price transparency, it needed only to "acknowledge factual uncertainties and identify the considerations it found persuasive." *Maryland v. EPA,* 958 F.3d 1185, 1210 (D.C. Cir. 2020) (quoting *Rural Cellular Ass'n*, 588 F.3d at 1105). The agency did just that by acknowledging the potential for patient confusion but concluding that on balance, the "vast majority" stood to benefit from "the increased availability of data, especially as it may be reformatted in consumer-friendly price transparency tools." 84 Fed. Reg. at 65,547. It also acknowledged that there are "no definitive conclusions on the effects of price transparency on the market" but discussed the

studies it found most relevant in the absence of a national model.  *Id.* at 65,548–49.  Such

uncertainty is not fatal to the Final Rule; indeed, it is because the "available data does not settle a

regulatory issue . . . [that] the agency [is entitled to] then exercise its judgment in moving from

the facts and probabilities on the record to a policy conclusion."  *State Farm*, 463 U.S. at 52.

Moreover, CMS reasonably concluded that the publication of just chargemaster rates

suffers from the same deficiencies Plaintiffs claim are associated with the publication of

negotiated rates.  Although chargemaster rates have been public for some time, consumers

remain "exceptionally frustrated at the lack of publicly available data to help ease [the burden of

understanding the costs of care]."  84 Fed. Reg. at 65,547.  This is likely because chargemaster

rates are paid in connection with a very small minority of patients and are thus generally

confusing for the majority of patients.  In fact, one of the sources on which the Chamber's Brief

relies criticizes *chargemaster* rates for being opaque and misleading.  *See* Kircher et al., *supra*, at

463 ("[B]ecause [the chargemasters'] listed prices likely do not reflect what a patient (or the

insurance company) will ultimately pay, it is unclear how useful this information is in making a

comparative cost-based decision." (citation omitted)).  The article further concludes that

"mandating the publication of chargemasters in their current form does little to empower patients

through better access to hospital price information and to create a consumer centered

marketplace."  *Id.*  Plaintiffs' proposed approach would appear to magnify any such defects.  *Cf.*

*Merck*, 2020 WL 3244013, at *6 ("[I]t is difficult to see how requiring the disclosure of ['a price

that's rarely paid'] to consumers generally promotes price transparency in any material way."

(quoting Oral Arg. Tr. at 39:1)).

Plaintiffs also argue that the agency woefully underestimated the costs of compliance,

which will outweigh any benefits of the Final Rule.  *See* Pls.' Mot. at 27–29.  But, as discussed

above, the agency did not act arbitrarily and capriciously in concluding that the Final Rule could

have substantial benefits.  Nor did the agency "ignore[] the evidence bearing on the [question] of

compliance costs."  Pls.' Mot. at 27 (citing *Butte County v. Hogen*, 613 F.3d 190, 194

(D.C. Cir. 2010)).  CMS recognized hospitals' concerns about the "thousands of lines of data

consumers would have to sift through" and technical hurdles in compiling the data into one file.

84 Fed. Reg. at 65,556.  It ultimately concluded, however, that a single data file[26] will be used

"by the public in price transparency tools, to be integrated into [electronic health records] for

purposes of clinical decision-making and referrals, or to be used by researchers and policy

officials to help bring more value to healthcare."  *Id.* at 65,555–56.  The agency even identified

previous types of Medicare data files that were of comparable size yet were easily accessible to

health care consumers.  *Id* at 65,556.

　　　When commenters disputed the agency's assumption that the hospitals' contracts and

prices were electronically available and remarked that much of the work would need to be done

manually, the agency suggested that hospitals request electronic copies of their contracts and rate

sheets from third-party payers.  *Id.* at 65,550.[27]  It also proposed a complementary rule that

would require insurers to post data, such as negotiated rates, in electronic form, which could

benefit "less resourced hospitals" in complying with the Rule.  *Id.* at 65,550–51.  It can hardly be

said hospitals' concerns about their burden fell on deaf ears.  And mindful of comments

describing compliance as a "herculean task" and recognizing that a short time frame would pose

---

[26] Requiring the data to be maintained in a single file is consistent with the statutory mandate that hospitals publish "*a* list."  § 300gg-18(e) (emphasis added).  Had the agency required or even permitted numerous data files, Plaintiffs certainly would have opposed that move, arguing that publishing multiple data files was too far removed from the requirement of a single list.

[27] Hospitals' best practices dictates that these charges already be available in contracts and their associated rate sheets.  84 Fed. Reg. at 65,546.

challenges for certain hospitals, CMS modified its rule and delayed its effective date by a year. *Id.* at 65,585.  That the agency's proposed solutions may not have been to Plaintiffs' satisfaction does not render the Rule arbitrary and capricious.

In sum, CMS considered commenters' concerns, echoed here in Plaintiffs' briefs, about the Rule but determined that those concerns were not persuasive.  By acknowledging conflicting data and articulating which information it found most convincing, the agency fulfilled its duty to examine the evidence before it and connect it to the Final Rule.

### IV.    Conclusion

For the reasons set forth above, Plaintiffs' Motion for Summary Judgment is denied, and Defendant's Motion for Summary Judgment is granted.


DATE:  June 23, 2020

CARL J. NICHOLS
United States District Judge